IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HUGHETTE CRUMPLER, | ) | CASE NO. C-1-02-131 |
| | ) | |
| Plaintiff, | ) | JUDGE SUSAN J. DLOTT |
| | ) | |
| vs. | ) | |
| | ) | |
| TELXON CORPORATION, et al., | ) | |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN W. PAXTON, SR., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

---

### MEMORANDUM IN SUPPORT OF
### TELXON CORPORATION AND SYMBOL TECHNOLOGIES, INC.'S
### MEMORANDUM IN OPPOSITION TO MOTIONS FOR SUMMARY
### JUDGMENT OF JOHN W. PAXTON, SR. AND HUGHETTE CRUMPLER

---

OF COUNSEL:

GOODMAN WEISS MILLER LLP

JAMES S. WERTHEIM (0029464)
KIMBERLY Y. SMITH (0066849)
JON J. PINNEY (0072761)
100 Erieview Plaza, 27th Floor
Cleveland, OH 44114-1882
(ph.) 216-696-3366 • (fax) 216-363-5835
wertheim@goodmanweissmiller.com
smith@goodmanweissmiller.com
pinney@goodmanweissmiller.com

**Attorneys for Defendants/Third-Party Plaintiffs**

## SUMMARY OF POINTS AND AUTHORITIES

Page

I.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Paxton Hires Crumpler as a $2,000 Per Day (Plus Expenses)
            Consultant Without Required Board Approval When Telxon
            Is On The Brink of Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    In the Face of a Merger, Paxton Creates a New Office for
            Crumpler, Gives Her An Employment Agreement With $150,000
            in Severance Benefits, Change in Control Agreements Worth
            $300,000, a $33,000 Signing Bonus, a $135,000 Relocation
            Package, and a $50,000 Bonus, Without Board Approval and
            in Violation of the Merger Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    Symbol Approaches in May 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            2.    Paxton Creates an Office for Crumpler and Hires Her
                  Without The Required Compensation Committee Approval . . . . . . . 7

            3.    Paxton Gives Crumpler an Employment Agreement With
                  1-Year Severance and a 1-Year Change in Control
                  Agreement Without Compensation Committee Approval . . . . . . . . . 14

            4.    The Merger Agreement is Signed On July 25, 2000,
                  Identifying Crumpler as Having only a 1-Year Change
                  in Control Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            5.    Paxton and Crumpler Back-Date the Amendment to the
                  Change in Control Agreement to Avoid the Restrictions
                  of the Merger Agreement, Giving Crumpler $300,000 Cash . . . . . . 22

            6.    Crumpler Submits an Undisclosed and Unauthorized
                  $200,000 Relocation Agreement Dated August 18, 2000 . . . . . . . . . 25

i

7.     **The Undisclosed and Unauthorized $33,000 Payment to Crumpler** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8.     **The Undisclosed and Unauthorized $50,000 Bonus Paid to Crumpler** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

9.     **The Undisclosed and Unauthorized $135,000 Relocation Payment That Crumpler Has Overnighted to Her Home Three Days Before Symbol Takes Over** . . . . . . . . . . . . . . . . . . . . . . . 29

D.     **Symbol and Telxon Investigate Paxton and Crumpler's Fraud** . . . . . . . . . . 32

E.     **Summary Table of the Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.     **LAW AND ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.     **Paxton is Not Entitled to Summary Judgment on Telxon and Symbol's Third-Party Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.     **The Fact that Telxon's Board Did Not Authorize Crumpler's Hiring or Paxton's Employment Agreements with Crumpler is an Undisputed Fact** . . . . . . . . . . . . . . . . . . . . . . . 35

a.     **Paxton misconstrues Delaware law and Telxon's By-Laws** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

In the Matter of Osteopathic Hospital Association of Delaware, 195 A.2d 759 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

In re Ivey & Ellington, Inc., 42 A.2d 508 (1945) . . . . . . . . . . . . 35

8 Del. C. § 142(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

b.     **Paxton's argument that he violated no contractual duties owed Symbol because he allegedly entered into all agreements with Crumpler prior to the date of the merger agreement ignores the plain terms of the merger agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2.    There Are Genuine Issues of Material Fact With Respect
to Whether Paxton Knowingly Concealed from
Telxon's Board Employment Agreements with Crumpler
and With Respect to Whether he Knowingly Failed to
Disclose to Symbol and Obtain Symbol's Consent to
Enter Into Post-Merger Agreements with Crumpler . . . . . . . . . . . . 40

Gaffin v. Teledyne, Inc., 611 A.2d 467 (Del. 1992)  . . . . . . . . . . . . . . 40

Empire Southern Gas Company v. Gray,
46 A.2d 741 (Del. Ch. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3.    8 Del. C. § 102(b)(7) and Telxon's Certificate of
Incorporation Do Not Bar Telxon's Breach of Fiduciary
Duty Claim Against Paxton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

8 Del. C. § 102(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

Emerald Partners v. Berlin, 2001 Del. Ch. LEXIS 20, *87 at n. 63  . . . . 42

In re ML/EQ Real Estate Partnership Litigation,
1999 Del. Ch. LEXIS 238  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4.    Paxton is Not Entitled to Summary Judgment on Telxon
and Symbol's Indemnification and Contribution Claims
Because Paxton, as a Corporate Officer, May Incur
Personal Liability to Third-Party Plaintiffs Under
Delaware Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Cahall v. Burbage, 121 A. 646 (Del. Ch. 1923) . . . . . . . . . . . . . . . 43, 44

Stewart Coach Industries, Inc. v. Moore,
512 F. Supp. 879 (S.D. Ohio 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

5.    Paxton is Not Entitled to Summary Judgment on his
Amended Counterclaims for Indemnification and
Advancement of Legal Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.    Crumpler is Not Entitled To Summary Judgment On Her
Complaint for Breach of Contract Claim or Telxon and
Symbol's Counterclaim for Fraud and Conversion as There
Are Multiple Issues of Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . 45

iii

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1.    **Genuine Issues of Material Fact Exist as to Whether
       Any of Crumpler's Agreements with Paxton Are
       Enforceable** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2.    **Paxton Did Not Have Actual or Apparent Authority
       to Hire Crumpler or Enter into Any of These Agreements** . . . . . . . . 48

       Billops v. Magness Construction Co., 391 A.2d 196
       (Del. S. Ct. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

       Lind v. Schenley Industries, Inc., 278 F.2d 79 (3rd Cir. 1960) . . . . . . . . 48

       System Investment Corp. v. Montview Acceptance Corp.,
       355 F.2d 463 (10th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

       Frank Sullivan Co. v. Midwest Sheet Metal Works,
       335 F.2d 33 (8th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-49

       International Boiler Works, Co. v. General Waterworks
       Corp.,372 A.2d 176 (Del. S. Ct. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 49

       Guyer v. Haveg Corporation, Del. Super.,
       58 Del. 88, 205 A.2d 176 (1964), aff'd . . . . . . . . . . . . . . . . . . . . . . . . . 49

       Haveg Corporation v. Guyer, Del. Super., 226 A.2d 231 (1967) . . . . . . 49

       3 C.J.S. Agency § 391 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       Arthur Jordan Piano Co. v. Lewis, Del. Super., 34 Del. 423,
       4 W.W.Harr. 423, 154 A. 467 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       Limestone Realty Co. v. Town & Country F.F. & C., Inc.,
       Del. Ch., 256 A.2d 676 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       Restatement of Agency § 135 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       2A C.J.S. Agency § 169 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

3.    **Telxon Did Not Waive Its Right to Offsets and Did
       Not Waive Any Defenses as Stated in Crumpler's
       Employment Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

State ex rel. Pucel v. Green (1956), 101 Ohio App. 531,
affirmed (1956), 165 Ohio St. 175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

4.    **Crumpler's Tortious Interference Claim Against
      Symbol Lacks Any Merit** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fred Siegel Co., LPA v. Arter & Hadden,
85 Ohio St. 3d 171 (1999), syll. ¶1 . . . . . . . . . . . . . . . . . . . . . . . . . 55-56

Kenty v. Transamerica Premium Ins. Co.,
72 Ohio St. 3d 415, syll. ¶2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Restatement of the Law 2d, Torts [1979], Section 767 . . . . . . . . . . . . . . 56

5.    **Telxon and Symbol Could Not Ratify Any of Crumpler's
      Agreements as a Result of Paxton and Crumpler's Fraud
      and Crumpler Has Failed to Establish That Symbol or
      Telxon Entered into Any Binding Agreement** . . . . . . . . . . . . . . . . . . . 57

Campbell v. Hospitality Motors Inns, Inc.,
24 Ohio St. 3d 54 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Genesis Respiratory Services, Inc. v. Hall,
99 Ohio App.3d 23 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Heiman Aber & Goldlust v. Ingram, 1998 Del. Super.
LEXIS 251, *4-5 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Federal Rule of Civil Procedure 8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Macurdy v. Sikov & Love, P.A., et al., 894 F.2d 818
(N.D. Ohio 1990), quoting 5 C. Wright & A. Miller,
Federal Practice & Procedure, § 1278 (1969) . . . . . . . . . . . . . . . . . . . . 59

6.    **Crumpler Is Not Entitled to Summary Judgment on
      Telxon and Symbol's Fraud and Conversion Claims
      as There Is Extensive Evidence of Crumpler's Fraud** . . . . . . . . . . . . 60

IV.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

## I.    STATEMENT OF THE CASE

On January 18, 2002, Hughette Crumpler ("Crumpler") filed a Complaint against Telxon Corporation ("Telxon") and Symbol Technologies, Inc. ("Symbol") in the Court of Common Pleas of Hamilton County, Ohio.  Crumpler's Complaint cited claims for breach of contract and intentional interference with contract.  On February 25, 2002, Telxon and Symbol (collectively "Defendants") removed the action to the United States District Court for the Southern District of Ohio, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446(a).  Following removal to federal court, Defendants filed their Answer to Crumpler's Complaint on March 25, 2002.  Included in the March 25, 2002 filing, Defendants asserted counterclaims for fraud and conversion against Crumpler.  Crumpler replied to Defendants' Counterclaim on April 12, 2002.

On April 3, 2002, Defendants initiated a Third-Party Complaint against John W. Paxton, Sr. ("Paxton"), Telxon's former Chairman and Chief Executive Officer, alleging fraud, breach of fiduciary duty, indemnity, and contribution.  Paxton answered the Third-Party Complaint on August 14, 2002, and filed a Counterclaim against Symbol for indemnification.  Symbol moved to dismiss Paxton's Counterclaim for failure to state a claim upon which relief can be granted on September 6, 2002.  On October 2, 2002, Paxton amended his counterclaim against Symbol to include Telxon in his claim for indemnification.  Defendants answered Paxton's Amended Complaint on October 22, 2002.

On July 31, 2003, Crumpler moved for summary judgment on her claim for breach of contract, as well as Defendants' counterclaims of fraud and conversion.  On August 1, 2003, Paxton filed a Motion for Summary Judgment seeking judgment as a matter of law with respect to the third-party claims against him, as well as his counterclaims against Telxon and Symbol.  Telxon and

Symbol file this Memorandum in Opposition to Crumpler and Paxton's Motions for Summary Judgment.

## II.    STATEMENT OF THE FACTS

### A.    Introduction.

Crumpler and Paxton characterized Telxon and Symbol's claims against them as nothing more than a veiled attempt to avoid payment on monies allegedly owed Crumpler. Symbol and Telxon, global leaders in the development and sale of mobile data transaction systems, have better things to do than avoid honoring valid agreements. However, both companies are compelled to challenge Paxton's gross breach of his fiduciary duties to Telxon and his agreements with Telxon's acquiror, Symbol. Both companies are also compelled to challenge Crumpler's knowledge of and acquiescence in this conduct to her own personal financial benefit. Paxton engaged in a pattern of abuse of his office at Telxon that is now the subject of multiple lawsuits.

Telxon has also sued Paxton in the United States District Court for the Northern District of Ohio, Eastern Division,[1] for, among other claims, (1) in violation of his employment agreement, using over $3 million in company funds to purchase stock options in Telxon he was entitled to purchase under his employment agreement (provided he used his own funds); (2) unilaterally setting terms of a promissory note evidencing the debt to Telxon; (3) failing to pay the money back; and (4) converting over $1 million worth of stock options in a Telxon subsidiary to his personal benefit without the approval of Telxon's Board. In response to this lawsuit, Paxton, in an attempt to avoid a valid debt, sued Telxon and Symbol for interfering with his ability to exercise his Telxon (now

---

[1]    *See* Tab 14, Telxon's Amended Complaint in <u>Telxon Corporation v. John W. Paxton, Sr.</u>, Case No. 5:01CV2356, in the United States District Court for the Northern District of Ohio, Eastern Division.

Symbol) stock options and sued Symbol for securities fraud. Judge Dowd dismissed both of Paxton's frivolous claims with prejudice. In addition, Judge Dowd granted Telxon summary judgment on its claim for return of company money Paxton used to buy company stock options and failed to return to the company.[2] Telxon's Motion for Summary Judgment on its claim against Paxton for unlawful conversion of options for stock in a Telxon subsidiary remains pending before Judge Dowd. Paxton's "agreements" with Crumpler are part of a widespread pattern of corporate misconduct engaged in by Paxton – a pattern of conduct that Paxton engaged in with Crumpler's knowledge and acquiescence.

Following Symbol's acquisition of Telxon on November 30, 2000, Symbol and Telxon discovered that Paxton literally pillaged Telxon of millions of dollars before the merger was consummated. Crumpler, Paxton's personal friend, was involved in the fraud and after only five months of purported employment with Telxon, was set to gain significant financial wealth in excess of $1.0 million in cash and stock. Just days before the merger closed, Paxton awarded $3.8 million in bonuses, $1.18 million going to Paxton and the remainder going to other friends and appointees of Paxton, including $50,000 to Crumpler. Also days before the merger closed, Crumpler directed an employee to overnight to her home in Illinois a check for approximately $135,000 for relocation expenses, despite never relocating. None of these payments were authorized by Telxon's Board of Directors or Symbol. A Telxon employee later alerted Symbol to Paxton and Crumpler's conduct, and Symbol immediately discovered discrepancies in agreements that awarded Crumpler, among

---

[2]    *See* Tab 15, Memorandum Opinion and Order entered on April 23, 2003 on Motion for Summary Judgment entered in Telxon v. Paxton and Paxton v. Telxon and Symbol, Case Nos. 5:01CV2356 and 5:01CV2860, in the United States District Court for the Northern District of Ohio, Eastern Division; and Tab 16, Memorandum Opinion and Order on Paxton's Motion for Voluntary Dismissal in Telxon v. Paxton and Paxton v. Telxon and Symbol, Case Nos. 5:01CV2356 and 5:01CV2860, in the United States District Court for the Northern District of Ohio, Eastern Division.

others, hundreds of thousands of dollars. Crumpler and Paxton repeatedly assert that there are "no genuine issues of material fact," but neither provide this Court a complete or accurate statement of the facts. Genuine issues of material fact exist with respect to Telxon and Symbol's claims against Paxton and Crumpler.

B. **Paxton Hires Crumpler as a $2,000 Per Day (Plus Expenses) Consultant Without Required Board Approval When Telxon Is On The Brink of Bankruptcy.**

Telxon's Board of Directors appointed Paxton Chairman and Chief Executive Officer in March 1999. (Paxton Depo., pg. 6.) According to Paxton, in March 1999 Telxon was "in dire financial straits and on the brink of Chapter 11 bankruptcy." (Paxton's Mem. in Support, pg. 1.) Despite Telxon's current financial problems, Paxton retained Crumpler in April 1999 as a human resource consultant at an exorbitant rate of approximately $2,000 per day plus expenses. (*See* Exs. Z, AA.) Paxton and Crumpler are long-time social friends that worked together in the past. (*See* Crumpler Depo., pg. 24.) Paxton never obtained the approval of Telxon's Board of Directors prior to entering into the consulting agreements with Crumpler, particularly at a time when Telxon was experiencing cash flow problems. (*See* Paxton Depo., pg. 111; Tab 2, Reddy Declaration ¶16, 17.)

Paxton's Employment Agreement dated March 22, 1999 states that Paxton "shall act in conformity with the management policies, guidelines and directions issued by the Board...." (*See* Ex. 23, Section 2. (a).) Telxon's Board of Directors maintained a policy and practice of reviewing and approving significant consulting arrangements prior to authorizing the Chief Executive Officer to enter into them. (*See* Tab 1, Rose Declaration ¶9; Reddy Declaration ¶15, 16.) This policy and practice is evident from Telxon's Board minutes which reflect that the Board of Directors approved such arrangements. (*See* Tab 13, Goodman Declaration ¶4, Exs. A, B, I.) Paxton testified that he

4

reviewed prior Board minutes in assessing his level of authority at the company. (Paxton Depo., pgs. 22-24, 35.) Paxton therefore was on notice that prior Board approval was required. At a minimum, Paxton was obligated to consult Telxon's legal counsel regarding the policies and practices of the Board, which he did not do.[3]

Paxton states in his Memorandum in Support that "[b]oth Pais and Paxton had authority to, and did, approve [Crumpler's consulting] contracts on behalf of Telxon." (*See* pg. 5, citing Paxton Depo., pg. 196; Pais Depo., pg. 8-10; Exs. Z, AA.) Paxton's counsel misstates Pais' testimony. Pais was never asked if she had "authority" to approve Crumpler's consulting contracts; rather, she was only asked if she signed the contracts, along with Paxton who, without Board approval, actually authorized the contracts. (*See* Pais Depo., pgs. 8-10.) Paxton claims that he did not need Board approval to retain Crumpler because Telxon's Board gave him authority to enter into contracts up to $25.0 million dollars without seeking Board approval. (Paxton Depo., pg. 99.) This testimony is not supported by any documentary evidence and is inconsistent with Telxon's policies and past practices. As noted in Paxton's Memorandum in Support, when he was appointed, the Board had a "heightened awareness" of complying with Telxon's rules of corporate governance as a result of questionable conduct by the prior CEO. (Mem. in Support pg. 4, citing Garwood Depo., pg. 50; Paxton Depo., pgs. 98-100.)

Telxon did not give Paxton a "blank check" to the company after terminating a prior CEO and while Telxon was on the brink of bankruptcy. Paxton's testimony that he was given authority

---

[3] As Paxton stated in his Memorandum in Support, "'[Telxon's] Counsel was always pretty good about pointing out things the Board had to approve" (citing Garwood Depo., pg. 21) and that "Paxton and the Board had a 'heightened awareness' of complying with Telxon's rules of corporate governance due to the history of the questionable dealings by the prior CEO." (Mem. in Support pg. 4, citing Garwood Depo., pg. 50; Paxton Depo., pgs. 98-100.) As the record will demonstrate, Paxton never consulted Telxon's legal counsel, ignored Telxon's rules of corporate governance, and engaged in unethical and fraudulent behavior.

5

to enter into $25.0 million contracts is also inconsistent with his own conduct during his tenure.  For instance, Telxon's Board Minutes reflect that Paxton sought approval prior to signing a contract worth only $215,000 for estate and financial planning consulting services.  (*See* Tab 13, Goodman Declaration, ¶4, Exs. C, H.)  According to Paxton's Memorandum in Support that "[i]n setting Crumpler's consulting fees, Paxton researched what Telxon was paying its other consultants...." (Pg. 5, citing Paxton Depo., pgs. 110-111.)  Paxton's testimony is a fabrication.  Telxon's accounting records for fiscal years 1998, 1999, and 2000 reflect that Telxon never retained any individual consultant at a rate of $2,000.00 per day plus expenses.  (*See* Tab 4, Grand Declaration ¶4.)  Moreover, as noted in Paxton's Memorandum in Support, in March 1999, Telxon was "on the brink of Chapter 11 bankruptcy." (*See* pg. 1.)  As a result, Telxon terminated all outside services with the exception of essential consultants such as its outside auditors, banking firms, and public relations advisors. (*See* Tab 4, Grand Declaration ¶5; Ex. KK.)  Telxon's accounting records reflect that from March 1999 through January 2000, Crumpler was paid more than McDonald Investments, Inc. and Hambrecht & Quist,[4] Telxon's investment banking consultants.  (*See* Tab 4, Grand Declaration ¶6; Ex. KK.)

     **C.**    **In the Face of a Merger, Paxton Creates a New Office for Crumpler, Gives Her An Employment Agreement With $150,000 in Severance Benefits,  Change in Control Agreements Worth $300,000, a $33,000 Signing Bonus, a $135,000 Relocation Package, and a $50,000 Bonus, Without Board Approval and in Violation of the Merger Agreement.**

          **1.**    **Symbol Approaches in May 2000.**

---

[4]    Incidentally, on November 8, 1999, Paxton sought Board approval to retain Hambrecht and Quist as Telxon's investment banker.  (See Tab 12, Goodman Declaration, ¶4, Ex. I.)

In late May 2000, Symbol's President, Mr. Tomo Razmilovic, telephoned Paxton and "explained that Symbol remained very interested in acquiring Telxon." (*See* Tab 5, Chung Declaration ¶4; Ex. B, pg. 28.) Mr. Razmilovic requested a meeting with Mr. Paxton to discuss the terms of the proposed acquisition. (Id. at 28.) On June 15, 2000, Mr. Razmilovic and Mr. Ken Jaeggi, Symbol's Chief Financial Officer, met in Cincinnati, Ohio, with Paxton and Mr. Woody McGee, Telxon's Chief Financial Officer. (Id. at 28.) Paxton and Mr. Razmilovic "tentatively agreed on a 0.5 exchange ratio, subject to completion of due diligence and conditions of the definitive documents and approvals of their respective boards." (Id. at 28.) On June 16, 2000, Telxon and Symbol entered into a confidentiality agreement. On that same day, Telxon's Board held a telephonic meeting with Paxton and counsel to discuss the terms of the merger. (Id. at 28.) Telxon's Board "authorized management and Telxon's financial and legal advisors to conduct due diligence of Symbol and to negotiate the terms of the proposed transaction." (Id. at 28.) On June 17, 2000, Paxton advised Telxon's Board that "it was a firm offer with no contingencies, except for Board and shareholder approval." (*See* Tab 13, Goodman Declaration, ¶4, Ex. J.) On June 19, 2000, Symbol's legal advisors delivered to Telxon and its counsel a draft merger agreement. (Id. at 28.) On Telxon's behalf, Paxton signed the Agreement and Plan of Merger ("Merger Agreement") on July 25, 2000.[5] On November 30, 2000, the merger closed and Symbol acquired Telxon as a wholly owned subsidiary.

---

[5] In an attempt to justify his decision to hire Crumpler in the wake of a merger, Paxton testified that until 60 days prior to the closing which occurred on November 30, 20000, he believed that Symbol was not serious about the merger and only trying to "disrupt our business." (*See* Paxton Depo., pg. 69; Crumpler Mem. in Support, pg. 11.) This testimony is not credible since there is no evidence beyond his self-serving testimony that Paxton conveyed this belief to Telxon's Board. Moreover, Paxton's belief that Symbol was not serious even after the Merger Agreement was signed is illogical given the fact that the Merger Agreement provided for a "bust-up fee" of $25.0 million dollars. Once again, Paxton's testimony is not credible.

###### 2.    Paxton Creates an Office for Crumpler and Hires Her Without The Required Compensation Committee Approval.

From April 1999 through June 2000, Crumpler was paid $2,000 per day (plus expenses) as a human resources consultant. The terms of the merger, as negotiated by Paxton starting in late May 2000, called for a reevaluation of all outside consulting services. (*See* Ex.18.) At some point in early June, Paxton and Crumpler negotiated the terms of her employment with Telxon. (Crumpler Depo., pg. 46; Paxton Depo., pgs. 44-45.) According to their testimony, Crumpler initially requested a base salary of $200,000 and 100,000 shares. (Paxton Depo., pg. 47.) Paxton, prior to faxing an offer letter, advised Crumpler that he could not offer her a salary of $200,000 and 100,000 shares. (Crumpler Depo., pg. 67.) Crumpler testified that she understood that Telxon's Board, specifically the Compensation Committee was limiting Paxton's ability to give a $200,000 base salary and 100,000 shares. (Crumpler Depo., pgs. 68-71.) According to Crumpler, Paxton made a comment that:

> the board of directors, composition of the board of directors would be changing, and that he was working with the board, that he inherited, you know, when he joined the company, and he was the chairman of that board and that, you know, some members would be joining. There was presumably people that he knew that he helped select.

(Crumpler Depo., pg. 71.)[6]

---

[6]    Counsel for Paxton and Crumpler deposed only three of the 10 directors listed on Telxon and Symbol's initial disclosures – Robert D. Garwood, Larry M. Hone, and Robert A. Goodman. Paxton nominated (i.e. "helped select") both Garwood and Hone for their seats. (*See* Garwood Depo., pg. 8; Hone Depo., pg. 8.) Note that Paxton and Crumpler have not filed with the Court Goodman's deposition and do not cite it in their briefs, despite noticing Goodman's deposition. Counsel for Paxton and Crumpler are apparently "lying in wait" for Telxon and Symbol's counsel to file and cite Goodman's deposition, in an effort to disqualify Goodman. Counsel for Paxton and Crumpler should not be permitted to represent to this Court that there are no genuine issues of material fact and deliberately ignore testimony they solicited. Notwithstanding, Telxon and Symbol have proffered multiple affidavits, including two from members of Telxon's Board that were actually present when Paxton was hired and advised of the limitations on his authority. (*See* Tabs 1, 2.) Garwood and Hone began their terms in September 1999, seven months after Paxton was appointed. Note that Garwood was not even aware of the fact that he served on Telxon's Compensation Committee around the time Crumpler was

On June 12, 2000, Paxton faxed Crumpler an offer letter dated June 8, 2000 (the "Offer Letter") that "set forth the terms of the agreement between you and Telxon." (*See* Ex. 1.) The Offer Letter identifies the position as "Vice President Administration and Organizational Development." (*See* Ex. 1.) The Offer Letter also states that Crumpler will report directly to Paxton (i.e., a "direct report"). Crumpler signed it and faxed it back on June 14, 2000. (*See* Ex. 1.) The signed Offer Letter that "set forth the terms of the agreement between [Crumpler] and Telxon" provided Crumpler a $150,000 base salary and 30,000 options and eligibility for a bonus of 25% of her base salary. (*See* Ex. 1.) Crumpler started on June 26, 2000. (*See* Crumpler Depo., pg. 8.) Paxton testified that he notified Telxon's Board of Crumpler's hire "sometime after June 8th" and indicated that it was "standard practice" to update "the Board on executive hires at the board meeting after they were on board." (*See* Paxton Depo., pg. 57.) This is false.

Paxton never notified the Board of Crumpler's hiring. (*See* Tab 2, Reddy Declaration ¶6-8; Tab 3, Pais Declaration ¶9; Pais Depo., pgs. 61-62.) Board Minutes from the Board's June 17, 2000 and June 26, 2000 meetings confirm that Paxton did not advise the Board of Crumpler's hiring. (*See* Tab 13, Goodman Declaration ¶4, Exs. G, J.) The June 26, 2000 Minutes state that "Mr. Paxton then advised the Compensation Committee on a small change in option grants." These, and no future Minutes mention Crumpler. (*See* Tab 13, Goodman Declaration ¶4, Ex. J.)

As noted above, Paxton met with three of Telxon's long-standing members of the Board, Robert Goodman, Telxon's Secretary and outside counsel, Raj Reddy, Telxon's then Chairman, and Richard Bogomolny, Telxon's Chairman of the Compensation Committee, prior to being appointed. (Paxton Depo., pg. 34.) In addition to asking about the "limits of authority relative to his signature,"

---

hired. (*See* Garwood Depo., pg. 20.)

Paxton also asked about "hiring practices of officers, hiring practices of all others." (Paxton Depo., pg. 20.)  According to Paxton, Messrs. Goodman, Bogomolny, and Rose stated that "officers required approval." (Paxton Depo., pg. 34.)  Paxton testified that he believed that this meant only four positions, himself, the Chief Financial Officer, the Chief Operating Officer, and the Vice President of Finance.  (Paxton Depo., pg. 34.)  Paxton stated that he never inquired whether the Board required approval for any other hires (Paxton Depo., pg. 26) and further stated that he never submitted to the Board other employees for approval.[7]  (Paxton Depo., pg. 28.)  Paxton also testified that the Board did not have to approve any other compensation for any other employees.  (*See* Paxton Depo., pg. 28.)

Paxton's testimony is inconsistent with the long-time policies and practices of Telxon's Board of Directors, as reflected in various Minutes of the Board of Directors and Board related materials, which Paxton testified he reviewed as a guide to his level of authority prior to assuming office.  (*See* Exs. 26, 27, 28, 29; Paxton Depo., pgs. 23, 35.)  Pursuant to Telxon's By-Laws, Telxon's Board of Directors established a number of committees, including a Compensation Committee.  (*See* Ex. A, Telxon's Amended and Restated By-Laws, Section 8; Tab 1, Rose Declaration ¶2.)  The Compensation Committee maintained a practice and policy of reviewing and approving the hiring of and remuneration arrangements with all members of Telxon's senior management prior to their employment with Telxon.  (*See* Tab 1, Rose Declaration ¶4; Tab 2, Reddy Declaration ¶4; Tab 3, Pais Declaration ¶2-5; Tab 4, Grand Declaration ¶2, 3; Pais Depo., pgs. 61-64.)[8]  The Compensation

---

[7]    As discussed below, this is not accurate.

[8]    Telxon's Restated Certificate of Incorporation states that Telxon's Board of Directors is expressly authorized to "establish bonus, profit sharing, stock options, retirement or other types of incentive or compensation plans for the employees (including officers and directors) of the Corporation...." (*See* Ex. LL, Article Eight, Subsection F.)  The By-Laws permit the formation of committees and allow the full Board to "delegate to such

Committee also maintained a practice and policy of reviewing and approving all officer severance packages, including change in control agreements, entered into with senior management or any Telxon employee. (*See* Tab 1, Rose Declaration ¶7, Ex. A; Tab 2, Reddy Declaration ¶18, Tab 3, Pais Declaration ¶2; Tab 4, Grand Declaration ¶2-3; Exs. 26, 27, 28, 29.)[9]

Paxton's testimony regarding his authority to hire, without Compensation Committee approval, any officer except the CFO, COO, and Vice President of Finance is also inconsistent with Telxon's Amended and Restated By-Laws, which Paxton testified he reviewed as a guide to his level of authority. (Paxton Depo., pg. 22.) Telxon's Amended and Restated By-Laws state:

> Section 1.    Executive Officers of the Corporation. The executive officers of the Corporation shall be chosen by the Board of Directors and shall be a Chairman of the Board, a Vice Chairman of the Board (if such office is created by the Board), a Chief Executive Officer, a President, a Chief Operating Officer (if such office is created by the Board), a Secretary, a Treasurer, and one or more Senior Vice Presidents, which may include a Senior Vice  President-Chief Financial Officer, a Senior Vice President-International Operations, a Senior Vice President-Operations, and a Senior Vice President-Sales and Marketing. Any two offices, except those of (1) Chairman of the Board and Vice Chairman of the  Board, (ii) President and any Senior  Vice President, and (iii) President and Secretary, may be filled by the same person -
>
> Section 2.    Choosing of Executive Officers.  The Board of Directors at its first meeting after each Annual Meeting of the stockholders shall elect a Chairman of the Board, a Vice Chairman of the  Board (if such office is created by the Board),  a Chief Executive Officer, a President, a Chief Operating Officer (if such office is created by the Board), a Secretary, a Treasurer, and one or more Senior Vice Presidents (if such offices are created by the Board), none of whom need be a member of the Board except the

---

committees such powers of the Board as it may consider appropriate." (*See* Ex. A, Article II, Section 8.)

[9]    While titled notes of the Audit Committee, Exhibits 26, 28, and 29 are notes from both an Audit Committee and Compensation Committee.  These committees were comprised of the same directors, with the exception of Mr. Goodman, who attended as the company's Secretary.

> Chairman of the Board, the Vice Chairman of the Board, and the Chief Executive Officer.
>
> Section 3.        Additional Non-Executive Officers.   The Chief Executive Officer of the Corporation may appoint additional non-executive officers of the Corporation **whose duties do not generally include the formulation of Corporation policies**.
>
> The titles of such additional officers may include Vice President, Assistant Vice President, Assistant Secretary, Assistant Treasurer, or such other titles as the Chief Executive Officer deems appropriate to the duties and responsibilities of such additional officers.  All such additional officers appointed by the Chief Executive Officer shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Chief Executive Officer, provided that the appointment of each such additional officer by the Chief Executive Officer shall be subject to ratification and approval thereof by the Board of Directors within one (1) year following the date of appointment of each such additional officer.

(*See* Ex. A.) (emphasis added)

Crumpler and Paxton both testified that the Vice President Administration and Organizational Development was an "executive position." (Crumpler Depo., pg. 11; Paxton Depo., pg. 46.) Crumpler was also a direct report. (*See* Ex. 1; Tab 7, Hansen Declaration ¶3.) According to Paxton, Crumpler's duties and responsibilities included "all of HR and she had legal reporting to her" and was also subsequently appointed Safety Officer for the corporation. (*See* Paxton Depo., pgs. 112-113.) Telxon's HR and Legal Departments were two separate departments that were headed-up respectively by long-term key employees Meg Pais, Telxon's Vice President of HR, and Glenn S. Hansen, Telxon's Vice President of Legal Administration. (*See* Tab 2, Reddy Declaration, ¶7.)

12

The creation of an office that oversees both of these departments established a new management position within Telxon whose duties would have included the formulation of company policy and represented a significant change in the organizational structure of Telxon. (*See* Tab 2, Reddy Declaration ¶10; Tab 1, Rose Declaration ¶5.) Paxton never consulted Telxon's Compensation Committee prior to creating this office. (*See* Tab 2, Reddy Declaration ¶6; Rose Declaration ¶5.) Paxton also never consulted Telxon's General Counsel, Glenn Hansen, about the creation of the office, Telxon's By-Laws, or whether Board approval was required. (*See* Tab 7, Hansen Declaration, ¶5-7.) In fact, Paxton never advised Mr. Hansen or Ms. Pais that Crumpler was hired, let alone placed in charge of their departments. (*See* Tab 3, Pais Declaration ¶9; Tab 7, Hansen Declaration, ¶5-7.) Telxon's Director of HR in Texas was also never advised that Crumpler was placed in charge of HR or Legal. (*See* Tab 6, Hickman Declaration ¶13.)

Paxton's testimony that he never submitted to the Board any employees for approval, other than the CFO, COO, and Vice President of Finance is simply false. (*See* Paxton Depo., pg. 28.) Telxon's Board Minutes reflect that Paxton sought approval for the hiring of David H. Biggs, as the Vice-President, Chief Technical Officer. (*See* Tab 13, Goodman Declaration ¶4, Exs. C, D, E.) Mr. Biggs was not a direct report or a classified "Executive Officer" under Telxon's By-Laws, yet Paxton still sought approval. (*See* Tab 13, Goodman Declaration ¶5, Ex. K.) As noted, Paxton also testified that he reviewed prior Board minutes as a guide to his authority. (*See* Paxton Depo., pgs. 23, 35.) Telxon's prior Board Minutes reflect that Telxon's prior CEO, Frank E. Brick, sought Board approval to hire Vice Presidents such as "George Kugler, as Vice President of Logistics and Distribution." (*See* Ex. 27.) The Board Minutes state:

13

> Mr. Brick then presented a request to hire George Kugler as Vice
> President of Logistics and Distribution at a salary of $175,000 with
> a $50,000 bonus opportunity, 10,000 options under the employee
> stock option plan vesting over three years and an eight-year term.
> After discussion, upon motion by Mr. Bogomolny and second by Mr.
> Reddy, Mr. Kugler's hire and compensation package indicated were
> unanimously approved.

(*See* Ex. 27.)   The office of Vice President of Logistics and Distribution is not classified as an

"Executive Officer" under Telxon's By-Laws. (*See* Ex. A.)

### 3.    Paxton Gives Crumpler an Employment Agreement With 1-Year Severance and a 1-Year Change in Control Agreement Without Compensation Committee Approval.

Crumpler started with Telxon on June 26, 2000. (Crumpler Depo., pg. 8.) Up until at least

June 26, 2000, Crumpler had not signed an employment agreement or a change in control agreement,

only the Offer Letter, which did not indicate that Crumpler was entitled to any severance benefits.

(*See* Ex. 1.) At some point thereafter, Paxton and Crumpler signed an employment agreement

providing Crumpler $150,000 in severance benefits (the "Employment Agreement") and a 1-year

change in control agreement providing Crumpler $150,000 in severance benefits in the event of a

merger (the "Change in Control Agreement"). (*See* Exs. 4,5.) Both documents are dated "as of June

8, 2000," but were not signed on that date.

According to Paxton, "as of June 8, 2000, Crumpler and Paxton verbally agreed that

Crumpler's compensation package would include: (1) an annual salary of $150,000; (2) a two year

Change in Control provision (providing Crumpler with two years of separation pay if control of

Telxon changed and she lost her job as a result); (3) 30,000 stock options, subject to Board approval,

and (4) payment for relocation as permitted under Telxon's Relocation Policy." (*See* Paxton's Mem.

in Support, pg. 6.) However, the Offer Letter that originally "set forth the terms of the agreement

14

between [Crumpler] and Telxon" never mentioned Change in Control benefits (1 or 2 year) or payment for relocation. (*See* Ex. 1.) Faced with this problem, Crumpler argues that the Offer Letter "did not purport to cover all of the agreed terms, but rather summarized the basic terms such as job title, reporting structure, salary, bonus eligibility and stock options." (*See* Crumpler Mem. in Support, pg. 7.)

Crumpler also points to the fact that the Offer Letter referenced an "Employment Agreement," which they claim is evidence that Paxton and Crumpler contemplated entering into a subsequent employment agreement that further outlined the terms of her employment and a change in control agreement that afforded her several hundred thousand dollars in severance. (*See* Crumpler Mem. in Support, pg. 7.) However, Crumpler and Paxton's testimony is simply not credible since all of Telxon's standard offer letters conditioned employment on signing Telxon's standard "Employment Agreement" that acknowledged the at-will nature of the employee's employment and the employee's confidentiality, inventions, and non-competition agreements. (*See* Tab 5, Chung Declaration ¶3, Ex. A; Tab 2, pg. 25; Tab 3, Pais Declaration ¶10.) As a policy and practice, Telxon's offer letters also outline severance benefits for separation and in the event of a change in control and lump sum relocation agreements. (*See* Tab 5, Chung Declaration ¶3, Ex. A; Tab 2, pg. 25, Annex I to Schedule 2.10(a); Tab 3, Pais Declaration ¶15, Ex. F.) As noted, Crumpler's Offer Letter did not mention any severance benefits or relocation lump sum agreement. (*See* Ex. 1.) Moreover, the Change in Control Agreement afforded Crumpler only 1-year of severance (or $150,000), not two years (or $300,000.)

By June 26, 2000, Paxton already received a copy of the draft merger agreement and Telxon and Symbol were heavily involved in due diligence. (*See* Tab 5, Chung Declaration ¶4, Ex. B, pg.

15

28.) Throughout June and July, Telxon and Symbol exchanged due diligence. (*See* Tab 5, Chung Declaration ¶4, Ex. B, pg. 28.) Symbol's due diligence schedules indicate that as of July 12, 2000, Telxon provided Symbol all employment related agreements. (*See* Tab 5, Chung Declaration ¶4, Ex. C.) Crumpler's Offer Letter, or any other employment related agreements, were not disclosed to Symbol as of July 12, 2000. (*See* Ex. 35; Bradshaw Depo., pgs. 41-42.)

Paxton testified that during their negotiations on June 8, 2000, Crumpler requested a change in control agreement and that he advised her that Telxon's current V.P. of H.R. had one and that her position was entitled to a change in control agreement. (Paxton Depo., pgs. 146-147.) Crumpler testified that she was not even familiar with the term. (Crumpler Depo., pgs. 49, 53.)

Crumpler also testified that she was not aware that merger negotiations were taking place until after the merger agreement was signed on July 25, 2000. (Crumpler Depo., pgs. 13-14, 131.) Crumpler's testimony is not credible given the fact that Paxton testified she requested a change in control agreement and that Telxon and Symbol were heavily involved in due diligence when Crumpler arrived. (*See* Pais Depo., pgs. 32-33.)

Crumpler worked in the Cincinnati office with Paxton and other senior personnel. According to Paxton, Crumpler was placed in charge of HR and the Legal Department. (*See* Paxton Depo., pgs. 112-113.) Lisa McManis was the Director of HR in Cincinnati and therefore reported directly to Crumpler. (*See* Crumpler Mem. in Support, pg. 8) Lisa McManis was involved in due diligence starting in June 2000 and was aware of the merger negotiations by virtue of her involvement in due diligence. (*See* Tab 12, McManis Declaration ¶4.) Crumpler's testimony that she was not aware of the merger negotiations is simply not believable.

16

Just days before the Merger Agreement was signed, Paxton and Crumpler entered into the Employment Agreement and Change in Control Agreement without required Board approval. When asked whether the Board had to approve "change in control agreements," Paxton testified that "Change of Control Agreements were generated from our legal staff and submitted to HR, and then we gave the board a status of the Change of Control agreements for each person that had one." (Paxton Depo., pg. 29.) Paxton could not recall if there was a policy of the Board that required approval for change of control agreements. (Paxton Depo., pg. 31.) Paxton did not submit to the Compensation Committee or the full Board any list that identified Crumpler as a recipient of a change in control agreement. (*See* Tab 2, Reddy Declaration ¶18; Tab 3, Pais Declaration ¶9; Tab 7, Hansen Declaration ¶9.)[10]

Telxon's Vice President of HR, Meg Pais, who was responsible "for providing the members of the Compensation Committee with all information necessary to the Committee's evaluation of any proposed hire of and remuneration agreements with company officers," was never provided a copy of Crumpler's Employment Agreement or Change in Control Agreement. (*See* Tab 3, Pais Declaration ¶3,9,10,13.) In fact, Crumpler specifically instructed Lisa McManis not to provide Meg Pais a copy of her Offer Letter. (*See* Tab 13, McManis Declaration ¶5; Tab 3, Pais Declaration ¶9.) Telxon's General Counsel, Glenn Hansen, did not prepare Crumpler's Employment Agreement or Change in Control Agreement. (*See* Tab 7, Hansen Declaration ¶5.) He was also not even aware of the fact that Paxton entered into these agreements. (*See* Tab 7, Hansen Declaration ¶5-7.) Accordingly, neither Ms. Pais or Mr. Hansen were able to advise Telxon's Compensation Committee

---

[10]     Hone testified that he did not recall hearing the name Hughette Crumpler. (Hone Depo., pg. 44.) Hone could not recall if Board approval was required prior to entering into change in control agreements. (Hone Depo., pgs. 18-19.)

or Board about Crumpler's hiring or remuneration arrangement Paxton entered into with Crumpler in the wake of a merger.  (*See* Tab 2, Reddy Declaration ¶8; Tab 3, Pais Declaration ¶9.)

Garwood and Hone, the two directors deposed by Paxton and Crumpler, could not recall if Paxton was required to get approval to enter into change in control agreements.  (*See* Garwood Depo., pg. 18; Hone Depo., pg. 19.)  According to the other member of Compensation Committee at the time Crumpler was hired, Raj Reddy, Telxon's former Chairman and Board member since 1987, Telxon's "Compensation Committee maintained a policy and practice of reviewing and approving significant consulting arrangements during [his] tenure."  (See Tab 2, Reddy Declaration ¶15.)  Approximately one month before Paxton was appointed, another member of Telxon's Compensation Committee, Norton Rose, sent a memo to Telxon's prior CEO, Frank E. Brick, advising Mr. Brick that "the Committee also wants to be sure to keep with long-standing policy there are no officer severance packages put forth without the prior approval of the Board...."  (*See* Tab 1, Rose Declaration ¶7, Ex. A.)  Notes from Telxon's Audit and Compensation Committee Notes dated January 28, 1999, one month before Paxton was appointed, state: "No severance packages without Board approval."  (*See* Ex. 28.)  When asked about this Exhibit 28, Paxton stated:

Q:  Mr. Paxton, I've handed you what's been marked as Exhibit 28.  Can you tell me if you've ever saw that document before?

A:  Just a moment.  I'll take a moment to read it quickly.

Q:  Have you seen that before?

A:  Yes.

Q:  When did you see that?

A:  Several times.  I can't remember the exact dates.

Q:    Is it your testimony that this document which states that "No severance packages without board approval," did not apply to you?

A:    This applied specifically to Brick and Haver, and I wasn't aware that Bob Goodman, by the way, was a member of the Audit Committee. I don't think he was, so I think that's an error. And also, I was – they were worried about the cash position of the company as a whole, and they were talking about Haver issues outside the scope of the CFO and competency was discussed. That's why they limited these two people from doing the things that they were doing prior. And so they were actually at that time starting to look for outside Chairman, CEO, President.

(*See* Paxton Depo., pgs. 99-100.)[11]

As noted, Paxton testified that he met with members of Telxon's Board and counsel to discuss the scope of his authority. (*See* Paxton Depo., pg. 34.) The Board and its counsel communicated the policies and practices of the Compensation Committee, including the requirement for Compensation Committee approval of employment and remuneration agreements and severance packages with senior management. (*See* Tab 1, Rose Declaration ¶8; Tab 2, Reddy Declaration ¶11; Tab 4, Grand Declaration ¶2-3.) The facts demonstrate that Paxton and Crumpler took steps to ensure that Crumpler's various agreements were not brought to the attention of Telxon's Compensation Committee or Board.

###    4.    The Merger Agreement is Signed On July 25, 2000, Identifying Crumpler as Having only a 1-Year Change in Control Agreement.

According to the terms of the Merger Agreement, Paxton was required to conduct business in the ordinary course and disclose to Symbol (or refrain from entering into) essentially any type of

---

[11]    Crumpler's counsel has attempted at various times to advance an argument that a "change in control" agreement is not a severance benefit. This argument is unsupportable given the fact that Crumpler's change in control agreement contains the following sentence in the opening paragraph: "[T]he Board has determined to extend to you the severance benefits set forth in this letter agreement...." (*See* Ex. 5.) This sentence also refutes Paxton's testimony that, unlike the prior CEO, he was authorized to enter into change in control agreements without Board approval. (*See also* Tab 1, Rose Declaration ¶7 states "A change in control agreement, of course, is a severance agreement....")

employment related agreements from March 31, 2000 through July 25, 2000, including change in

control agreements, bonuses, or any agreements that increase or amend the compensation or fringe

benefits of directors, officers, or employees.  From July 25, 2000 through November 30, 2000,

Paxton could not enter into virtually any employment related agreements without the express written

consent of Symbol.  (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.8, 4.1 (f),

(n), (p).)[12]  Section 2.10 of the Merger Agreement also required Paxton to disclose any agreements

with employees such as:

> SECTION II.10 Employee Benefit Plans. (a) Section 2.10(a) of the
> Company Disclosure Schedule contains a true and complete list of
> each "employee benefit plan" (within the meaning of Section 3(3) of
> the Employee Retirement Income Security Act of 1974, as amended
> ("ERISA")), (including without limitation multi-employer plans
> within the meaning of ERISA Section 3(37)), stock purchase, stock
> option, severance, employment, change-of-control, fringe benefit,
> collective bargaining, bonus, incentive, deferred compensation and all
> other all other employee benefit plans, agreements, programs, policies
> or other arrangements, whether or not subject to ERISA, whether
> formal or informal, oral or written, under which any employee or
> former employee of the Company or any of its subsidiaries has any
> present or future right to benefits or under which the Company or any
> of its subsidiaries has any present or future liability.

(*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.10.)  Section 2.19 of the

Merger Agreement further required the disclosure of:

> SECTION II.19 Material Contracts. Section 2.19 of the Company
> Disclosure Schedule contains a complete and accurate list of all
> contracts (written or oral), plans, undertakings, commitments or
> agreements to which the Company or any of its subsidiaries is a party

---

[12]    Note that Section 2.8 of the Merger Agreement states that disclosure is not required if the agreement was
"disclosed with reasonable specificity in the Company SEC Reports filed prior to the date of this Agreement...."
No agreements with Crumpler were disclosed in Telxon's SEC filings.  (*See* Tab 7, Hansen Declaration ¶8.)

or by which any of them is bound as of the date of this Agreement of the following categories ("Contracts") (other than those listed as exhibits to the Company SEC Reports):

> (a) to the extent not listed in Section 2.10(a) of the Company Disclosure Schedule, employment contracts, including, without limitation, contracts to employ executive officers and other contracts with officers, directors or stockholders of the Company, and all severance, change in control or similar arrangements with any officers, employees or agents of the Company that will result in any obligation (absolute or contingent) of the Company or any of its subsidiaries to make any payment to any officers, employees or agents of the Company following either the consummation of the transactions contemplated hereby, termination of employment, or both;
>
> ***
>
> (h) any other Contract (other than real property leases) containing "change of control" provisions which would be triggered upon the Merger.

Attachment A to Disclosure Schedule 2.10(a) titled "FY'2000 Employment/Change in Control Agreements," stated with respect to Crumpler:

| Name | Base Salary | Severance Provision | Change in Control Provision |
|---|---|---|---|
| Hughette Crumpler | $150,000 | 1 year | 1 year |

(*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.10, Tab 2, pg. 26, Attachment A to Schedule 2.10(a); Disclosure Schedule 2.19.)[13]   The Disclosure Schedules did not identify any

---

[13]    Note that Disclosure Schedule 2.19(a) refers you to Attachment A to Schedule 2.10(a) and does not identify any further employment related agreements, other than those identified in Schedule 2.10(a).

21

of the following agreements that Crumpler and Paxton signed after Paxton, on Telxon's behalf, signed the Merger Agreement.

> **5.    Paxton and Crumpler Back-Date the Amendment to the Change in Control Agreement to Avoid the Restrictions of the Merger Agreement, Giving Crumpler $300,000 Cash.**

At some point well after the Merger Agreement was signed, Crumpler drafted an amendment to the Change in Control Agreement (the "Amendment") increasing her severance benefit from one year (or $150,000) to two years (or $300,000), providing her an additional $150,000.  (*See* Ex. 6.) The Amendment stated:

> Due to the increased responsibilities in Key Employee's duties for Telxon, and in order to make the terms of the employment for Key Employee comparable to her predecessor, whose employment terms provided for a severance package that included, in pertinent part, "a lump sum severance payment of two times annual salary" where a change in control event occurred, the modification to the Letter Agreement is as follows:

> Section 1(b): The reference in the first sentence shall be changed to read "A lump sum severance payment equal to two (2) times your annual salary".

Crumpler and Paxton dated the Amendment "6/29/00." (*See* Ex. 6.)  However, the actual wording of the document indicates that it was backdated.  Meg Pais did not resign from Telxon and, therefore, become Crumpler's "predecessor" until August 2000, well after "6/29/00" and well after the Merger Agreement was signed.[14]  (*See* Tab 3, Pais Declaration ¶12.)  As noted above, the

---

[14]    Telxon's "Report of New Hires/Rehires" identifies Crumpler's "Hire Date" as "6-26-00." (*See* Ex. W.) Crumpler's Amendment is dated just three days later. (*See* Ex. 6.) Paxton and Crumpler are claiming that after just three days of work, Crumpler was given "increased responsibility in Key Employee's duties to Telxon" and Meg Pais became Crumpler's "predecessor" even though she did not leave the company for another two months. (*See* Ex. 6.) The Amendment was clearly backdated to predate the Merger Agreement.

disclosure schedules attached to the Merger Agreement signed on July 25, 2000 state that Crumpler had a 1-year Change in Control Agreement (or $150,000), not two (or $300,000).

The back-dating was also confirmed by the testimony of Beth Staples, Telxon's senior corporate attorney working in Cincinnati with Paxton and Crumpler. (Staples Depo., pg. 84.)[15] After the Merger Agreement was signed, Staples learned that Crumpler "had the belief that her change in control letter was wrong and that it needed to be increased from one year to two." (Staples Depo., pg. 62.) Ms. Staples responded that "to change one of these letters in light of the merger process required approval by the acquiring company, which would have been Symbol, and specific written approval, to my recollection, is what the merger agreement required. That no employment terms, contract terms could be changed when you were at the management level." (Staples Depo., pg. 62; see generally 60-68.) Ms. Staples further testified as follows:

> Q.    And you have, you don't have any idea who was talking about these issues at some point in time after the merger was announced?
>
> A.    I believe Ms. Crumpler was in some capacity. I was also aware I believe through Mr. Paxton's secretary that a replacement change in control letter may have been created.
>
> Q.    Who was Mr. Paxton's secretary?
>
> A.    Bridgett Huerkamp.
>
> Q.    And Bridgett Huerkamp told you what specifically?
>
> A.    I don't remember specifics other than presumably Ms. Crumpler had requested and Ms. Huerkamp may have created a replacement letter.
>
> Q.    At what point in time?

---

[15]    Paxton or Crumpler do not cite – or even mention – the testimony of Ms. Staples in their Memoranda in Support. Apparently counsel for Paxton and Crumpler are pretending that Ms. Staples never testified. The Court will soon see why.

A.    After the merger was announced.

Q.    And how do you know that?

A.    I recall that, whether it was Ms. Huerkamp or Ms. Crumpler that presented this information to me, I know that I would normally have prepared such a letter and found it odd that a legal document could be created without my knowledge.

Q.    Why would that be odd?

A.    These type of letters, and in light of the merger pending, normally would have gone through legal, as I had prepared at least certain change in control letters back in the June time frame; and from a document control standpoint, it appeared that someone pulled the form off of the legal drive of the company's computer to create it.

Q.    What are you talking about?

A.    To obtain the form that a change in control letter would have been created on, these were not hand typed; so either the soft copy -- it was not obtained from me; so it would either have had have had electronic versions of prior change in control agreements as sent to John Paxton or such a form would have to come from the legal drive which was presumably a restricted drive.

Q.    Presumably but not sure?

A.    I found out later it was not restricted to strictly legal; that Ms. Huerkamp had access to it and I believe Ms. Crumpler did, as well.

(Staples Depo., pgs. 62-64.)[16] Ms. Staples repeatedly testified that the Amendment was created after

the Merger Agreement was signed. (Staples Depo., pgs. 62, 65, 71.) Ms. Staples emphatically stated

over and over again:

> [M]y response to anyone that would have discussed this with me and
> my reaction to Ms. Crumpler's assertion that she was entitled to this

---

[16]    Bridgette Huerkamp was not identified as having a change in control agreement in the disclosure schedules attached to the Merger Agreement or in any documents provided to Symbol during due diligence. (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.10, Tab 2, pg. 26, Attachment A to Schedule 2.10(a); Disclosure Schedule 2.19) Huerkamp's employment agreement and change in control agreement are both dated May 22, 2000. Huerkamp's 1-year change in control agreement is first disclosed to Symbol in a schedule prepared by Crumpler that for the first time identifies Crumpler as having a 2-year change in control agreement. (*See* Ex. D.)

> was it's something that would have to go through the approval process before it could happen. That's my recollection. And that's why I would not have prepared documentation and did not, to my recollection.

(Staples Depo., pg. 72.) Ms. Staples also testified that in preparing documents for the merger, she never saw any document indicating that Crumpler had anything other than a one-year change in control agreement. (Staples Depo., pg. 81.) Paxton or Crumpler never obtained written consent to enter into the Amendment, as required by the Merger Agreement. Paxton or Crumpler never advised Symbol that the Amendment was backdated. As set forth below, Crumpler continues to engage in fraudulent conduct over the coming months and right up to the closing date.

### 6. Crumpler Submits an Undisclosed and Unauthorized $200,000 Relocation Agreement Dated August 18, 2000.

On August 18, 2000, Crumpler submitted for payment a crudely drafted relocation agreement that does not appear to have been signed by Paxton, and therefore may have been forged by Crumpler. (Ex. 11; Tab 10, Huerkamp Declaration ¶8.) The relocation agreement stated that Crumpler will be paid a lump sum relocation payment of $111,010 before July 30, 2000. The relocation agreement further stated that Telxon will "provide adequate tax gross-up coverage at year end in order to ensure that the employee has no federal, state, local tax liability as a result of this relocation payment." (*See* Ex. 11.) Shockingly, this means that the agreement is worth approximately $200,000, and Crumpler would receive $111,010 in cash tax free (hereinafter the "$200,000 Relocation Agreement").[17] The $200,000 Relocation Agreement states that $111,010 "is

---

[17]    Note that neither Paxton nor Crumpler discuss this document in their statement of facts for obvious reasons, yet claim repeatedly that there is no evidence of fraud. Paxton testified that he could not recall when he signed this document. (Paxton Depo., pg. 153.)

based on the attached estimated relocation expenses." (*See* Ex. 11.)[18] The attached estimate is even more shocking. Included in the $111,010 "relocation" estimate is $33,000 for a "Contract Cancellation Fee."

According to Paxton and Crumpler's testimony, when Paxton and Crumpler negotiated the terms of her employment on June 8, 2000, Paxton agreed to pay Crumpler $33,000 for a contract that she had to cancel with the company UNOVA as a result of taking a job with Telxon. (*See* Crumpler Depo., pgs. 113-114; Paxton Depo., pgs. 120-121.)[19] Obviously, this is not a relocation expense.[20] Also inexplicable is why Paxton would agree to "gross-up" or pay Crumpler's taxes on the supposedly lost contract. The cost of this contract to Telxon would, therefore, be approximately $50,000 and Crumpler would receive $33,000 cash, tax free. Crumpler testified that she did not expect to get a tax gross-up on the $33,000. (Crumpler Depo., pg. 156.) What is unexplained is why then Crumpler attempted to gross-up the $33,000 payment. (*See* Ex. 11.)

---

[18]     When asked about this document, Paxton was clearly startled and stated that he believed "that was the aggregate" relocation expense for Crumpler, Doug Froh, and Gene Harmegnies, who are identified in Crumpler's cover memo on the first page of Ex. 11. (*See* Paxton Depo., pgs. 150-151.) Only after Mr. Paxton's counsel admonished him to read the document again did he realize that the entire $111,010 (grossed-up to approximately $200,000) was "for Hughette alone." (*See* Paxton Depo., pg. 151.) Paxton could not recall if he was ever provided a copy of the attached estimate of relocation expenses. (Paxton Depo pg. 152.) It is worth noting that Gene Harmegnies, the Vice President, Consulting/Systems Integration, actually relocated from Seattle, Washington to Cincinnati. Unlike Crumpler's Offer Letter, Mrs. Harmegnies' offer letter set forth the terms of her relocation agreement. It stated that "as an exception to the relocation policy, Telxon will provide you with a $5,000 resettlement allowance." (*See* Tab 3, Pais Declaration ¶15, Ex. F.) Nothing more needs to be said.

[19]     This term was left out of Crumpler's Offer Letter dated June 8, 2000 and is not mentioned in Crumpler's Employment Agreement. (*See* Ex. 1, Ex. 4.) Crumpler, a human resources expert that gets paid $2,000 per day and $1.0 million dollars for five months of work, wants this Court to believe that all of these additional terms were agreed to on June 8, 2000, yet Crumpler never insisted for several months that the terms be put in writing. Crumpler's lawyers have portrayed this, and all the other terms missing from her Offer Letter, as "clerical errors." If this is true, and Crumpler made "clerical errors" to the tune of $300,000 in missing terms, she was clearly not qualified to work for Telxon in any capacity.

[20]     Telxon would have violated several Internal Revenue Service rules and regulations by expensing Crumpler's $33,000 contract cancellation fee as a relocation expense. Crumpler, as the supervisor of Telxon's legal department according to Paxton, should have consulted one of Telxon's tax attorneys at her disposal.

Also unexplained is why Paxton agreed to pay Crumpler $33,000 for a contract cancellation where according to the terms of the contract with UNOVA, Crumpler was already paid $16,500 of the $33,000 prior to even starting with Telxon. The contract allegedly canceled is attached to the $200,000 Relocation Agreement and clearly states that Crumpler would be paid $16,500 "on or before May 30, 2000." (*See* Ex. 11.) Crumpler did not even start her employment with Telxon until June 26, 2000. (*See* Ex. 1.) Therefore, Crumpler was presumably paid $16,500 by UNOVA, and another $33,000 (grossed-up to $50,000) by Telxon.

The relocation estimate attached to the $200,000 Relocation Agreement also contains ridiculous figures such as $17,600 for "Temporary Housing" that Crumpler knows are blatantly overstated. From July 26, 2000 through August 18, 2000, Crumpler stayed at the Holiday Inn Express and incurred only approximately $2,000 in housing expenses. (*See* Tab 9, Patel Declaration ¶3, Ex. A.) Crumpler also included $3,700 for "Health Insurance" that she refers to as "Self Coverage."[21] Once again, this is clearly not a relocation expense or an expense that Telxon should pay the taxes on, especially since it is tax deductible to Crumpler. Lastly, the estimate includes $20,000 for "closing costs and/or down payment" and $12,000 for the "movement of household goods." Crumpler never moved or bought a house. (Crumpler Depo., pg. 51; Tab 11, Kochy Declaration ¶5-6.)

The $200,000 Relocation Agreement was never disclosed to Symbol, as required by the terms of the Merger Agreement, or approved by Telxon's Compensation Committee. The $200,000 Relocation Agreement is obviously not in conformity with Telxon's relocation policies and practices.

---

[21]    The fact that Crumpler never canceled her personal health insurance demonstrates that she was aware of the looming merger with Symbol and that her employment with Telxon was only a six month term. Thanks to Paxton, Crumpler would have paid approximately $1.0 million in cash and stock for six months of work.

(*See* Ex. 10, Tab 12, McManis Declaration ¶6-8.)  Apparently no payment was issued pursuant to the $200,000 Relocation Agreement, as currently drafted.  (*See* Ex. 11.)[22]  However, as discussed below, Crumpler subsequently received the $33,000 for the purported "contract cancellation," $135,000 for purported relocation expenses and, an additional $50,000 bonus, all just weeks before the merger closed on November 30, 2000, and all without Symbol's approval or knowledge.

### 7.    The Undisclosed and Unauthorized $33,000 Payment to Crumpler.

At some point just prior to the closing date on November 30, 2000, Crumpler was paid the $33,000 dollars for the contract cancellation fee.  (Crumpler Depo., pgs. 104-105, 156; Ex. 11.) Paxton testified that he did not get authorization to make this payment because it was not required. (Paxton Depo., pg. 121.) Symbol was never advised of this agreement with Crumpler or the payment and never gave Paxton written consent to make the payment as required by the Merger Agreement. (Paxton Depo., pg. 121; Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.8, 4.1 (f), (n), (p); Staples Depo., pgs.62-64.)

### 8.    The Undisclosed and Unauthorized $50,000 Bonus Paid to Crumpler.

On November 2, 2000, Paxton awarded $862,500 in bonuses to six employees, including Crumpler who received $50,000. (*See* Ex. 16.) Paxton awarded himself $1.18 million.  Paxton also awarded an additional $2.8 million in bonuses to several employees at some point in November, for a total of $3.8 million in bonuses, all without Symbol's consent or the consent of Telxon's Board. (*See* Tab 8, Siegel Declaration ¶3; Tab 6, Hickman Declaration ¶12; Bradshaw Depo., pgs. 21-22; Tab 2, Reddy Declaration ¶20.) Section 4.1(f) of the Merger Agreement expressly precluded Paxton

---

[22]    As this Court knows, as the non-moving parties, Symbol and Telxon are not required at this time to present their entire case, only demonstrate that genuine issues of material fact exist.  (*See* Tab 10, Huerkamp Declaration ¶8.)

from granting any bonuses without the written consent of Symbol. (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.8, 4.1 (f), (n), (p); Staples Depo., pgs.62-64.)

Section 3. b. of Crumpler's Employment Agreement states:

> b.    Bonus Compensation.  In addition to the Base Salary, Key
> Employee shall, at the discretion of the Board, be eligible to
> receive bonus compensation ("Bonus Compensation") with
> respect to the Employment Period on such basis as shall be
> approved by the Board.  For FY '01, Key Employee shall be
> eligible for a potential bonus of up to $37,500 based upon
> achieving goals and achievements agreed upon by Key
> Employee and the Supervisor, subject to such approval
> thereof as may be required by the Chief Executive Officer
> and/or the Board.  Bonus compensation for subsequent fiscal
> years will be determined by the Board in its discretion based
> upon the recommendation of the Chief Executive Officer.

(*See* Ex. 4.)  The $50,000 bonus Crumpler received for only five months of employment was in excess of the maximum amount to which she was entitled under her Employment Agreement. Telxon's Board also did not approve Crumpler's bonus, as required under the express terms of her Employment Agreement.  (*See* Exs. 29, 16;  Tab 4, Grand Declaration, ¶2,3; Tab 2, Reddy Declaration ¶19,20; Tab 1, Rose Declaration ¶9; )

### 9.    The Undisclosed and Unauthorized $135,000 Relocation Payment That Crumpler Has Overnighted to Her Home Three Days Before Symbol Takes Over.

On October 20, 2000, Paxton signed a second "Relocation Agreement" prepared by Crumpler that provided her a lump sum payment of $75,000 grossed-up for tax purposes to $135,256.99 (the "Relocation Agreement").  (*See* Ex. 8.)  In other words, Crumpler would receive $75,000 in cash, and Telxon would bear all tax liabilities.  The Relocation Agreement stated that the lump sum payment of $75,000 was "in accordance with the Company's policy of a maximum of ½ of the base

29

pay." (*See* Ex. 8.) The Relocation Agreement also stated that the "lump sum payment obviates the need to keep receipts or submit expense reports. These activities are not required." (*See* Ex. 8.)

Crumpler's Relocation Agreement was not in accordance with Telxon's relocation policy. Telxon's relocation policy did not authorize an employee to simply receive a lump sum payment equal to 50% of their base salary; rather, it capped all reimbursable relocation expenses at 50% of the employee's base salary. (*See* Exs. EE, 10; Tab 12, McManis Declaration ¶7-8.) As an exception to the relocation policy, employees periodically negotiated a lump sum payment. The amount of the lump sum payment was based on a reasonable estimate of the employee's relocation expenses. Telxon never simply provided an employee a lump sum payment equal to 50% of their salary. Telxon also never agreed to also "gross-up" for tax purposes a relocation payment equal to 50% of the employee's salary. (*See* Exs. EE, 10; Tab 12, McManis Declaration ¶7-8.) Moreover, Crumpler's Relocation Agreement was not in conformity with Telxon's policy since she never relocated. (*See* Tab 12, McManis Declaration ¶6; Tab 6, Hickman Declaration ¶7-8.)

On November 27, 2000, just three days before Symbol was set to take over, Crumpler contacted Telxon's HR Director for Telxon's Texas facilities, Cecile Hickman, and instructed Ms. Hickman to locate an expense report that had been sent to Accounts Payable, and have a check processed, made payable to her, for what she described as her relocation expenses. (Tab 6, Hickman Declaration ¶3.) Crumpler advised that the amount to be reimbursed to her was $75,000 (approximately $135,000 gross-up for tax purposes). (Tab 6, Hickman Declaration ¶4.) Crumpler advised Ms. Crumpler that this needed to be done that day and that the check had to be overnighted to her home in Illinois for 10:30 delivery the following morning. Crumpler further advised that the overnight package should be left at her back door in the event no one was home at her residence.

30

Crumpler further instructed Ms. Hickman to confirm that the check was mailed that day. (Tab 6, Hickman Declaration ¶5.)

As instructed by Crumpler, the check was processed and overnighted to Crumpler's home in Illinois. (Tab 6, Hickman Declaration ¶6; Ex. 12.) Ms. Hickman was "very surprised to learn that Ms. Crumpler collected $75,000 (approximately $135,000 grossed up) for relocation expenses when she did not relocate." (Tab 6, Hickman Declaration ¶7.) According to Ms. Hickman, it was "against company policy for an employee to collect a lump sum relocation payment of $75,000 (approximately $135,000 grossed up) when you do not actually relocate." (Tab 6, Hickman Declaration ¶8.) Moreover, "in all [Ms. Hickman's] years with Telxon, I was never aware of an officer collecting a lump sum payment of $75,000 (approximately $135,000 grossed up) for relocation." (Tab 6, Hickman Declaration ¶9.)

The following week, after the merger closed, Robert Bradshaw, Symbol's V.P. of Human Resources, returned to Telxon's Houston facility to facilitate the Telxon/Symbol merger and Ms. Hickman advised Mr. Bradshaw immediately upon his arrival that Ms. Crumpler, at her instruction, was overnighted a $75,000 (approximately $135,000 grossed up) check for relocation when in fact she did not relocate. (Tab 6, Hickman Declaration ¶10-11.) Ms. Hickman further advised Mr. Bradshaw that she "thought that the payment to Ms. Crumpler was in violation of the Telxon/Symbol merger agreement, and that it was not in conformity with Telxon policy." (*See* also Bradshaw Depo., pgs. 36-42.)

At some time shortly after the Symbol/Telxon merger occurred, Ms. Hickman also advised Mr. Bradshaw that certain employment related documents, such as change-in-control agreements, had been backdated to reflect a date of agreement prior to the signing of the Merger Agreement in

order to give Telxon employees greater severance benefits upon Symbol's ultimate acquisition of Telxon. Ms. Hickman reached this conclusion after reviewing a list of employees with severance benefits that deviated from a list that Ms. Hickman previously participated in preparing for Symbol. This list included the names of several Telxon officers who worked in Cincinnati with Paxton. These employees were given change-in-control benefits that were not specified in their original offer letters or disclosed to Symbol in Telxon's disclosure schedules. (*See* Tab 6, Hickman Declaration ¶12.)

Ms. Hickman also advised Mr. Bradshaw that she was "alarmed by bonuses paid out by Mr. Paxton to these same officers without the consent of Symbol. [She] advised Mr. Bradshaw to investigate, as [she] believed this conduct was not right." (*See* Tab 6, Hickman Declaration ¶12.)

### D.    Symbol and Telxon Investigate Paxton and Crumpler's Fraud.

Following Ms. Hickman's disclosure to Mr. Bradshaw, Telxon's new Board of Director's initiated an internal investigation in conjunction with Telxon's outside counsel. On December 1, 2000, Crumpler was placed on administrative paid leave. (*See* Ex. H.) Following the investigation, Telxon's Board passed resolutions authorizing Telxon's officers to "demand that Mr. Paxton and Mr. McGee return to the corporation the approximately $3.8 million ($3,800,000.00) in payments to employees wrongfully authorized by them." (*See* Tab 8, Siegel Declaration ¶3.) The Board also passed a resolution authorizing the termination of Paxton and Mr. McGee in the event that their explanation for the improper payments was not sufficient. (*See* Tab 8, Siegel Declaration ¶3.) Paxton and McGee were subsequently terminated. (*See* Ex. B.)

During the week of December 11, 2000, Symbol's President, Mr. Tomo Razmilovic, met with Paxton and Paxton's counsel, pursuant to their request. (*See* Ex. B.) On December 20, 2000, Paxton

32

sent Mr. Razmilovic a letter stating that he agreed to repay $862,000.00 of the unauthorized bonus payments personally that he made in November 2000. (*See* Ex. B.) Paxton was also permitted to resign from Telxon. (*See* Ex. B.) Paxton's counsel, on the same day, faxed Symbol a letter that purported to outline what Tomo and Paxton discussed "and related matters which we did not specifically discuss...." (*See* Ex. B.) On January 4, 2001, Symbol honored Paxton's change in control agreement, but offset the $862,000 in unauthorized bonus payments made by Paxton. (*See* Ex. C.)

On January 21, 2001, Symbol sent Crumpler a letter advising her that her termination was effective February 1, 2001. (*See* Ex. H.) Symbol enclosed a check for $14,743.01 with the following explanation:

> I am enclosing with this letter your severance payment in connection with your Change in Control agreement in the gross amount of $14,743.01. This amount was determined as follows:
>
> 1.    Your original Change in Control agreement specified a severance benefit equal to twelve (12) months of your base salary ($150,000) paid as a lump sum. We later learned that this amount had been increased by Mr. Paxton to twenty four (24) months or ($300,000). In discussion with Tomo Razmilovic on or about October 20, 2000, Mr. Paxton acknowledged that the correct severance was 12 months. This reduced the gross benefit to twelve (12) months of your base salary, or $150,000.
>
> 2.    In addition, in October 2000, the corporation paid you a relocation allowance of $75,000, which amount was then grossed-up for tax purposes to $135,256.99. Insofar as you did not relocate, we have deducted this amount from your gross severance benefit.

(*See* Ex. H.) Crumpler's counsel subsequently returned the check for $14,743.01 and instituted this litigation.

33

E.    **Summary Table of the Facts.**

The following table summarizes the foregoing facts:

| Action/Agreement | Date | Amount | Authorized by Telxon's BOD? | Disclosed to Symbol? | Written consent by Symbol? |
|---|---|---|---|---|---|
| Consulting Agreement | March 1999 through March 2000 | $2,000 per day (plus expenses) | No[23] | N/A | N/A |
| Hiring; Offer Letter; Employment Agreement; Change in Control Agreement | Offer Letter Signed June 14, 2000, rest unknown. | $450,000[24] | No[25] | Disclosed on "Disclosure Schedule" attached to Merger Agreement.[26] | N/A[27] |
| Amendment to Change in Control Agreement | Back-dated to June 29, 2000[28] | $150,000 | No | Back-dating not disclosed | No[29] |
| $200,000 Relocation Agreement (Grossed-up) | August 18, 2000 | $200,000 (grossed-up)[30] | No | No | No |
| $75,000 Relocation Agreement (Grossed-up to $135,000) | October 20, 2000 | $135,256.99 (Grossed-up) | No | No | No |

---

[23]    Required per Tab 1, Rose Declaration ¶9; Tab 2, Reddy Declaration ¶15-17.

[24]    Includes $150,000 base salary, $150,000 separation severance, and $150,000 change in control severance.

[25]    Approval required for senior management per Compensation Committee policy and practice. (*See* Tab 2, Reddy Declaration ¶4-11; Tab 1, Rose Declaration ¶4-7; Tab 3, Pais Declaration ¶2-6; Tab 4 Grand Declaration ¶2-3; Tab 7, Hansen Declaration ¶3,4,6,9.)

[26]    *See* Tab 5, Chung Declaration ¶3, Ex. A, Merger Agreement, Tab 2.

[27]    Not required if occurred prior to the signing of the Merger Agreement. (*See* Tab 2, Chung Declaration ¶3, Ex. A, Merger Agreement, Section 2.8, 4.1.) However, full disclosure required for any employment related agreements entered into from March 31, 2000 through July 26, 2000. (*See* Tab 2, Chung Declaration ¶3, Ex. A, Merger Agreement, Section 2.8, 4.1.)

[28]    *See* generally Staples Depo., pgs. 60-80.

[29]    Symbol's written consent was required for employment related agreements that occurred after July 25, 2000, the date the Merger Agreement was signed. (*See* Tab 5, Chung Declaration ¶3, Ex. A, Merger Agreement, Section 4.1(f), (n), and (p).)

[30]    Crumpler was not paid under this agreement for reasons not in the record, yet.

| $33,000 payment for purported "contract cancellation" | Occurred at some point after August 18, 2000 | $33,000 | No | No | No |
|---|---|---|---|---|---|
| $50,000 bonus | November 2, 2000 | $50,000 | No | No | No |

## III.    LAW AND ARGUMENT

### A.    Paxton is Not Entitled to Summary Judgment on Telxon and Symbol's Third-Party Complaint.

#### 1.    The Fact that Telxon's Board Did Not Authorize Crumpler's Hiring or Paxton's Employment Agreements with Crumpler is an Undisputed Fact.

Paxton acknowledges that the Telxon Board did not authorize Crumpler's hiring or his employment agreements with Crumpler. He argues that since Crumpler was a non-executive officer hire (which, in itself, is an issue of fact), Telxon's By-Laws granted him unilateral authority to hire Crumpler, and any Board requirement that he obtain the Board's approval for all officer hires is contrary to Delaware law. With respect to the charge that he knowingly violated the terms of the Telxon/Symbol Merger Agreement, he argues that he entered into all agreements with Crumpler prior to execution of the Telxon/Symbol merger agreement on July 25, 2000.

##### a.    Paxton misconstrues Delaware law and Telxon's By-Laws.

The rule in Delaware, adopted by its Supreme Court, is clear and unequivocal:

> Ordinarily, a corporate by-law may be amended by implication and without any formal action being taken by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein; but usually the course of conduct relied on to affect the change must have continued for such a period of time as would justify the inference that the stockholders had knowledge thereof and impliedly consented thereto.

In the Matter of Osteopathic Hospital Association of Delaware, 195 A.2d 759 at 762, reaffirming the principle stated in In re Ivey & Ellington, Inc., 42 A.2d 508 (1945). Here, long-term Telxon

35

Board members Reddy and Rose establish that Telxon maintained a policy and practice of reviewing and approving the hiring of and remuneration arrangements for all officers. (*See* Tab 1, Rose Declaration, ¶6; Tab 2, Reddy Declaration ¶4.) This policy is acknowledged by, respectively, the company's long-term head of Human Resources, Corporate Accounting, and Legal Department, Pais, Grand, and Hansen. (*See* Pais Declaration ¶2-5; Tab 4, Grand Declaration ¶2-3; Tab 7, Hansen Declaration ¶3-5.) Moreover, Rose, a long-term member of Telxon's Board, establishes that the company and its counsel communicated this policy to Paxton when appointing him CEO. (*See* Tab 1, Rose Declaration ¶8.) Telxon's corporate records also establish that this policy was followed (*see* Exs. 27, 28, 29) and that Paxton himself followed this policy on at least one occasion when hiring a non-executive officer. (*See* Tab 13, Goodman Declaration ¶4, Exs. C, D, E.)

Paxton cites 8 Del. C. § 142(a) to argue that any limitation on a CEO's authority not enumerated in the company's by-laws is invalid under Delaware law. As set forth above, this is not an accurate statement of law. Also, 8 Del. C. § 142(a)'s provision that officer titles and duties "shall be stated in the by-laws or any resolution of the board of directors which is not inconsistent with the by-laws" does not address in any way the hiring authority for a CEO of a Delaware corporation. It simply states what it states: that Delaware corporations shall set forth officer titles and duties in its by-laws or resolutions of its board of directors. This statutory provision has no impact on this case.

Moreover, Paxton misconstrues Telxon's By-Laws governing the hiring authority of its CEO. Telxon's By-Laws expressly limit the CEO's authority to hire non-executive officers to those "whose duties do not generally include the formulation of corporation policies." (*See* Ex. A.) It is both an issue of fact as to whether Crumpler was an executive officer and whether Crumpler's duties included the formulation of company policy. Paxton and Crumpler testified she was in "an executive

36

position." (Crumpler Depo., pg. 11; Paxton Depo., pg. 46.) Paxton testified she oversaw both Human Resources and Legal. (*See* Paxton Depo., pgs. 112-113.) Her offer letter stated that she was charged with providing "professional guidance in the selection, management and development of additional key staff." (*See* Ex. 1.)

It is undisputed that she was a direct report to the company's CEO. (Crumpler Depo., pg. 11; Ex. 1.) Telxon, as a matter of corporate policy and practice, required Board approval for the appointment and remuneration of all officers directly reporting to the company's CEO. (*See* Tab 7, Hansen Declaration ¶3.) In fact, the executive officer positions enumerated in the company's By-Laws provide for "one or more senior vice presidents," and the positions enumerated are those typically reporting to the CEO: the Chief Financial Officer, Head of Operations, Head of Sales, etc. (*See* Ex. A.) Crumpler's position was "Vice President, Administration and Organizational Development." (*See* Ex. 1.) To be in charge of "Organizational Development" would have necessitated involvement in the formulation of company policy. (*See* Tab 2, Reddy Declaration ¶7,10.)

In summary, Telxon's Board required its approval for all officer hires and all remuneration agreements with officers, and Telxon's Board and its counsel instructed Paxton on this policy when he became CEO. This limitation on his authority is in compliance with Delaware law. In addition, it is an issue of fact as to whether Crumpler was hired as an executive officer or one whose duties included the formulation of company policy requiring Board approval pursuant to the express terms of the company's By-Laws. (*See* Ex. A.) Paxton's argument that Defendants' claims for fraud,

breach of fiduciary duty, indemnification, and contribution fail to the extent they are premised on the assertion that Paxton lacked authority to hire Crumpler is without merit.[31]

> **b.    Paxton's argument that he violated no contractual duties owed Symbol because he allegedly entered into all agreements with Crumpler prior to the date of the Merger Agreement ignores the plain terms of the Merger Agreement.**

Even assuming, *arguendo*, that when Paxton entered into the various subject remuneration agreements with Crumpler is not an issue of fact (which it is) and all agreements were entered into prior to execution of the merger agreement on July 25, 2000, Paxton ignores the fact that he had duties to Symbol under the plain terms of the merger with respect to all employee remuneration agreements he entered into between March 31, 2000 and July 25, 2000. In summary, provisions in the Merger Agreement required Paxton to disclose to Symbol or refrain from entering into any agreements increasing employee compensation and benefits from March 31, 2000, and July 25, 2000.

(*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Section 2.8, 4.1 (f), (n), (p).) These are typical merger provisions designed to prevent a company from doing exactly what Paxton did – waste valuable corporate assets on the eve of a merger.

It is undisputed that the only agreements with Crumpler that Telxon disclosed to Symbol prior to the merger were her Offer Letter and one-year Change-in-Control Agreement. It is an undisputed fact that prior to the merger, Telxon had not disclosed to Symbol:

> •    the Amendment to the Change-in-Control Agreement granting her a second year of benefits

---

[31]    Paxton's argument ignores Telxon's claims that Paxton was also not authorized to enter into any remuneration agreements with Crumpler without Board approval. As set forth above in the Statement of Facts, there is a plethora of evidence establishing that Telxon's Board required its approval for all officer remuneration agreements.

- the $75,000 Relocation Agreement (grossed-up to $135,000)

- the $200,000 Relocation Agreement grossed-up (never honored)

- the $33,000 contract cancellation payment

- the $50,000 bonus.

Having failed to disclose these agreements to Symbol prior to July 25, 2000, Symbol's express written consent was required to enter into these agreements with Crumpler, regardless of Paxton and Crumpler's self-serving claims that they were entered into prior to execution of the merger agreement, and regardless of whether they were disclosed to Symbol prior to the merger closure on November 30, 2000.

Furthermore, there is a genuine issue of disputed fact over whether these agreements were entered into prior to July 25, 2000. Beth Staples, Telxon's senior in-house attorney, expressly testified that Crumpler requested, after the Merger Agreement, an amendment to her change-in-control agreement. (*See* Staples Depo., pgs. 60-70, 84.) Paxton, and Crumpler for that matter, ignore this testimony.

Accordingly, Plaintiff's argument that Telxon and Symbol's claims against Paxton fail because Telxon and Symbol have not established that Paxton did not enter into the subject agreements with Crumpler prior to the Merger Agreement is without merit. Furthermore, to the extent they do depend on establishing this fact, there is a genuine issue of material fact with respect to whether these agreements were entered into prior to the merger.[32]

---

[32]    Third-Party Plaintiffs do not here reiterate the evidence in support of the fact that the other agreements (other than the offer letter and 1-Year Change-in-Control Agreement) were entered into after the Merger Agreement. However, it is important to note here that the $135,000 and $200,000 Relocation Agreements, the $33,000 contract cancellation fee agreement, and the $50,000 bonus were all expressly dated and entered into after the Merger Agreement without the express written consent of Symbol. This is an undisputed fact.

    **2.**    **There Are Genuine Issues of Material Fact With Respect to Whether Paxton Knowingly Concealed from Telxon's Board Employment Agreements with Crumpler and With Respect to Whether he Knowingly Failed to Disclose to Symbol and Obtain Symbol's Consent to Enter Into Post-Merger Agreements with Crumpler.**

Paxton was Telxon's CEO at all relevant times. The Board instructed him that its approval was required for all officer hires and remuneration agreements with officers. (*See* Tab 1, Rose Declaration ¶8; Tab 2, Reddy Declaration ¶11.) Crumpler is Paxton's personal friend. (*See* Crumpler Depo., pg. 24.) Other than Plaintiff's self-serving testimony, there is no corporate record supporting his assertion that he informed the Board about the hire of Crumpler, much less that he obtained Board approval for the hire and the various employment agreements he entered into with Crumpler. Even one of his appointees to the Board, Hone, testified that he had never heard of Crumpler. (Hone Depo., pg. 44.) He personally entered into the agreements with Crumpler.

Paxton had an affirmative duty to disclose to the Board, a Board he chaired, his employment agreements with Crumpler and to obtain its approval for these agreements. Fraud is not limited to overt misrepresentations, but includes deliberate concealment of material facts and silence when there is a duty to speak. Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 (Del. 1992). Further, a corporation may bring a fraud claim against members of its board of directors for material misrepresentations. Empire Southern Gas Company v. Gray, 46 A.2d 741, 743 (Del. Ch. 1946).

Paxton was a signatory to the Telxon/Symbol Merger Agreement. (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement.) He must be charged accordingly, at least for purposes of this Motion, with knowingly failing to disclose to Symbol all agreements with Crumpler except for her Offer Letter and one-year Change-in-Control agreement. To add insult to injury, having failed

to disclose those agreements to Symbol, he then knowingly failed to obtain Symbol's consent to these agreements.

Paxton argues that there is no evidence of an intention to mislead Telxon or Symbol or evidence of detrimental reliance. The evidence of intentional deception is the backdating of, at a minimum, the Amendment to the Change-in-Control Agreement to a date preceding the Merger Agreement. (*See* Staples Depo., pgs. 60-71.)

Paxton's argument that Telxon or Symbol did not detrimentally rely on his non-disclosures is bizarre. The company was caused to commit to hundreds of thousands of dollars in payments to a new employee when Paxton was communicating to the Board that he had received "a firm offer" from Symbol. (*See* Tab 13, Goodman Declaration, ¶4, Ex. J.) Symbol acquired significant financial obligations to Crumpler that were not disclosed to it or approved.

There are genuine issues of material fact on the elements necessary to establish fraud under either Ohio or Delaware law.[33] Therefore, Plaintiff's Motion for Summary Judgment on Telxon and Symbol's fraud claim against him should be denied.

### 3.    8 Del. C. § 102(b)(7) and Telxon's Certificate of Incorporation Do Not Bar Telxon's Breach of Fiduciary Duty Claim Against Paxton.

Telxon alleges facts giving rise to a claim against Paxton for breach of his duty of loyalty to Telxon.[34] Simply, the exculpatory provision of 8 Del. C. § 102(b)(7) and Telxon's adoption of this provision in its Certificate of Incorporation, on their express terms, do not exculpate directors for

---

[33]    Telxon and Symbol do not concede Paxton's assertion that Ohio law applies to their fraud claim. However, they agree that the elements of fraud are the same under both Ohio and Delaware law.

[34]    Paxton expressed confusion in his brief. To clarify, the facts as alleged and established give rise to a cause of action against Paxton for breach of his fiduciary duty, specifically his duty of loyalty, to Telxon.

41

personal liability "[f]or any breach of the director's duty of loyalty to the corporation or its stockholders."

Paxton argues, in essence, that a director cannot be found liable to a Delaware corporation for a breach of the director's duty of loyalty owed the corporation unless the director is found to have acted for his or her own personal financial gain. This is simply not Delaware law. It is true that a duty of loyalty is typically implicated when an officer or director has a personal financial interest in a corporate transaction. However, breaches of the duty of loyalty include acts of bad faith made against the interests of the corporation, including acts of intentional misconduct.

> Although corporate directors are unquestionably obligated to act in good faith, doctrinally that obligation does not exist separate and apart from the fiduciary duty of loyalty. Rather, it is a subset or "subsidiary requirement" that is subsumed within the duty of loyalty, as distinguished from being a compartmentally distinct fiduciary duty of equal dignity with the two bedrock fiduciary duties of loyalty and due care.

Emerald Partners v. Berlin, 2001 Del. Ch. LEXIS 20, *87 at n. 63. Acts of bad faith constituting a breach of the duty of loyalty include acts "so lacking in business rationality that the only conclusion one can reach is that the defendants were acting in bad faith." Id. at *89. Preferring the interest of another over those to whom a fiduciary duty is owed also constitutes a breach of the duty of loyalty. See, for example, In re ML/EQ Real Estate Partnership Litigation, 1999 Del. Ch. LEXIS 238, where investors sued managers of partnership assets for preferring the interests of its owner over those of the investors to whom they owed fiduciary duties of loyalty and care. Indeed, 8 Del. C. § 102(b)(7) itself cites examples of other subsets subsumed within the duty of loyalty, including "acts or omissions not in good faith [or in other words, in bad faith] or which involve intentional misconduct or a knowing violation of law."

Telxon has pled and established facts in discovery giving rise to a genuine issue of material fact over whether Paxton, in his business dealings with Crumpler, preferred the interests of another, Crumpler, over Telxon, to whom he owed a fiduciary duty. In addition, Telxon has pled facts and established facts in discovery that Paxton committed the company to hundreds of thousands of dollars in payments to Crumpler on the eve of or after the company's merger with Symbol (for purposes of this argument, it does not matter). These facts give rise to a genuine issue of material fact over whether this conduct was so lacking in business rationality that the only conclusion one can reach is that Paxton acted in bad faith, and over whether Paxton favored in these transactions the personal interests of Ms. Crumpler over those of the company. Accordingly, Paxton's Motion for Summary Judgment on Telxon's claim for breach of fiduciary duty should be denied.

> **4.      Paxton is Not Entitled to Summary Judgment on Telxon and Symbol's Indemnification and Contribution Claims Because Paxton, as a Corporate Officer, May Incur Personal Liability to Third-Party Plaintiffs Under Delaware Law.**

When a corporation suffers a loss as a result of a director's breach of fiduciary duty, a corporation is entitled to indemnification from the director. Cahall v. Burbage, 121 A. 646, 649 (Del. Ch. 1923). Paxton is correct that under the case Paxton cites, Stewart Coach Industries, Inc. v. Moore, 512 F. Supp. 879, 884 (S.D. Ohio 1981), the Court stated that "[it] is horn book law that officers of the corporation assume no personal obligation on an instrument which they sign...as the corporation's agent." However, Paxton neglects to inform this Court that that Court qualified that statement with the following: "This is not to say that Lenz and Moore, as corporate officers, were incapable of incurring personal liability to plaintiffs for losses with respect to the agreement." Id.

Under Delaware law, the director of a corporation holds a position of significant trust and confidence. When a corporation is injured by a director's breach of trust, the corporation has a right to remuneration in order "to be restored to the status quo ante as nearly as the facts and circumstances of each case will permit." Cahall, 121 A. at 648.

### 5.    Paxton is Not Entitled to Summary Judgment on his Amended Counterclaims for Indemnification and Advancement of Legal Fees.

Paxton has not properly moved for summary judgment on his Amended Counterclaims for Indemnification and Advancement of Legal Fees. On September 6, 2002, Symbol moved to dismiss Paxton's original counterclaims. On September 30, 2002, Paxton filed a Memorandum in Opposition to Symbol's Motion to Dismiss.

However, on October 2, 2002, Paxton filed an Amended Counterclaim "as a matter of course, since no pleading responsive to plaintiff's initial counterclaim has yet been filed." (Paxton's Amended Counterclaim, pg. 1.) This filing rendered moot Symbol's Motion to Dismiss Paxton's original Counterclaim. On October 22, 2002, Telxon and Symbol filed their Answer to Paxton's Counterclaims.

Simply, Symbol's Motion to Dismiss Paxton's original Counterclaims is not pending and is moot. Paxton asks the Court to excuse his obligation to move properly for judgment on these claims according to the Federal Rules of Civil Procedure and to accept instead, as a substitute for a proper motion, his Memorandum in Opposition to a moot motion of Symbol's that is no longer pending.

44

Telxon and Symbol should be compelled to respond to any motion for judgment on Paxton's Counterclaims only when a proper one is made.[35]

### B. Crumpler is Not Entitled To Summary Judgment On Her Complaint for Breach of Contract Claim or Telxon and Symbol's Counterclaim for Fraud and Conversion as There Are Multiple Issues of Material Fact.

Crumpler asserts that the "record overwhelmingly supports Crumpler's right to judgment in her favor on all claims and defenses at issue in this case." (*See* Crumpler's Mem. in Support., pg. 13.) However, as demonstrated in Defendants' Statement of Facts, Crumpler ignores all the evidence that demonstrates that there are multiple issues of material fact in this case. Pursuant to Fed. R. Civ. P. 56, Crumpler is not entitled to summary judgment.

### 1. Genuine Issues of Material Fact Exist as to Whether Any of Crumpler's Agreements with Paxton Are Enforceable.

Crumpler argues that as of June 8, 2000, Paxton and Crumpler "had a verbal meeting of the minds" and that Paxton and she agreed to all of the terms of her employment "before the July 25, 2000 merger agreement." (*See* Crumpler's Mem. in Support., pgs. 13-14.) Crumpler then falsely asserts that "No one - literally no witness whatsoever - can identify anything that would even arguably refute the validity and enforceability of Crumpler's agreements with Telxon." (*See* Crumpler Mem. in Support, pg. 15.) As demonstrated in Telxon and Symbol's Statement of Facts, Crumpler's statement is a misrepresentation of the record.

---

[35]    It is also noted that Paxton sought pre-judgment indemnification and advancement of legal fees in <u>Telxon v. Paxton</u> and <u>Paxton v. Telxon and Symbol</u>, Case Nos. 5:01CV2356 and 5:01CV2860, in the United States District Court for the Northern District of Ohio, Eastern Division. The magistrate judge ruled that under the terms of the Telxon/Symbol merger agreement, Symbol is not obligated to cause Telxon to indemnify Paxton or advance his legal fees prior to any judgment on the case. Judge Dowd adopted the magistrate's recommended ruling on this issue. (*See* Tab 17, Report and Recommendation of Magistrate Judge entered on March 4, 2003 and Memorandum Opinion and Order entered June 30, 2003 in <u>Telxon v. Paxton</u> and <u>Paxton v. Telxon and Symbol</u>, Case Nos. 5:01CV2356 and 5:01CV2860, in the United States District Court for the Northern District of Ohio, Eastern Division.

Crumpler knows that Symbol never consented in writing to any agreements that Paxton and Crumpler entered into after the Merger Agreement (e.g., the Amendment to the 1-Year Change in Control Agreement, the $200,000 Relocation Agreement, the $135,000 Relocation Agreement, the $33,000 contract cancellation fee, and the $50,000 bonus). (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Sections 2.19, 2.8, 2.10, 4.1.) Accordingly, none of these agreements are valid or enforceable pursuant to the express terms of the Merger Agreement. Crumpler is therefore forced to argue that all of these various agreements were "verbally agreed to" before the Merger Agreement, just not put into writing until months later. This argument is not credible given the following:

- The disclosure schedules attached to the Merger Agreement indicate that Crumpler only has a 1-year Change in Control Agreement and identified no other agreements with Crumpler. (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Tab 2, Disclosure Schedule.)

- Beth Staples testified that Crumpler's Amendment to the Change in Control Agreement was entered into after the Merger Agreement without Symbol's written consent, which Ms. Staples stated was required. (Staples Depo., pgs. 60-70.) Crumpler therefore knowingly back-dated the Amendment to "6/29/00" in order to avoid the prohibitions of the Merger Agreement, demonstrating that she was aware of the restrictions the Merger Agreement placed on Paxton's authority. (*See* Ex. 6.)

- Statements contained in the Amendment demonstrate that it was drafted after Meg Pais resigned, which occurred in August 2000, well after the Merger Agreement was signed. (*See* Ex. 6, "predecessor" and "increased responsibilities" even though Meg Pais did not leave until August 2000.)

- The Change in Control Agreement expressly states that "the Board" authorized the 1-Year Change in Control Agreement. (Ex. 5.) According to Beth Staples' testimony, Crumpler went into the legal database and prepared the Amendment to the Change in Control Agreement without Staples' knowledge, and obtained Paxton's signature and back-dated the document, all without Board or Symbol authorization. (Staples Depo., pg. 62-64.)

- The Offer Letter, which was signed before the Merger Agreement and stated that it "set forth the terms of the agreement between Crumpler and Telxon," did not mention an agreement for Telxon to reimburse Crumpler for any expenses, let alone provide her a $200,000 or $135,000 lump sum payment without the need to keep receipts or actually relocate. (*See* Ex. 1.)

- The Offer Letter also did not mention an agreement for Telxon to pay Crumpler $33,000 for a purported "contract cancellation fee." (*See* Ex. 1.)

- The $200,000 Relocation Agreement or the $135,000 Relocation Agreement, as well as the $33,000 contract cancellation agreement were not disclosed as mandated by the terms of the Merger Agreement. *See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Sections 2.19, 2.8, 2.10, 4.1., Tab 2, Disclosure Schedules.)

- The $200,000 Relocation Agreement - that bears a potentially forged Paxton signature (*see* Tab 10, Huerkamp Declaration ¶8) - indicates that Crumpler attempted to gross-up and pass-off the $33,000 cancellation fee (grossed-up to $50,000) and $3,700 (grossed-up to $5,000) in health care expenses as "relocation expenses" and further attempted to collect $17,600 for 6 months of "temporary housing" when as of the date that Crumpler submitted the potentially forged agreement, Crumpler had only incurred approximately $2,000 in housing expenses with the Holiday Inn Express. (*See* Ex. 11; Tab 9, Patel Declaration ¶3.) The $200,000 Relocation Agreement is prima facie evidence of Crumpler's fraud and blatantly violates Telxon's relocation policy. The $200,000 Relocation Agreement was not honored for reasons not yet known, but Crumpler admitted she submitted it to Telxon's Controller with the instruction to "cut her a check." (*See* Ex. 11; Crumpler Depo., pg. 149.)

- Crumpler's Employment Agreement only referenced the 1-year Change in Control Agreement and makes no mention of any relocation agreement, contract cancellation agreement, or Amendment to the Change in Control Agreement. (*See* Ex. 4.)

- Crumpler's Employment Agreement capped her bonus compensation at $37,500 for all of fiscal year 2001 and states that the Board approves bonuses. (*See* Ex. 4, section 3, b.) However, after only five months of employment, just days before the merger closed, Crumpler was given a $50,000 bonus without Board or Symbol approval. (*See* Ex. 16.) As Meg Pais' replacement, Crumpler assumed the responsibility of obtaining Compensation Committee approvals, which never occurred, and was also aware of the restrictions placed on Paxton's authority by the Merger Agreement.

Crumpler, a human resources consultant that gets paid $2,000 per day, wants this Court to believe that she entered into several agreements with Paxton on June 8, 2000, but did not insist that

47

these agreements be contemporaneously memorialized in her Offer Letter, Employment Agreement, or any writing for several months. The record demonstrates that the Offer Letter, Employment Agreement, and the 1-Year Change in Control Agreement are the only agreements that were signed before the Merger Agreement. (*See* Tab 5, Chung Declaration, Ex. A, Merger Agreement, Tab 2, Disclosure Schedule; Staples Depo., pgs. 60-70; Exs. 8; 11; 12; 16.) However, Telxon's Compensation Committee never approved Crumpler's hiring and never authorized Paxton to sign the Employment Agreement and 1-Year Change in Control Agreement. (*See* Tab 2, Reddy Declaration ¶9, 18, 20; Tab 3, Pais Declaration ¶9; Tab 7, Hansen Declaration ¶5,7,9.) Therefore, Paxton did not have express authority to enter into the Offer Letter, Employment Agreement, and 1-Year Change in Control Agreement. As discussed below, there are also genuine issues of material fact as to whether Paxton had apparent authority to enter into any of these agreements with Crumpler.

>    **2.    Paxton Did Not Have Actual or Apparent Authority to Hire Crumpler or Enter into Any of These Agreements.**

As set forth above in Section II., A. of this Memorandum, Paxton lacked actual authority to enter into any of the agreements with Crumpler. With respect to Crumpler's argument that Paxton had apparent authority, this issue is not properly resolved on a motion for summary judgment since "[q]uestions of apparent authority are questions of fact and are, therefore, for the jury to determine." Billops v. Magness Construction Co., 391 A.2d 196, 199 (Del. S. Ct. 1978) (reversing decision to grant summary judgment on basis of apparent authority, remanding for trial), citing Lind v. Schenley Industries, Inc., 278 F.2d 79 (3rd Cir. 1960), System Investment Corp. v. Montview Acceptance Corp., 355 F.2d 463 (10th Cir. 1966); Frank Sullivan Co. v. Midwest Sheet Metal Works, 335 F.2d

48

33 (8th Cir. 1964). An agent can bind the principal on an apparent authority basis only if the third person involved reasonably concludes that the agent is acting for the principal. <u>International Boiler Works, Co. v. General Waterworks Corp.</u>,372 A.2d 176 (Del. S. Ct. 1977); citing <u>Guyer v. Haveg Corporation, Del. Super.</u>, 58 Del. 88, 205 A.2d 176, 180 (1964), aff'd, <u>Haveg Corporation v. Guyer</u>, Del. Super., 226 A.2d 231 (1967); 3 C.J.S. Agency § 391 (1973). In dealing with the agent the third person must act with "'ordinary prudence and reasonable diligence,'" <u>id.</u>, citing <u>Arthur Jordan Piano Co. v. Lewis</u>, Del. Super., 34 Del. 423, 4 W.W.Harr. 423, 154 A. 467, 472 (1930); <u>Limestone Realty Co. v. Town & Country F.F. & C., Inc.</u>, Del. Ch., 256 A.2d 676, 679 (1969), in ascertaining the scope of the agent's authority and she will not be permitted to claim protection if she ignores facts illustrating the agent's lack of authority. <u>Id.</u>, citing <u>Arthur Jordan Piano Co. v. Lewis</u>, supra, Cf. Restatement of Agency § 135 (1958). In this regard, the third person must make a preliminary investigation as to the agent's apparent authority and additional investigations if the facts so warrant. <u>Id.</u>, citing 2A C.J.S. Agency § 169 (1972) and cases cited therein.

There is an issue of fact as to whether Paxton had apparent authority to hire Crumpler, enter into the Employment Agreement, and enter into the 1-Year Change in Control Agreement. Crumpler testified that she initially requested a base salary of $200,000 and 100,000 shares. Paxton advised Crumpler that he could only offer her $150,000 and 30,000 shares. Crumpler testified that she understood that Telxon's Board, specifically the Compensation Committee, was limiting Paxton's ability to give her a $200,000 base salary and 100,000 shares. (Crumpler Depo., pgs. 68-71.) According to Crumpler, Paxton made a comment that:

> the board of directors, composition of the board of directors would be changing, and that he was working with the board, that he inherited, you know, when he joined the company, and he was the chairman of

49

> that board and that, you know, some members would be joining.
> There was presumably people that he knew that he helped select.

(Crumpler Depo., pg. 71.)  This testimony clearly demonstrates that Crumpler (and Paxton) was aware that Paxton's authority to hire her and negotiate the terms of her remuneration agreement was limited by Telxon's Board of Directors or a Committee thereof.  When Crumpler arrived for employment on June 26, 2000, she specifically advised Lisa McManis not to provide Meg Pais a copy of her Offer Letter.  (*See* Tab 12, McManis Declaration ¶5; Tab 3, Pais Declaration ¶9.)  Meg Pais was responsible for presenting to the Compensation Committee remuneration arrangements with senior management for approval.  (*See* Tab 3, Pais Declaration ¶3; Tab 2, Reddy Declaration ¶14; Tab 7, Hansen Declaration ¶4.)  In fact, the two people who were responsible for communicating with the Compensation Committee, Meg Pais and Glenn Hansen, were not advised of Crumpler's hiring by Paxton.  (*See* Ex. HH; Tab 7, Hansen Declaration ¶6.)  There is an issue of fact as to whether Paxton and Crumpler were attempting to conceal that she was hired without Board approval.

Moreover, Crumpler's Change in Control Agreement states that "the Board has determined to extend to you the severance benefits set forth in this agreement...."  (*See* Ex. 5.)  Crumpler's Employment Agreement states that the Board of Directors sets her salary, bonus, and stock options, based on a recommendation from the Chief Executive Officer. (*See* Ex. 4, Section 3. a., b., c.)  Once again, Crumpler is clearly on notice that Paxton's authority is limited by the Board, but made no inquiry into whether Paxton obtained appropriate Board approval.   (Crumpler Depo., pgs. 72-73.)  There is certainly an issue of material fact as to whether Paxton had any authority, let alone apparent authority, to enter into these agreements.

Beth Staples testified that the Amendment to the Change in Control Agreement was prepared after the Merger Agreement. (Staples Depo 60-70, 84.) She further testified that she indicated that Symbol's written consent was required prior to entering into or modifying any employment related agreements with Telxon management. Based on this testimony, Crumpler is clearly aware of the restrictions that the Merger Agreement placed on Paxton's authority, destroying any apparent authority argument. Crumpler's back-dating of the Amendment to predate the Merger Agreement confirms her knowledge. (*See* Ex. 6.) These facts alone establish that Crumpler is not entitled to summary judgment on the basis that Paxton had apparent authority to enter into the Amendment.

As noted, the back-dating of the Amendment establishes that Crumpler knew that Paxton lacked both actual and apparent authority to enter into employment related agreements after the Merger Agreement. Therefore, Crumpler must have known that Paxton lacked both actual and apparent authority to enter into any of the other agreements that were signed or consummated after the Merger Agreement (i.e. the $200,000 Relocation Agreement, the $135,000 Relocation Agreement, the $33,000 contract cancellation fee, and the $50,000 bonus). Also, contrary to Crumpler's false assertions, the $135,000 Relocation Agreement was not in conformity with Telxon's relocation policy.

With respect to the $135,000 Relocation Agreement, Crumpler states at page 8 of her Memorandum in Support that:

> Crumpler learned from Lisa McManis (who worked for Crumpler in HR) that Telxon's relocation policy allowed employees to receive up to one-half their salary in a lump sum payment instead of having to retain and submit receipts, etc. Crumpler Depo. 56. This is what Telxon did with McManis and her husband Scott, as authorized by Pais.

McManis directly refutes this testimony in her declaration:

> The most recent version of Telxon's relocation policy capped reimbursable relocation expenses set forth therein at 50% of the employees base salary. It was not company policy to pay an employee a lump sum payment equal to 50% of the employee's base salary. Furthermore, I never communicated to Ms. Crumpler that it was Telxon policy to pay the employee a lump sum payment equal to 50% of the employee's base salary. Company policy was to reimburse reasonable relocation-related expenses actually incurred. As an exception to the policy, Telxon in isolated instances, agreed to pay the employee a reasonable lump sum payment that was assessed and arrived at based on estimated relocation costs. During my entire time at Telxon, the company never agreed to pay an employee a lump sum payment of $75,000 for relocation or never agreed to pay the employee a lump sum payment equal to 50% of their base salary. Ms. Crumpler's relocation agreement, which I reviewed and is attached hereto as Ex. A., was not consistent with Telxon's relocation policy and I never communicated to her at any point that it was. In fact, I was no longer employed by Telxon in October 2000, when Ms. Crumpler's relocation agreement was signed.

(*See* Tab 12, McManis Declaration ¶7.) Ms. McManis also directly refutes Crumpler's false statements regarding her and her husband's relocation agreement with Telxon:

> I have also reviewed page 8 of Ms. Crumpler's Memorandum in Support, attached hereto as Exhibit B, which states that "Crumpler learned from Lisa McManis (who worked for Crumpler in HR) that Telxon's relocation policy allowed employees to receive up to one-half their salary in a lump sum payment instead of having to retain and submit receipts, etc. Crumpler Depo. 56. This is what Telxon did with McManis and her husband Scott, as authorized by Pais. Pais Depo. 124-125." These statements are not true. I never advised Ms. Crumpler that Telxon's relocation policy allowed employees to receive up to one-half their salary in a lump sum payment instead of having to retain receipts, because this is not true as stated in paragraph 8. The statement that "this is what Telxon did with McManis and her husband Scott..." is also not true. My husband and I were both asked to relocate to Cincinnati and actually did so. As an exception to Telxon's relocation policy, and based on an estimated relocation cost and in consultation with Telxon's relocation consultants, ProSource, and Meg Pais, my husband and I requested a

> lump sum payment of $20,000 to cover our relocation costs and
> obviate the need to submit receipts. We did not receive a lump sum
> payment even close to 50% of either my or my husband's base salary.
> The lump sum $20,000 payment was intended to cover both my and
> my husband's relocation expenses since we both worked for Telxon.

(*See* Tab 12, McManis Declaration ¶8.) McManis' declaration directly refutes Crumpler's testimony

and creates obvious issues of fact.

The $33,000 contract cancellation was also something that was not consistent with Telxon's

policies. (*See* Tab 3, Pais Declaration ¶15.) Further, the $50,000 bonus exceeded the maximum

amount permitted under Crumpler's employment agreement ($37,500). (*See* Ex. 4; Ex. 16.)

Crumpler's employment agreement stated that the Board had to approve her bonus, but she testified

that she did not know or inquire if that occurred. (Crumpler Depo. pg. 162.) Paxton and Crumpler

both testified that Crumpler participated in due diligence with Symbol. (*See* Ex. 4.) Crumpler

testified that she knew that Symbol had to approve new hires and the terms of their offers.

(Crumpler Depo., pgs. 75-77.) Paxton testified that the Legal Department was reporting to Crumpler

shortly after she was hired. (Paxton Depo., pg. 198.) The Merger Agreement was already signed

and a matter of public record. Crumpler testified that she recalled seeing the Merger Agreement.

(Crumpler Depo., pg. 164.) Therefore, there is an issue of fact as to whether Crumpler knew or

should have know that Paxton could not enter into any of these agreements without the written

consent of Symbol or Telxon's Boards.

### 3.    Telxon Did Not Waive Their Rights to Offsets and Did Not Waive Any Defenses as Stated in Crumpler's Employment Agreement.

Crumpler argues that Telxon waived its right to offset against or defenses to Crumpler's claim

that Telxon and Symbol breached her 1-Year Change in Control Agreement and Amendment. (See

Crumpler's Mem. in Support., pg. 16.) Symbol originally offset the $135,000 Relocation Agreement since it was unauthorized, outside Telxon's relocation policy, and fraudulent.[36] Telxon was expressly permitted to offset the $135,000 Relocation Agreement under the terms of Paragraph 11 of Crumpler's Employment Agreement, which states:

> **Right of Setoff.** Any payments made to [Crumpler] under this Agreement shall be subject to offset by Employer for any claims for damages, liabilities or expenses which it may have against [Crumpler].

(*See* Ex. 4, ¶11.) Accordingly, Telxon is expressly permitted to recover or offset any damages, liabilities, or expenses from Crumpler that were paid to Crumpler, including the $135,000 for relocation expenses, the $33,000 contract cancellation fee, and the $50,000 bonus by virtue of her Employment Agreement, all which Telxon wants back.

In addition, Crumpler's Employment Agreement provides Telxon the right to terminate Crumpler for "dishonesty, grossly negligent misconduct, willful misconduct, disloyalty, act of bad faith...." (*See* Ex. 4, ¶4, c.) Under Section 5, subsection d., all of Telxon's obligations to Crumpler end upon Crumpler's termination for cause, including the obligation to pay Crumpler any monies allegedly due under the 1-Year Change in Control Agreement, which was expressly incorporated into the Employment Agreement. (*See* Ex. 4, ¶6.) The full extent of Crumpler's fraud, dishonest, disloyalty, and bad faith were only recently discovered by Telxon and Symbol as a result of this litigation. (*See e.g.*, Ex. 11, the $200,000 Relocation Agreement.) Had Crumpler's conduct been

---

[36]     Symbol sent Crumpler a check for approximately $15,000 (before taxes), the difference between the $135,000 Relocation Agreement and the $150,000 for her 1-Year Change in Control Agreement. Crumpler returned the check and choose to institute litigation where Telxon and Symbol have discovered that, in addition to the $135,000 Relocation Agreement, Crumpler back-dated the Amendment to the Change in Control, received unauthorized payments of $33,000 and $50,000 bonus and attempted to originally collect $200,000 in phony relocation expenses.

fully discovered when it occurred, Crumpler would have been immediately terminated for cause by Telxon's Board of Directors, thereby negating Telxon's obligation to honor any agreements, including the 1-Year Change in Control Agreement, valid or invalid.

Accordingly, pursuant to Crumpler's Employment Agreement, Crumpler's fraud, dishonesty, disloyalty, and/or bad faith vitiates, as of the date it occurred, the 1-Year Change in Control Agreement since "fraud vitiates everything that its use creates." State ex rel. Pucel v. Green (1956), 101 Ohio App. 531, 534, affirmed (1956), 165 Ohio St. 175. Crumpler therefore cannot assert any restrictive covenants in the 1-Year Change in Control Agreement as a basis for summary judgment because her fraud would have resulted in her termination, which vitiates all agreements, including her 1-Year Change in Control Agreement.

### 4.    Crumpler's Tortious Interference Claim Against Symbol Lacks Any Merit.

Crumpler's claims that Symbol caused Telxon to breach the terms of the contract between Telxon and Crumpler. (*See* Crumpler Mem. in Support., pgs. 17-18.) Crumpler states that "Symbol interfered with the agreements when it caused Telxon not to honor the Amendment to her change in control agreement and to offset the reduced change in control payment by the amount of Crumpler's relocation expense; Symbol had no justification whatsoever (legally or contractually) in taking those actions." (Crumpler Mem. in Support., pg. 18.)

As an initial matter, Crumpler has not established the elements of a tortious interference claim. The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. Fred Siegel Co., LPA

v. Arter & Hadden, 85 Ohio St.3d 171 (1999), syll. ¶1, citing Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, syll. ¶2. Establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper. Id., syll. ¶2, citing Kenty v. Transamerica Premium Ins. Co., supra. In determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. Id., syll. ¶3, citing and adopting Restatement of the Law 2d, Torts [1979], Section 767.

As noted above, a Telxon employee (Cecile Hickman) alerted Symbol to the fact that Crumpler had overnighted to her three days before the merger closed a $135,000 check for relocation expenses despite never relocating. (See Tab 6, Hickman Declaration ¶10-12.) Symbol was advised that this agreement was unauthorized, contrary to policy, and in violation of the Merger Agreement. (See Tab 6, Hickman Declaration ¶11.) Moreover, Crumpler never even relocated or even attempted to do so. (See Tab 6, Hickman Declaration ¶9.) Simply put, Symbol was advised that this was simply "not right." (See Tab 6, Hickman Declaration ¶12.) Based on this information, Symbol offset Crumpler's $135,000 Relocation Agreement. (See Ex. 22.) Crumpler cannot possibly establish that Symbol's actions were improper, particularly since Crumpler's Employment Agreement expressly provides for the offset of any claims, liabilities, or expenses. In addition, Symbol also learned directly from Paxton that Crumpler's Amendment to the Change in Control Agreement was not

56

authorized and backdated. (*See* Ex. 22.) Crumpler's claim against Symbol lacks any merit since Crumpler cannot prove that Symbol's conduct was improper or unjustified under the circumstances.

> **5.    Telxon and Symbol Could Not Ratify Any of Crumpler's Agreements as a Result of Paxton and Crumpler's Fraud and Crumpler Has Failed to Establish That Symbol or Telxon Entered into Any Binding Agreement.**

Ratification by a Board of Directors requires "actual knowledge of the facts." See Campbell v. Hospitality Motors Inns, Inc., 24 Ohio Softechnics.3d 54, 57 (1986); *see also* Genesis Respiratory Services, Inc. v. Hall, 99 Ohio App.3d 23, 29-30 (1994). There are issues of fact as to whether Paxton and Crumpler fraudulently concealed material information from Telxon and Symbol from the outset. For instance, Paxton and Crumpler concealed from Telxon that the Amendment to the Change in Control Agreement was back-dated to predate the Merger Agreement. (*See* Staples Depo. pgs. 60-70.) Moreover, the $33,000 contract cancellation fee payment, the $135,000 Relocation Agreement, and the $50,000 bonus were not disclosed (or authorized) in violation of the Merger Agreement. (*See* Tab 5, Chung Declaration, ¶3, Ex. A, Merger Agreement, Tab 2, Disclosure Schedules.) While the 1-Year Change in Control Agreement was disclosed in the disclosure schedules to the Merger Agreement, the agreement was not provided to Symbol at any point prior to that date, and placed on the disclosure schedule just days before the Merger Agreement was signed. (*See* Tab 5, Chung Declaration, ¶3, Ex. A, Merger Agreement, Tab 2 Disclosure Schedules.) Symbol and Telxon also promptly repudiated the $135,000 Relocation Agreement, the Amendment to the Change in Control Agreement (*see* Ex. 22) and the unauthorized payments to Crumpler for $33,000 and $50,000 by virtue of its counterclaims against Crumpler. Crumpler is clearly not entitled to summary judgment on the basis that Symbol and Telxon ratified any agreements between Crumpler and Paxton. Moreover, the express terms of the Merger Agreement required Paxton to

obtain Symbol's express written consent prior to entering into any employment related agreements.

(*See* Tab 5, Chung Declaration, ¶3, Ex. A, Merger Agreement, Sections 4.1.) Symbol never consented in writing to any of Crumpler's various post-merger agreements with Paxton. As such, Symbol never ratified these agreements.

Moreover, Crumpler has not established that Symbol or Telxon entered into any settlement agreement with Paxton that obligates Symbol or Telxon to honor any agreements with Crumpler. Crumpler argues that Exhibit B amounts to a binding settlement agreement and that "Symbol reneged on the December 2000 agreement and caused Telxon to breach its agreement with Crumpler. (*See* Crumpler's Mem. in Support pg. 12, 19.) Crumpler's argument is baseless considering that Symbol or Telxon never entered into any type of settlement agreement with Paxton. Rather, following Paxton's termination for fraud, Paxton's counsel faxed Symbol's President, Tomo Razmilovic, a letter that purported to outline what Mr. Razmilovic and Paxton discussed "and related matters which we did not specifically discuss...." (*See* Ex. B.) Paxton's counsel stated "I believe this letter accurately sets forth what we discussed and resolutions contemplated by our discussion. If it does not, please call me at your earliest convenience as I know that all of us want to avoid disagreements and want to bring friendly closure to this transaction." Crumpler never even deposed Mr. Razmilovic and therefore cannot establish what was even discussed. Accordingly, Crumpler cannot prove that Symbol or Telxon ever entered into a settlement (which they did not). *See* Heiman Aber & Goldlust v. Ingram, 1998 Del. Super. LEXIS 251, *4-5 (1998) (stating that "the party seeking to enforce a settlement agreement has the burden of proving the existence of the contract by a preponderance of the evidence.")

Crumpler asserts that "Symbol's current Vice President of Human Resources confirmed that Symbol's president and CEO had agreed to the provision set forth in counsel's letter." (*See* Crumpler's Mem. in Support, pg. 12.) This is another blatant misrepresentation of the record. Mr. Bradshaw testified that he never even talked to Mr. Razmilovic. (Bradshaw Depo., pg. 29.) Mr. Bradshaw did state that Paxton agreed to return $862,000 in unauthorized bonuses he paid out by reduction of that amount owed him under his change in control agreement. (Bradshaw Depo. pgs. 30-31.) Bradshaw was then asked: "What wasn't resolved?" and responded "It was not clear to me that everything else was resolved." (Bradshaw Depo., pg. 31.) Mr. Bradshaw's testimony clearly establishes that he lacked any knowledge to authenticate or validate any purported settlement agreement. Crumpler asserts that the scribbling somehow indicates that Telxon and Symbol are bound by the letter. (*See* Crumpler's Mem. in Support, pg. 12.) None of the handwriting was Bradshaw's, and he had no knowledge of Mr. Razmilovic's state of mind or overall intent. Crumpler therefore has failed to establish that Symbol and Telxon entered into any agreement.

Notwithstanding the fact that Crumpler has not even come close to establishing that Telxon and Symbol are bound by the letter, Crumpler failed to plead the affirmative defense of "release" as required pursuant to Fed. R. Civ. P. 8(c) in her Reply to Symbol and Telxon's Counterclaim. (*See* "Plaintiff Hughette Crumpler's Reply to Defendants' Counterclaim.") Crumpler, therefore, is now precluded from asserting it as an affirmative defense. <u>Macurdy v. Sikov & Love, P.A., et al.</u>, 894 F.2d 818, 824 (N.D. Ohio 1990), <u>quoting</u> 5 C. Wright & A. Miller, Federal Practice & Procedure, § 1278 (1969).

6.    **Crumpler Is Not Entitled to Summary Judgment on Telxon and Symbol's Fraud and Conversion Claims as There Is Extensive Evidence of Crumpler's Fraud.**

As set forth in detail in Telxon and Symbol's Statement of Facts, there is substantial evidence that Crumpler engaged in fraud and improperly converted Telxon property, as summarized below:

**Amendment to Change in Control**

After the Merger Agreement, Crumpler prepared and provided Symbol a document titled "FY'2000 EMPLOYMENT/CHANGE IN CONTROL AGREEMENTS" that indicated, for the first time, that Crumpler had a two-year change in control provision. (*See* Ex. D; Crumpler Depo., pgs. 123-125.) Crumpler did not disclose that the Amendment to the Change in Control Agreement was prepared and signed after the Merger Agreement. Under the terms of the Merger Agreement, Crumpler had a duty to disclose this material fact to Symbol. Crumpler's representation to Symbol that she had a two-year change in control provision was a material misrepresentation of fact. Crumpler's failure to disclose that the Amendment was prepared and signed after the Merger Agreement amounts to an omission or concealment of a material fact.

**The $200,000 Relocation Agreement & the $135,000 Relocation Agreement**

The $200,000 and $135,000 Relocation Agreements were not disclosed to Symbol either before or after the Merger Agreement in violation of the terms of the Merger Agreement. (*See* Tab 5, Chung Declaration, ¶3, Ex. A, Merger Agreement, Tab 2 Disclosure Schedules.) Crumpler had a duty to obtain Symbol's written consent prior to entering into these agreements. (*See* Tab 5, Chung Declaration, ¶3, Ex. A, Merger Agreement, Section 4.1.) Her failure to even disclose these agreements amounts to an omission of material facts. They were also not in compliance with policy and, therefore, were based on false pretenses. Crumpler's representation in the $135,000 Relocation

60

Agreement that a lump sum payment equal to ½ of the employees base salary was consistent with Telxon's relocation policy constitutes a misrepresentation of material fact. (*See* Ex. 8.) Additionally, the $200,000 Relocation Agreement potentially contains a forged signature and contains multiple misrepresentations regarding phony relocation estimates. (*See* Ex. 11.)

What were Crumpler's actual expenses that she incurred during her five months of work? Crumpler claims to have thrown out every bill, receipt, document, credit card bill, record, boarding pass, or any document that would establish that Crumpler actually incurred any expenses. (*See* Crumpler Depo., pg. 63.) The only evidence in the record are documents obtained by Telxon and Symbol's counsel from the Holiday Inn Express. (*See* Tab 9, Patel Declaration ¶3, Ex. A.) According to those records, Crumpler only stayed at the Holiday Inn Express for a total of 55 days from July 25, 2000 to November 27, 2000. The total bill for this period was about $2,000. Moreover, these records indicate that Crumpler arrived in Cincinnati on July 25, 2000, the day the Merger Agreement was signed, not in June as Paxton and Crumpler claim. (*See* Tab 9, Patel Declaration., ¶3, Ex. A; Crumpler Depo., pgs. 4-6.)

During her five months of employment with Telxon, Crumpler testified that she traveled to Brussels, France, the UK, Germany, Spain and Canada.[37] (Crumpler Depo., pg. 180.) Crumpler admits that Telxon reimbursed her for all her travel expenses incurred while she was traveling. (Crumpler Depo., pg. 146.) Based on the Holiday Inn Express records, Crumpler therefore apparently traveled for approximately 50 of the 100 days she worked for Telxon.[38] She admits that

---

[37]    Telxon has no clue what Crumpler was doing in these countries.

[38]    The only other possibility is that Crumpler only worked 50 days and took the other 50 off. Crumpler was set to be paid in excess of $1,000,000 in cash and stock. That means Telxon paid her approximately $18,000 per day. Paxton's assertion that this passes the "business judgment rule" is without merit. Crumpler's assertion that she is entitled to $135,000 for relocation expenses is a joke.

she was fully reimbursed for all her expenses for ½ of her entire five month employment term. Despite this, she still attempted to collect $200,000 in recollection expenses and eventually collected $135,000. These facts alone create multiple issues of fact and raise significant and alarming questions.

## Crumpler's Unauthorized Use Of Paxton's Signature Stamp

Several documents relating to Crumpler that were located by Symbol and Telxon, and produced in this litigation, bear Paxton's stamped signature and not his actual penned signature. (*See* Exs. 3, 7, 13, 14; Tab 3, Pais Declaration ¶12; Paxton Depo., pg. 137.) Paxton's secretary, Bridgette Huerkamp, the custodian of Paxton's signature stamp, states that "Mr. Paxton's signature stamp was not used for any type of contract, agreement, or legal document in nature. The signature stamp was used for general correspondence and was rarely used." (*See* Tab 10, Huerkamp Declaration ¶4.) Ms. Huerkamp also "never permitted anyone to use the signature stamp at anytime." (*See* Tab 10, Huerkamp Declaration ¶4.) Ms. Huerkamp, who was familiar with Paxton's handwriting and signature, also believes that the $200,000 Relocation Agreement "does not bear Mr. Paxton's actual penned signature." (*See* Tab 10, Huerkamp Declaration ¶5, 8; Ex. 11.)[39] The documents that bear either Paxton's signature stamp or a potentially forged signature provided Crumpler hundreds of thousands of dollars in cash and stock. (*See* Exs. 3, 7, 11, 13, 14.) In short, these documents raise significant and serious issues regarding Crumpler's knowledge of and knowing participation in the unauthorized acts described herein.

---

[39]     Perhaps that is why this agreement was not honored.

## IV.     CONCLUSION

Telxon and Symbol, based on the foregoing, respectfully request the Court to deny, pursuant to Federal Rule of Civil Procedure 56, Paxton and Crumpler's Motions for Summary Judgment, on grounds that genuine issues of material fact exist, and Paxton and Crumpler are not entitled to judgment as a matter of law.

Respectfully submitted,

OF COUNSEL:

GOODMAN WEISS MILLER LLP

/s/ Jon J. Pinney
JAMES S. WERTHEIM (0029464)
KIMBERLY Y. SMITH (0066849)
JON J. PINNEY (0072761)
100 Erieview Plaza, 27th Floor
Cleveland, OH 44114-1882
(ph.) 216-696-3366 • (fax) 216-363-5835
wertheim@goodmanweissmiller.com
smith@goodmanweissmiller.com
pinney@goodmanweissmiller.com

**Attorneys for Defendants/Third-Party
Plaintiffs**

63

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2003, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


                                                    /s/ Jon J. Pinney
                                                  JON J. PINNEY (0072761)