**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **HUGHETTE CRUMPLER,** | : | Case No. C-1-02-131 |
| Plaintiff | : | Judge Susan J. Dlott |
| v. | : | |
| **TELXON CORPORATION, et al.,** | : | |
| Defendants, | : | **REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF HUGHETTE CRUMPLER'S MOTION FOR SUMMARY JUDGMENT** |
| v. | : | |
| **JOHN W. PAXTON, SR.,** | : | |
| Third-Party Defendant. | : | |

**I.   INTRODUCTION**

What do parties do when they lack genuine issues of material fact to avoid summary judgment? In the case of Telxon and Symbol, they make some up. And if that doesn't work, they misrepresent the evidence, use declarations from witnesses they never disclosed or otherwise promised not to use, refer to documents not produced in discovery, and make repeated references to unsubstantiated "facts" in the hopes that somehow, somewhere, the Court would find a non-existent question of fact.[1] That is the only possible explanation for the nonsense that Telxon and Symbol filed in opposition to Hughette Crumpler's Motion for Summary Judgment. Fortunately the Court is well-versed in disregarding a party's rhetoric, unsupported accusations and inadmissible conjecture and hearsay. When those elements are ignored—as they must be—

---

[1] Included among the materials filed by Telxon and Symbol are documents not produced in discovery (Exhibits B, C and F to the Pais Declaration; Exhibits A and B to the Chung Declaration; Exhibit A to the Hansen Declaration; Exhibit A to the Siegel Declaration), and declarations from four witnesses whom Telxon and Symbol never disclosed (Chung, Siegel, Patel and Kochy) and one witness (attorney Robert Goodman) whom they represented to the Court would *not* be used as a witness. The extent of Telxon and Symbol's evidentiary abuses is so overwhelming that Crumpler will file separately a Motion to Strike all such inadmissible items.

the record of admissible evidence actually before the Court confirms that no *genuine* issues of material fact exist and that Crumpler is entitled to judgment as a matter of law.

## II. THE ADMISSIBLE EVIDENCE IN THE RECORD ENTITLES CRUMPLER TO SUMMARY JUDGMENT.

Crumpler's opening memorandum cites to the admissible evidence in the record that warrants her right to summary judgment. Even when presented with the opportunity to file a 50-page brief in response to Crumpler's 20-page memorandum, Telxon and Symbol have no substantive response to these undisputed and, in some instances, admitted facts:

- ✓ As Telxon's then-current Vice President of Human Resources (Meg Pais) confirmed, Paxton "absolutely" had the authority to hire Crumpler as an outside human resources consultant to the corporation in 1999.[2]

- ✓ Pais considered Crumpler qualified and personally approved each of Telxon's consulting payments to Crumpler.[3]

- ✓ Paxton hired Crumpler to replace Pais. On June 8, 2000, Paxton confirmed that Crumpler would receive the identical compensation and benefits received by Pais.[4]

- ✓ Telxon and Crumpler signed her offer letter, Employment Agreement and original change in control agreement *before* Telxon and Symbol announced their potential merger on July 25, 2000.[5]

---

[2] Pais Depo. 88-89, 98.
[3] Pais Depo. 7-13, 93, 99-100, PXZ & AA. It is truly laughable that Telxon and Symbol have the audacity to challenge Crumpler's consulting agreement at this late stage.
[4] Pais Depo. 33-34, PXBB; Paxton Depo. 38-41, 47-48, 129, 199-200; Crumpler Depo. 49-50, 67-68, 72-73.
[5] Telxon and Symbol readily admit these facts in their memorandum. Defendants' Memorandum at 37.

- ✓ Crumpler's offer letter, Employment Agreement and original change in control agreement were disclosed to Symbol before the merger was announced, and also referenced in schedules to the merger agreement.[6]

- ✓ Both Paxton and Crumpler signed the Amendment to her change in control agreement *before* the announced merger. Every single witness presented by Telxon and Symbol (including Beth Staples) admitted they had no idea when the Amendment was prepared or signed.[7]

- ✓ Crumpler knew nothing about the merger before Telxon hired her, or at any time before the announcement date.[8]

- ✓ As Telxon's Chairman and Chief Executive Officer, Paxton had "general charge and supervision of the business of the Corporation."[9] Telxon's former board members and officers all confirmed the general authority bestowed upon Paxton.[10]

- ✓ Telxon's by-laws authorized Paxton, as Chief Executive Officer, to hire non-executive officers such as Crumpler and to give them job titles and compensation that he deemed appropriate.[11]

- ✓ Telxon's by-laws did not require Paxton to obtain the board's pre-approval before hiring a non-executive officer.[12]

- ✓ Telxon and Symbol admit that, but for Paxton's disputed authority, Crumpler would have been a "non-executive officer" as defined in Telxon's by-laws.[13]

---

[6] Defendants' Memorandum at 14-15, 26, 45. In light of these admissions and other facts, how can Telxon and Symbol possibly dispute with a straight face that Crumpler's agreements existed before the announced merger?
[7] Paxton Depo. 139-140; Staples Depo. 75; Bradshaw Depo. 63.
[8] Crumpler Depo. 13-14, 131.
[9] Telxon's Amended and Restated By-laws, PXA, Article III, Section 8.
[10] Hone Depo. 33; Garwood Depo. 32-33; Pais Depo. 59; Paxton Depo. 203.
[11] Telxon's Amended and Restated By-laws, PXA, Article III, Section 3.
[12] Crumpler can only cite generally to the by-laws, as it is difficult to prove something that does not exist.

- ✓ Telxon and Symbol concede that Crumpler was a Telxon employee as of June 26, 2000.[14]

- ✓ Paxton verbally agreed and confirmed prior to the July 25th merger announcement that Telxon would pay Crumpler's relocation expenses in a lump sum and that she did not have to retain or present expenses or receipts.[15]

- ✓ Telxon's written relocation policy expressly authorizes the payment of relocation expenses in a lump sum grossed up for tax purposes and gives employees one full year to complete the relocation.[16]

- ✓ Symbol had knowledge of Crumpler's Amendment to her change in control agreement before the merger closed on November 30, 2000, and documents prepared by agents of Telxon (not Crumpler) refer to Crumpler's 2-year change in control agreement. Paxton also personally discussed Crumpler's 2-year change in control agreement with Symbol's president before the merger closed.[17]

- ✓ Three separate officers of Symbol (Brian Burke, Leonard Goldner and Robert Bradshaw) knew about Crumpler's relocation agreement before the merger closed on November 30, 2000.[18]

- ✓ As Telxon's CEO, Paxton signed multiple change in control agreements in May and June 2000. Telxon and Symbol honored all such agreements even though

---

[13] See Request No. 7 to Defendants' Amended Responses to Plaintiff's Second Request for Admission (copy attached as Exhibit A). This binding admission eliminates any attempt by Telxon and Crumpler to play games with Crumpler and Paxton's deposition testimony concerning Crumpler's alleged status as an "executive."

[14] Defendants' Memorandum at 10 ("Crumpler started with Telxon on June 26, 2000."). Telxon and Symbol have backed off the ridiculous claim that Crumpler was not an employee of Telxon and that Paxton back-dated payroll records. Of course, they persist in making other unsubstantiated accusations.

[15] Crumpler Depo. 49-50, 57-59, 140-141; Paxton Depo. 63-65, 193.

[16] Pais Depo. 123-127; DX32 at 2.0(E), 7.0 and 9.0.

[17] Paxton Depo. 108-109, 145; PXD, PXE, PXG; Bradshaw Depo. 145-146.

[18] Bradshaw Depo. 136.

4

there is no evidence that Telxon's board of directors approved those change in control agreements, as allegedly required.[19]

- ✓ No evidence exists that Crumpler had any reason to doubt Paxton's authority to hire her or that she knew anything about the alleged (and non-existent) "policies and practices" whereby Telxon's board of directors would have been required to approve her various employment-related agreements.
- ✓ Telxon fired Crumpler before she could move to Cincinnati.[20]
- ✓ At Symbol's direction, Telxon offset Crumpler's change in control payment by the amount of her relocation allowance.[21]

Confronted with those undisputed facts, Telxon and Symbol resort to misrepresenting and embellishing the record. For example, Telxon and Symbol, perhaps hoping the phrase will stick in the Court's mind, repeat the phrase "back-dated" over and over again. But the record contains absolutely no evidence that any of Crumpler's agreements were "back-dated." Telxon and Symbol cite Beth Staples' deposition testimony as purported support for their claim that Paxton and Crumpler back-dated the Amendment to the change in control agreement and accuse Crumpler and Paxton of ignoring that testimony. In hindsight, Crumpler should have slammed home that testimony because Staples readily admitted that *she has no personal knowledge* when the Amendment was prepared, signed by Paxton, or signed by Crumpler. Staples Depo. 75. All Staples could refer to was inadmissible hearsay by an unidentified source about something that may or may not have happened or been said.[22] It is outrageous for Telxon and Symbol to

---

[19] Bradshaw Depo. 100-110, 113-122; Paxton Depo. 186.
[20] Bradshaw Depo. 75-77; Crumpler Depo. 50-51.
[21] Bradshaw Depo. 69-70, 73, 78-88.
[22] None of Staples' deposition testimony on these issues is remotely admissible. Not only was much of it hearsay (including references to comments made by other Telxon employees), but Staples could not even remember the gist of most conversations or the names of people who allegedly made any statements. Somehow the term "misrepresentation" is inadequate to describe how Telxon and Symbol have lied to the Court in claiming that Staples

suggest that Staples "repeatedly testified that the Amendment was created after the Merger Agreement was signed." Defendants' Memorandum at 17. Their deception wastes the Court's time and obviously creates no issue of fact.

Equally baseless are Telxon and Symbol's belated complaints about Crumpler's consulting agreement. Telxon and Symbol present no evidence that Crumpler's fees were "exorbitant." Instead, they resort to accusing Paxton of fabricating testimony—without putting forth any evidentiary support for that allegation. Telxon and Symbol refer to mystical information contained in "Telxon's accounting records for fiscal years 1998, 1999 and 2000." (Defendants' Memorandum at 3) but have *never* produced those documents, either with their initial disclosures or at any time during discovery, or even submitted them to the Court at this late stage. The same is true of their reference to Crumpler's consulting fee vis-à-vis the fees paid to investment bankers. Grand Declaration ¶6. Telxon and Symbol fail to produce any evidence to support Mr. Grand's conclusory testimony on this subject.[23]

Similarly, Telxon and Symbol mysteriously and repeatedly argue that unidentified "policies and practices" about getting board approval for the company's hiring of non-executive officers support their position. Neither this "policy/practice" nor any such requirement is found anywhere in Telxon's by-laws or any other corporate record. In fact, the by-laws expressly provide the exact opposite: Paxton had unfettered discretion to hire non-executive offers like Crumpler. Telxon and Symbol have admitted that Crumpler would have been a non-executive officer. But they persist in submitting declaration after unsupported declaration from witnesses referring to policies and practices that simply do not exist.

---

knew when the Amendment to the change in control agreement was signed. She flatly denied having any such knowledge. Staples Depo. 75.

[23] The balance of Grand's Declaration is also completely devoid of foundation and premised on inadmissible hearsay (including what other Telxon employees allegedly said to him). Grand Declaration ¶¶2-6.

The Court cannot and should not consider any of that "evidence" because every single reference in a declaration to an alleged policy and practice lacks foundation and constitutes inadmissible hearsay. Telxon and Symbol's witnesses claim to know about an unidentified policy, practice, procedure or requirement that restricted Paxton's actions. All such testimony relates to an out of court statement (a verbal or written policy or practice or requirement) offered to prove the truth of the matter asserted (that Paxton had to get board approval before hiring non-executive officers). Unlike the admittedly binding by-laws, was the alleged policy or practice written down? What specifically does it provide? When was it enacted? By whom? Why? Telxon and Symbol have not come forward with evidence to answer any of those questions, or to explain how their conclusory and inadmissible declarations override the unambiguous by-laws.

Telxon and Symbol's cavalier attitude toward the truth is further reflected in their attack on Crumpler's relocation benefits. On the one hand, Telxon and Symbol admit that Telxon "employees periodically negotiated a lump sum payment" and that the written relocation policy "capped all reimbursable relocation expenses at 50% of the employee's base salary." Defendants' Memorandum at 21. On the other hand, Telxon and Symbol repeatedly assert that Crumpler's relocation agreement violated Telxon's policy. That is simply not true, and Telxon and Symbol know it.

Telxon's written relocation policy expressly provides that employees could receive relocation payments in "a lump sum amount to be determined on a case by case basis." Meg Pais admitted that Telxon reimbursed employees based on a percentage of their salaries. It may not have been common, but it happened. Pais authorized such payments for employees, and had no reason to question her authority or that of Paxton and other senior officers to do the same. While looking at the written policy during her deposition, Pais conceded and admitted that

7

paying a lump sum to an employee for relocation expense was *not* a violation of Telxon's written policy and "was not outside the policy." Pais Depo. 123-127, 133, 158-159.

Unable to present any facts to support their arguments, Telxon and Symbol resort to innuendo and all but claim that Crumpler received the relocation benefits in the dark of night. That is hardly the case. Paxton confirmed that he approved the relocation arrangement in early June 2000 and again later that month when Crumpler realized that an employee could receive a lump sum payment. Both he and Crumpler further confirmed that Telxon should have made that payment immediately in June 2000. Only when Telxon delayed making the payment from one month to the next did Crumpler take action to document her agreement. It is not remotely surprising that someone in Crumpler's position would push for the payment of an outstanding obligation on the eve of the merger when Telxon had failed to pay the agreed amount due for several months.[24] Given Telxon and Symbol's tendency to deny the existence and enforceability of agreements written in black and white, Crumpler's caution proved to be prescient.

Yet another fact that Telxon and Symbol try unsuccessfully to spin is the December 2000 agreement that Paxton reached with Telxon and Symbol as to their reimbursement of bonuses and commitment to honor all change in control agreements. The evidence before the Court confirms that, per an agreement reached between Paxton and Telxon, Telxon and Symbol withheld $862,000 in allegedly unauthorized bonuses from Paxton's change in control payment. Regardless of whether Bradshaw personally spoke with Symbol's president, Symbol's general counsel faxed him written proof of the approval of the settlement by Symbol's president, Bradshaw understood the bonus dispute to have been settled, and he sent the reduced change in

---

[24] The only thing confirmed by Cecille Hickman's Declaration on this subject is that she knows *nothing* about Telxon's relocation policy. How else does one explain her declaration in light of the express language of the written policy? The written policy authorizing the relocation lump sum—and not Hickman's uniformed testimony—is the best evidence of Telxon's actual relocation policy.

8

control payment to Paxton. Bradshaw Depo. 28-31. As Bradshaw admitted, "I believe that the issue with respect to the $862,000 [in bonuses] was resolved." Bradshaw Depo. 31. Those are the facts. Telxon and Symbol have not come forward with a shred of evidence—including any contrary testimony from Symbol's former president—to dispute these facts and admissions by Symbol's current Vice President of Human Resources.[25]

Telxon and Symbol's argument that Crumpler failed to plead "release" as an affirmative defense is yet another red herring. Paxton's reimbursement of the disputed bonuses—including the $50,000 bonus paid to Crumpler—goes to both the liability *and* damages phases of Telxon and Symbol's Counterclaim against Crumpler. Not only was the bonus dispute fully resolved in December 2000, but Telxon and Symbol cannot possibly claim to have suffered any damages because they recovered the entire $50,000 bonus paid to Crumpler. The fact that the money came from Paxton is irrelevant—*Telxon and Symbol have no damages*.

### III.   TELXON AND SYMBOL'S MISREPRESENTATIONS NOTWITHSTANDING, THERE ARE NO GENUINE ISSUES OF MATERIAL FACT. CRUMPLER IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS.

Telxon and Symbol admittedly have no defenses to Crumpler's claims. Their only hope is that the Court buys into their strained argument that Telxon's Chief Executive Officer did not have the authority to enter into the various agreements with Crumpler. Once the Court sidesteps that ridiculous claim, Crumpler's right to judgment is a no-brainer.

---

[25] Telxon and Symbol attack Crumpler for not deposing Tomo Razmilovic, Symbol's former president. But they cannot even produce a contrived declaration from Razmilovic or Leonard Goldner, Symbol's former general counsel, as they did with other witnesses. Perhaps that is due to the fact that Symbol terminated Razmilovic and Goldner in the wake of federal securities fraud and criminal scandals. See "Symbol Revenue Down $223M in Financial Restatement for 1998-2002" http://www.crn.com/sections/BreakingNews/dailyarchives.asp?ArticleID=45033. Several news sources have reported that Symbol terminated consulting agreements with Razmilovic and that he has refused to return to the United States from Great Britain for questioning by the SEC. *See, e.g.,* "The End of an Era," The Data Capture Report (7/25/03) http://www.scandcr.com/fileadmin/pdf_files/scan072503.pdf.

### A. Paxton had both actual and apparent authority to enter into each of Crumpler's agreements.

The Telxon shareholders' express grant of extensive authority to Paxton, as the company's CEO, could not be clearer. The by-laws confirm that Paxton had the authority to hire and fire non-executive officers such as Crumpler, to set their compensation, *and* to establish their job titles. Both Telxon and Symbol have admitted the authenticity of the by-laws in effect during 1999 and 2000.[26] The by-laws destroy Telxon and Symbol's baseless denial of Paxton's actual authority.

Moreover, no trier of fact could reasonably conclude that the unsubstantiated and conclusory testimony relating to alleged policies and practices somehow limited Paxton's actions as Telxon's CEO. Telxon's board can only act through formal votes, not allegedly unofficial policies and practices. If the board enacted any such policy or practice, then Telxon and Symbol would have produced it long ago and filed it with the Court in opposition to Crumpler and Paxton's dispositive motions. They have done neither.[27]

Just this week—on October 6, 2003—a sister court in an action by two of the same parties in this case (Telxon and Paxton) rejected an identical attempt to use conclusory affidavits to contradict written corporate by-laws.[28] In that decision, the court properly summarized the standards for considering evidence in the record on a motion for summary judgment. As the court found, "General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes" and "unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, 'do not satisfy Rule 56(e) and must be

---

[26] See Admission Nos. 2 and 3 to Defendants' Amended Response to Plaintiff's Second Request for Admissions.

[27] Under the best evidence rule, as set forth in FRE 1002, Telxon and Symbol are required to produce the documents underlying the alleged policies and practices. Conclusory comments by various witnesses are not the best evidence of Telxon's policies. Article III, Section 3 of Telxon's by-laws is the best and only evidence of Paxton's considerable authority.

[28] *See Telxon Corporation v. John W. Paxton, Sr.*, Proposed Memorandum and Opinion (J. Dowd, Oct. 6, 2003), Case No. 5:01CV2356 (N.D. Ohio) (copy attached as Exhibit B).

10

disregarded.'" Based on the express provisions of the corporate by-laws at issue in that case—which had not been amended (just like this case)—the court held that it "will not allow the Defendant's conclusory allegations to overcome corporate records."[29]

The same is true in this case. The various conclusory and unsupported references to "policies" and "practices" cannot be considered in light of the admittedly binding by-laws. As such, there can be no reasonable doubt as to Paxton's actual authority to hire non-executive officers.

There is also no dispute as to Paxton's apparent authority.[30] Crumpler confirmed that she relied upon Paxton's word because he was Telxon's CEO—she had no reason to doubt him. Telxon bestowed the CEO title on Paxton and held him out to the public as the person responsible for managing the corporation's business affairs. Any reasonable person in Crumpler's position would believe—quite rightly—that the company's CEO had the right to hire someone and negotiate their benefits package. At no time did Crumpler have any reason to question Paxton's authority. Knowing this, and knowing that no evidence suggests or proves otherwise, Telxon and Symbol mischaracterize Crumpler's deposition testimony to imply that she knew someone was looking over Paxton's shoulder. That is not true. When asked whether she thought that Telxon's board was involved in her hiring process, Crumpler responded, "I don't really know." Crumpler Depo. 68.

Next Telxon and Symbol argue that Crumpler's change in control agreement and Amendment were invalid because the board of directors never approved them. In reality, Paxton

---

[29] Memorandum and Opinion at 4-5, 8, citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991).

[30] The cases cited by Telxon and Symbol are interesting reading but not necessarily relevant. This diversity action is governed by Ohio law, not Delaware law. None of the cases, including *Billops v. Magness Construction Co.*, supports a denial of Crumpler's motion. The *Billops* case involves the authority of a franchisee to bind the franchisor. That case has nothing to do with the extensive authority of a corporate CEO to bind his employer.

signed multiple change in control agreements in May and June 2000, many in the identical format as Crumpler's and some even on the same day (June 8, 2000). There is no evidence in the record—and presumably Telxon and Symbol produced all board minutes as required—that Telxon's board of directors approved any of those change in control agreements. Bradshaw Depo. 100-110, 113-122; Paxton Depo. 186. Actually, there is no evidence in any of the board minutes that the board ever approved a change in control agreement for anyone. If the board's approval was required (as alleged) but never obtained, why did Telxon and Symbol pay under those agreements? Why haven't they challenged those change in control agreements? The reason is that Telxon and Symbol concocted the entire argument and knew full well the considerable extent of Paxton's authority.

Interestingly, Meg Pais admitted that *she* had the authority to sign and approve severance and change in control benefits for employees on behalf of Telxon. Pais Depo. 75-76.[31] Telxon and Symbol offer no explanation how Telxon's CEO allegedly lacked authority to hire someone and to sign similar agreements, but the company's former Vice President of Human Resources (his subordinate) possessed that very authority. Their silence on this issue is deafening and self-evident of their desperation and disregard of the facts and truth.

All of this evidence establishes Paxton's authority with no room for doubt. A reasonable trier of fact could only come to one conclusion: Paxton had the authority on behalf of Telxon to enter into Crumpler's various agreements.

---

[31] Pais also admitted that there is a difference between a severance provision and a change in control agreement *and* that anyone in the human resources field would understand the distinction. Pais Depo. 156. Telxon and Symbol's arguments to the contrary are baseless.

**B.    Each of Crumpler's agreements is enforceable, and her change in control agreement expressly precludes Telxon and Symbol from asserting any defenses or offsets.**

Having gotten passed Telxon and Symbol's idiotic lack of authority defense, the enforceability of Crumpler's various agreements is crystal clear.

Telxon and Symbol's persistent references to "back-dating" are nothing more than a red herring. There is absolutely no evidence in the record that the Amendment to Crumpler's change in control agreement was "back-dated." The only evidence before the Court is Paxton's unequivocal confirmation that he and Crumpler signed the Amendment on or about its date (June 29, 2000) and well before the merger was announced on July 25, 2000. Telxon and Symbol may believe their own misrepresentations and untruths, but the evidence proves otherwise.

That evidence proves that Crumpler and Paxton had a verbal meeting of the minds as to the essential terms of her employment arrangement as of June 8, 2000, and that they documented their understanding later that same month. Telxon and Symbol do not have a shred of evidence to refute the admissible facts proffered by Crumpler and Paxton with respect to their negotiations and agreements. Telxon and Symbol's conjecture and conclusions notwithstanding, there are genuine issues of material fact that Crumpler had binding change in control and relocation agreements as of June 2000.

As for the written documents, Telxon and Symbol have no response to the contractual waivers of the right to setoff outlined in paragraph 1 of Crumpler's change in control agreement[32] and the express waiver of any and all defenses laid out in paragraph 5(c) of the same

---

[32] Paragraph 1 of the change in control agreement provides that "**the amount of any payment or benefits provided for in this Agreement shall not be reduced, offset or subject to recovery by the Company** by reason of by [sic] any compensation earned by [Crumpler] as the result of your employment by another employer, by retirement benefits, **by any amount claimed to be owing by you to the Company or otherwise**. (Emphasis added)

13

agreement.[33]  They half-heartedly claim that the Employment Agreement allows them to violate the change in control agreement by offsetting Crumpler's benefits and asserting contrived defenses.  But the $300,000 in change in control benefits and $135,000 in relocation benefits are not "payments made to [Crumpler] under" the Employment Agreement.  Telxon was contractually obligated to pay those monies under separate verbal and written agreements.  Telxon and Symbol cannot use the Employment Agreement as a weapon against or defense to Crumpler's change in control agreement, Amendment thereto and relocation agreement.  Allowing that to happen would render meaningless the unambiguous provisions of paragraphs 1 and 5(c) of the change in control agreement.

With respect to the relocation agreement, Telxon and Symbol disingenuously claim that Crumpler "never relocated" as a defense to their payment of relocation expenses.  That is false.  The record confirms that Crumpler commuted to and from her home in Chicago and Telxon's offices in the Cincinnati area from the end of June 2000 through her last day at Telxon on November 30, 2000.  She incurred expenses for airfares, rental cars, meals, hotels, etc.  Crumpler testified under oath about all such expenses.  The only reason that she does not have the underlying invoices and records is that Telxon (through Paxton, its CEO) expressly told her in June 2000 that she would receive a lump sum payment equal to 50% of her base salary, thereby obviating any need to keep receipts.  Crumpler Depo. 52-54, 59.  As Crumpler confirmed, she was willing to move to Cincinnati at any time.  Telxon and Symbol should be estopped from arguing that Crumpler failed to relocate when their actions in putting her on administrative leave—involuntarily and without her consent—prevented the very relocation they now claim is lacking.  Crumpler Depo. 50-51.

---

[33] Paragraph 5(c) of the change in control agreement provides that Telxon "expressly waives any right it may have to deny or otherwise seek to avoid liability for any breach of its contractual obligations hereunder on grounds of lack of consideration, accord and satisfaction or any other defense."

14

Contrary to Telxon and Symbol's implication, Crumpler was *not* terminated for cause. She was placed on administrative leave as of December 1, 2000, and then terminated effective February 1, 2001. Neither Crumpler's relocation agreement signed by Telxon's CEO (DX8) nor its written relocation policy (DX32 at §3.0) requires that Crumpler refund those monies under these or any other circumstances at issue in this case.

> **C. Symbol had no justification to interfere with Crumpler's relocation agreement, change in control agreement and Amendment.**

Symbol's only defense to Crumpler's tortious interference claim is that Crumpler allegedly has not established the "lack of justification" element of the cause of action.[34] Symbol obviously has not read the record or paid attention to its own agent's deposition.

Symbol never even tries to argue that it was justified in not paying Crumpler's change in control benefits. That makes sense because Symbol has admitted that, at a minimum, Crumpler had a 1-year change in control agreement as of February 1, 2001. Bradshaw Depo. 79.[35] Nonetheless, neither Bradshaw nor anyone else at Symbol read the agreement or had any idea that Telxon and Symbol were contractually barred from offsetting any amounts from Crumpler's change in control benefits.

Symbol also has no response as to how or why it was justified in not paying Crumpler's full two years of benefits to which she was entitled under the Amendment to her change in control agreement. The *only thing* that Symbol claims is that a vice president at Symbol (Brian Burke) told Robert Bradshaw that Tomo Razmilovic (Symbol's president) told him (Burke) that Paxton allegedly said that Crumpler was entitled to one year of benefits. Bradshaw Depo. 65-

---

[34] Of note, Symbol does not deny that it caused Telxon to pay only one year of change in control benefits to Crumpler and to offset even that reduced payment by the relocation benefits that Telxon had previously paid to Crumpler.

[35] Bradshaw's admission flies in the face of Telxon and Symbol's claim that they did not ratify Crumpler's change in control agreement by sending her a check for change in control benefits on February 1, 2001.

15

66.[36] Crumpler lost count as to whether this constitutes third-party or fourth-party hearsay. Either way, none of that testimony is admissible.

Further, Paxton denies ever making any such comment, and there is no contradictory evidence in the record, whether from Razmilovic, Burke or someone else. That alleged conversation (which never took place) hardly justifies Symbol's actions in causing Telxon to breach Crumpler's change in control agreement and Amendment.[37]

As to Symbol's interference with and ratification of the relocation agreement, three separate Symbol officers (Brian Burke, Leonard Goldner and Robert Bradshaw) knew about Crumpler's relocation agreement *before* the merger closed on November 30, 2000. Bradshaw Depo. 136. Despite their knowledge, Symbol claims that it was justified in causing Telxon to breach its agreements with Crumpler based solely on the uninformed comments of Cecille Hickman. Had anyone at Symbol looked into the matter and actually read Telxon's relocation policy—or mentioned anything to Crumpler or Paxton—they would have realized that Hickman didn't know what she was talking about. Hickman was not privy to the negotiations between Paxton and Crumpler and their agreements reached during June 2000, and there is no evidence to suggest otherwise. She also obviously never read the relocation policy because it expressly authorizes lump sum payments grossed up for tax purposes.

Regardless of what Hickman currently says in her conclusory and self-serving declaration, there is no evidence in the record that Symbol relied on anything that Hickman may have said back in 2000 when it caused Telxon to breach Crumpler's agreements. Robert

---

[36] That conversation literally is the extent of Symbol's justification. Bradshaw acknowledged that he—Symbol's Vice President of Human Resources and Hickman's boss—is not aware of any facts or information that have come to light since February 1, 2001 (the date that Symbol mailed Crumpler's reduced change in control benefits) that would support Telxon and Symbol's claim that she had no change in control agreement of any kind. Bradshaw Depo. 152-153.

[37] Telxon and Symbol's cite to Exhibit 22 (Defendants' Memorandum at 44) is indicative of their ignorance of the Federal Rules of Evidence. Exhibit 22 contains double hearsay (what Razmilovic allegedly told Bradshaw that Paxton allegedly said to Razmilovic). None of that "evidence" is admissible.

16

Bradshaw testified at length concerning Symbol's decision to ignore the Amendment to Crumpler's change in control agreement and to withhold the relocation benefits from the reduced sum paid. Bradshaw confirmed that the *only reason* that Symbol had the relocation benefits taken out of Crumpler's change in control payment was that she allegedly did not relocate. Bradshaw obviously never even read the policy because he admits not knowing that the same policy gave employees up to one year to complete their relocation. Bradshaw Depo. 73-74, 77-78. Hickman's recent allegations had nothing to do with Symbol's actions in 2000 and 2001. As such, Symbol cannot claim at this stage that it was justified in acting as it did because of something Hickman claims to have said. Symbol's attempts to revise history must be rejected.

      **D.**    **Telxon and Symbol have not come forward with any evidence to support their fraud and conversion claims against Crumpler.**

The time has come and gone for Telxon and Symbol to present admissible evidence to support their claims against Crumpler. It's been nearly three years since their merger, and more than 20 months since this case began, and nothing has changed. Telxon and Symbol still offer nothing but rehashed conjecture.

On the fraud claim, Telxon and Symbol have not presented any evidence that Crumpler affirmatively and intentionally misrepresented a material fact or that Telxon and Symbol reasonably relied upon that misrepresentation of fact and suffered damages as a result. In fact, the entire fraud claim is premised on false accusations.[38] Contrary to Telxon and Symbol's apparent belief, repeating the "back-dating" argument *ad nauseum* does not make it true. The only admissible evidence in the record is Paxton's unequivocal confirmation that he signed the change in control and Amendment before the merger agreement was signed on July 25, 2000. Neither Crumpler nor Paxton "back-dated" anything—and Telxon and Symbol do not have a

---

[38] Telxon and Symbol's various pleadings and memoranda are so jam-packed with intentional falsehoods, untruths and, quite frankly, lies, that Crumpler is confident the Court will impose Rule 11 sanctions at the appropriate time.

17

shred of evidence even to suggest otherwise. Having already admitted that Crumpler's original change in control agreement was disclosed and referenced in a schedule to the merger agreement, it belies belief that Telxon and Symbol still argue that Crumpler somehow did not have that agreement in place before the merger agreement was signed and announced on July 25, 2000. Their admissions take this issue off the table.

All of Telxon and Symbol's rumbling about the "$200,000 relocation agreement" is completely bogus. That "agreement" never happened. There is no evidence before the Court that anyone entered into that "agreement," that Telxon relied upon anything in that document, or that it paid even a penny to Crumpler in response to that document. In short, the only relocation agreement at issue in this case is the one signed by Paxton (DX8) and breached by Telxon and Symbol, and the "200,000 Relocation Agreement" has nothing to do with this case.

Of course, that doesn't stop Telxon and Symbol from claiming that "the $200,000 Relocation Agreement potentially contains a forged signature." Even worse, Telxon and Symbol have the audacity to caption the last section of their memorandum, "Crumpler's Unauthorized Use Of Paxton's Signature Stamp." This is a deliberate attempt on the part of Telxon and Symbol to mislead the Court because there is not a shred of evidence to support those outrageous claims.[39]

Telxon and Symbol are equally incapable of identifying any evidence to support the elements of a conversion claim under Ohio law. By the time the Court even considers this claim, it will already have determined that Crumpler was entitled to every dollar paid to her by Telxon, both as a consultant and as an employee. No evidence exists that Crumpler took anything from Telxon (and certainly not Symbol), let alone that she *wrongfully* took something. Telxon paid

---

[39] Plus, there is no dispute that Paxton personally signed Crumpler's change in control agreement (DX5), Amendment (DX6) and relocation agreement (DX8). Paxton Depo. 134, 138-139, 149.

18

relocation benefits, a bonus and compensation pursuant to valid and enforceable agreements—all of which were entered into *before* the merger announcement. In hindsight, Symbol, as the acquiring company, may not *like* the deals that Paxton negotiated with Crumpler—and may not even care for Paxton and/or Crumpler—but that does not give rise to a tort of conversion.[40] Judge Dowd recognized as much in the pending case in the Northern District of Ohio when he *sua sponte* entered summary judgment in favor of Paxton on Telxon's claim that Paxton converted shares of stock.[41]

Absent evidence to support every element of the fraud and conversion claims, summary judgment must be entered in Crumpler's favor.

## IV.  CONCLUSION

Telxon and Symbol chose to bury the Court under pages and pages of inadmissible hearsay, unsubstantiated and conclusory testimony, statements from never-disclosed witnesses, "evidence" from never produced documents, and outright deception. In contrast, Crumpler submitted admissible evidence firmly establishing her right, as a matter of law, to relief and damages under her change in control agreement, Amendment and relocation agreement. This Court must enter summary judgment across the board in favor of Hughette Crumpler and against Telxon and Symbol, as more fully set forth in Crumpler's Motion for Summary Judgment.

---

[40] As a side noted, even if Telxon and Symbol could prove the misappropriation element—which they cannot—a conversion action only lies if the misappropriated funds are identifiable and not commingled with other funds. *See Ginsburg v. Haddad*, Nos. 93-3506/93-3548/93-3724 (6th Cir. Mar. 6, 1996) (copy attached as Exhibit C). Unlike *Ginsburg*, however, there is no evidence in this case that the various monies paid to Crumpler in 1999 and 2000 are identifiable and set aside in a separate account at this stage.

[41] *See* Memorandum and Opinion at 12-13.

Respectfully submitted,

**s/ Robert A. McMahon**
Robert A. McMahon Bar Number: 0064319
Attorney for Plaintiff Hughette Crumpler
Eberly McMahon Hochscheid LLC
3700 Eastern Avenue
Cincinnati, OH  45226
(513) 533-3441
(513) 533-3554 (fax)
E-mail:  bmcmahon@emh-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Drew A. Carson and James A. Wertheim, Goodman Weiss Miller LLP 100 Erieview Plaza, 27th Floor, Cleveland, Ohio 44114-188, and Michael A. Manzler, Esq. and Deborah DeLong, Esq., Dinsmore & Shohl LLP, 1900 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202.

**s/ Robert A. McMahon**
Robert A. McMahon Bar Number: 0064319
Attorney for Plaintiff Hughette Crumpler
Eberly McMahon Hochscheid LLC
3700 Eastern Avenue
Cincinnati, OH  45226
(513) 533-3441
(513) 533-3554 (fax)
E-mail:  bmcmahon@emh-law.com