UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HUGHETTE CRUMPLER, | : | Case No. C-1-02-131 |
| | : | |
| Plaintiff, | : | (Judge Susan J. Dlott) |
| | : | |
| v. | : | |
| | : | |
| TELXON CORPORATION et al., | : | |
| | : | |
| Defendants/Third-Party Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN W. PAXTON, SR., | : | |
| | : | |
| Third-Party Defendant. | : | |
| | : | |

**REPLY BRIEF IN SUPPORT OF
THIRD-PARTY DEFENDANT JOHN W. PAXTON, SR.'S
MOTION FOR SUMMARY JUDGMENT ON (1) ALL CLAIMS
BY THIRD-PARTY PLAINTIFFS AGAINST PAXTON
AND (2) PAXTON'S COUNTERCLAIMS AGAINST
THIRD-PARTY PLAINTIFFS**

Michael A. Manzler (0059968)
Dinsmore & Shohl LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio  45202
(513) 977-8693
michael.manzler@dinslaw.com

Trial Attorney for John W. Paxton, Sr.

## I.    <u>INTRODUCTION.</u>

While filled with name-calling, flippant remarks, groundless rhetoric and rampant speculation, not to mention absolutely untrue misrepresentations of the record evidence, Third-Party Plaintiffs Telxon Corporation's ("Telxon") and Symbol Technologies, Inc.'s ("Symbol") Memorandum in Opposition to John W. Paxton, Sr.'s Motion for Summary Judgment, at the end of the day, actually serves to confirm that summary judgment should be entered for Paxton, both on the four groundless claims Telxon and Symbol asserted against Paxton and on the two claims, for Indemnification and Advancement of legal fees, that Paxton filed in response.  Examination of the actual record facts of this matter, and application of clear Delaware law, reveals that there are no *genuine* issues regarding any fact which is *material* to resolution of the claims against Paxton or his counterclaims against Telxon and Symbol.  Because, likewise, the application of clear principles of Delaware law to the instant undisputed material record facts permits only one conclusion -- judgment for Paxton on all claims -- Paxton respectfully submits that the Court should grant his Motion for Summary Judgment. [1]

---

[1]  Telxon and Symbol submitted numerous "Declarations" from unknown individuals whom Telxon and Symbol **did not disclose** to Paxton (or to Plaintiff Hughette Crumpler) as potential witnesses in either their Initial Disclosures or their discovery responses, including Edward Chung, Walter Siegel, Ketki Patel, Bridgette Huerkamp, and Daryl Kochy.  Telxon and Symbol also cited (and included in their "Appendix") several documents that were never produced to Paxton (or Crumpler) during discovery.  Many of the other Declarations Telxon and Symbol submitted, moreover, are rife with statements that are either speculation, without foundation, and/or inadmissible hearsay.  Telxon and Symbol also submitted a Declaration from Margaret Pais which rewrites some of her deposition testimony to be more favorable to them, and a Declaration from Robert Goodman, an attorney with Goodman Weiss Miller LLP whom, the Court will recall, Defendants' counsel promised not to use as a witness in order to avoid disqualification from this matter.  Because all of these materials and others are improper, Paxton and Crumpler are currently in the process of preparing, and very shortly will file, a Joint Motion to Strike the above-mentioned Declarations and other materials, and respectfully submit that the Court should not consider these inadmissible items in ruling upon the pending Motions for Summary Judgment.  *See, e.g.,* <u>Dole v. Elliott Travel & Tours, Inc.</u>, 942 F.2d 962, 968-69 (6th Cir. 1991) (affidavits composed of hearsay and non-expert opinion evidence "do not satisfy Rule 56(e) and must be disregarded."); <u>Reid v. Sears Roebuck & Co.</u>, 790 F.2d 453, 460 (6th Cir. 1986) (nonmoving party may not "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony."); <u>Grobow v. Perot</u>, 539 A.2d 180, 187 n. 6 (Del. 1988) ("neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true").

## II.    THERE ARE NO *GENUINE* ISSUES REGARDING ANY *MATERIAL* FACT.

Although previously detailed in the Statement of Undisputed Facts in Paxton's Memorandum in Support of his Motion for Summary Judgment, several pivotal facts warrant emphasis in light of Telxon's and Symbol's numerous factual misrepresentations. Specifically, careful examination of the actual record demonstrates that there is no *record evidence* contradicting any of the following material facts:

(1)    Upon retaining Paxton, a respected businessman[2] and turnaround specialist, as Chairman of the Board and CEO for the purpose of attempting to save a company on the brink of bankruptcy, Telxon's Board authorized Paxton to execute contracts on behalf of the company involving amounts up to $25 million.[3]    (Paxton Dep. at 7-9, 83; Staples Dep. at 34, 37)

---

[2]    Paxton will not stoop to respond to Telxon's and Symbol's appalling attempts at character assassination (*see, e.g.*, Memo. in Op. at 1) other than to point them out for what they are, unsubstantiated allegations having nothing to do with the facts of the instant matter. Paxton respectfully suggests to the Court that such references are both indicative of Telxon's and Symbol's lack of support for their positions on the merits and typical of their conduct throughout this (and other) meritless litigation against Paxton. In fact, in the litigation that Telxon filed against Paxton in the Northern District of Ohio, which Telxon references in its Memorandum in Opposition, Judge Dowd recently issued an opinion which not only denied Telxon's motion for summary judgment against Paxton on its claims of breach of fiduciary duty and conversion, but *sua sponte* granted judgment in favor of Paxton on those claims. (*See* Attachment A hereto) (filed separately and under seal). Paxton also cannot resist pointing out the incredible irony of Telxon and Symbol attempting to portray him as a bad actor given the public record facts that Symbol itself is under investigation by the SEC and the U.S. Attorney's Office in New York, that top executives at Symbol recently have been indicted for fraud and/or forced to resign, and that Telxon had over 30 lawsuits and an SEC investigation pending against it and/or its former officers and directors at the time of its merger with Symbol (all relating to events which occurred prior to -- and indeed were part of the reason for -- Paxton's arrival). (*See, e.g.*, Attachments B, C hereto; Chung Dec., Ex. A, pp. 20-21)

[3]    Telxon and Symbol point out that Paxton's testimony that the Board informed him he had authority to enter into contracts on Telxon's behalf worth up to $25 million "is not supported by any documentary evidence." (Memo. in Op. at 3) Setting aside the irony of this statement, given the fact that Third-Party Plaintiffs' entire case is built around vague claims of "practices and policies" that it has never been able to substantiate, the fact remains that Paxton's testimony regarding his contractual authority is completely uncontroverted in the record. This is particularly noteworthy in light of the fact that Telxon and Symbol obtained highly self-serving "Declarations" from two former Board members, Norton Rose and Raj Reddy. Presumably, if Paxton's statement as to his authority were not true, Third-Party Plaintiffs would have included statements to that effect in those Declarations. Rose's and Reddy's silence on this point speaks volumes.

(2) All of the terms of Crumpler's employment-related contracts with Telxon -- for consulting services,[4] employment, salary and bonus, severance pay, payment in the event of a change in control, relocation, et cetera -- were worth far less than $25 million.

(3) Only when the CEO hired and set compensation for "Executive Officers" of the corporation was advance approval from Telxon's Board of Directors required. (Pltf. Ex. A (Telxon By-Laws), Art. III, Sec. 1; Paxton Dep. at 20-22, 33-34, 99; Garwood Dep. at 13; Hone Dep. at 12-15; Pais Dec., ¶ 2; Hansen Dec., ¶¶ 3, 9; Def. Ex. 26 ("salary and severance for **executive officers** . . . needs approvals"))

(4) Telxon's By-Laws, the legally controlling rules of the corporation, explicitly state that the "Executive Officers" requiring appointment by the Board "shall be a Chairman of the Board, a Vice Chairman of the Board (if such office is created by the Board), a Chief Executive Officer, a President, a Chief Operating Officer (if such office is created by the Board), a Secretary, a Treasurer, and one or more Senior Vice Presidents, which may include a Senior Vice President-Chief Financial Officer, a Senior Vice President-International Operations, a Senior Vice President-Operations, and a Senior Vice President-Sales and Marketing." (Pltf. Ex. A, Art. III, Sec. 1; Paxton Dep. at 22; Garwood Dep. at 22; Staples Dep. at 38-39)

(5) The Telxon By-Laws further provide that the CEO may hire anyone else without advance Board approval (although some such hirings, of a defined category of "Non-Executive

---

[4] Paxton testified that in the compensation for Crumpler's consulting services, he researched what Telxon was paying its other consultants and also contacted other providers of similar management assessment services, finding that Crumpler's standard rate was comparable to that of many Telxon consultants and significantly less than other test providers. (Paxton Dep. at 110-112) This testimony remains undisputed *in the record*. Telxon and Symbol now attempt to manufacture an issue of fact by introducing new "evidence," in the form of a witness's "recollection" of alleged "accounting records," that Telxon did not use consultants at $2,000 per day or more. (Memo. in Op. at 3, citing Grand Declaration) Grand's reference to alleged "accounting records," which incidentally were never produced in discovery, is blatant hearsay and should be disregarded by the Court.

Officers," must be "ratified" by the Board within one year).  (Pltf. Ex. A, Art. III, Sec. 3; Paxton

Dep. at 186-87; Garwood Dep. at 33)

(6)    Crumpler was hired as Telxon's "Vice President of Administration and

Organizational Development."  (Crumpler Dep. at 11; Def. Ex. 1)  By definition, Crumpler was

not an "Executive Officer."  (Defendants' Amended Response to Plaintiff's Second Request for

Admissions No. 7; Paxton Dep. at 27-28, 33-34, 186-87; Crumpler Dep. at 75, 138)

(7)  There is no record evidence that Crumpler was ever involved in "the formulation of

Corporation policy."  (Crumpler Dep. at 11; Def. Ex. 4)  To the contrary, her Employment

Agreement states that Crumpler would report to the CEO  "or such other officer of Employer as

the Chief Executive Officer shall direct" and would perform her duties  "in conformity with

management policies, guidelines and directions issued by Employer."  (Def. Ex. 4 at p. 1)[5]

(8)  Paxton and Crumpler agreed on June 8, 2000, that Crumpler would come work for

Telxon with a total compensation package equal to Margaret Pais's.  (Paxton Dep. at 45-48, 63,

109-10, 115, 129, 198; Crumpler Dep. at 11, 45-49, 67, 73, 115-16)

(9)  Crumpler and Paxton verbally agreed on June 8, 2000, that Crumpler's compensation

package would include: (1) an annual salary of $150,000; (2) a two-year "Change in Control"

provision (providing Crumpler with two years of separation pay if control of Telxon changed and

she lost her job as a result); (3) 30,000 stock options, subject to Board approval, and (4) payment

for relocation as permitted under Telxon's Relocation Policy.  (Paxton Dep. at 46-48, 63, 109-10,

115, 191-92; Crumpler Dep. at 45-50, 53-54; Pais Dep. at 72-73, 155)

---

[5]    Telxon solicited statements from two former outside directors who, despite lacking *any* personal knowledge of
the duties Crumpler actually performed -- in fact, one of them, Norton Rose, had ceased being a Board member of
Telxon over nine months before Crumpler was hired -- nevertheless felt entitled (or were encouraged) to
hypothesize as to what Crumpler "would have" done in her employment with Telxon.  (*See* Rose Dec., ¶ 5; Reddy
Dec., ¶ 10)  Such speculation is inadmissible and insufficient as a matter of law to preclude summary judgment.

(10)  Paxton hired Crumpler, Pais's successor, on the same terms that Pais had been receiving, because it had been agreed in April of 2000 that Pais would be leaving Telxon and Paxton wanted there to be time for human resources duties to be transitioned from Pais to Crumpler.  (Paxton Dep. at 38-40)

(11)  The Amendment to Crumpler's CIC Agreement (Def. Ex. 6), created to rectify a clerical error after Crumpler realized that her written CIC Agreement (Def. Ex. 5) mistakenly stated that she had only a one-year change in control benefit rather than the two years that Pais had had and Paxton and Crumpler had agreed she would receive, was signed *before* the July 25, 2000 Merger Agreement with Symbol.   (Paxton Dep. at 139-41; Crumpler Dep. at 120-21)

(12)  While reimbursement for actual moving expenses may have been the "norm" under Telxon's Relocation Policy, the Policy itself specifically allowed for the alternative method of providing a "lump sum" relocation payment (rather than reimbursement for actual expenses):

7.0    SELF-MOVE PROGRAM

Employees who have less than 3,000 pounds of household goods and are moving less than 1,000 miles are encouraged to use the Self-Move Program.  * * * **Employees who elect the Self-Move Program will receive a lump sum amount to be determined on a case-by-case basis**.

(Def. Ex. 10 at 00017; *see also*, Pais Dep. at 123-25)  Crumpler was relocating to Cincinnati from her apartment in Chicago.  (Crumpler Dep. at 4-5)  The Court may take judicial notice that Chicago is located approximately 300 miles from Cincinnati.

(13)  A separate written summary of Telxon's Relocation Policy provided that payment for relocation would be capped at a maximum of 50 percent of the employee's annual salary.  (Pltf. Ex. EE at 001730)

(14)   Telxon's written Relocation Policy stated that amounts paid to employees for relocation would be "grossed up" for tax purposes so that employees would be compensated for the amount of tax they would have to pay on the relocation benefits.  (Def. Ex. 10 at 00018)

(15)   Other Telxon employees had previously elected and been paid according to this "lump sum" method of compensation for relocation.  (McManis Dec., ¶ 7 ("Telxon, in isolated instances, agreed to pay the employee a reasonable lump sum payment"), ¶ 8 (acknowledging, as Crumpler, Pais, and Paxton testified, that McManis and her husband received "a lump sum payment to cover our relocation costs and obviate the need to submit receipts."); *see also*, Paxton Dep. at 63-64, 150-54; Crumpler Dep. at 56-57; Pais Dep. at 123, 125, 158-59)

(16)   As CEO, Paxton was authorized to provide relocation benefits to employees.  (Def. Ex. 10 at 00009)  Telxon's Relocation Policy allowed employees up to one year to relocate following hire.  (Def. Ex. 10 at 00010; *see also*, Pais Dep. at 131-32)

## III.   **ARGUMENT**

If nothing else, Third-Party Plaintiffs' Memorandum in Opposition makes it clear that all of the various claims of wrongdoing that Telxon and Symbol have asserted against Paxton, however labeled, fundamentally depend upon one (or both) of two underlying premises: (1) that Paxton lacked "authority" to hire (or provide benefits to) Crumpler without advance approval from Telxon's Board of Directors; and (2) that Paxton "backdated" the written documentation of one aspect of Crumpler's compensation package -- her two-year Change in Control Agreement -- in order to avoid having to obtain Symbol's approval (which was required only after Telxon and Symbol signed a Merger Agreement on July 25, 2000, reflecting their intention to merge the corporations).  Neither of these premises finds support in the record evidence.  Paxton will debunk as many of Third-Party Plaintiffs' false and misleading statements as space permits.

### A.    Paxton, As CEO, Had Authority To Hire (And Provide Employment Benefits To) Crumpler Because She Was Not An "Executive Officer."

The undisputed facts reveal that: (1) Paxton was authorized to execute contracts on behalf of Telxon up to $25 million; (2) Paxton had explicit authority under Telxon's By-Laws to hire and compensate anyone, other than "Executive Officers," without approval from the Board; (3) the contracts Paxton executed with Crumpler on behalf of Telxon involved far less than $25 million; and (4) Crumpler, as a Vice President, was *not* an Executive Officer as that term is explicitly defined in Telxon's By-Laws, the controlling rules of the corporation.[6]

Having had no choice but to admit that Crumpler was *not* an Executive Officer, Telxon and Symbol now resort, *after* Paxton moved for summary judgment, to trying to create the false impression that Board approval was required not just for Executive Officers -- despite the fact that Telxon's governing By-Laws expressly so state -- but also for Telxon's so-called "senior management," a vague and undefined term found nowhere in the Telxon By-Laws or any other corporate documentation.  (Memo. in Op. at 7-8)  Specifically, Telxon and Symbol argue that the "Declarations" they submitted from former Board members Rose and Reddy are sufficient to create an issue of fact regarding Telxon's governance requirements pertaining to the CEO's hiring of anyone to whom the ambiguous and undefined label "senior management" might apply. (*See* Rose Dec., ¶¶ 4, 6; Reddy Dec., ¶ 6)  Third-Party Plaintiffs' argument that the Rose and Reddy Declarations create a genuine issue of material fact fails for a number of reasons.

---

[6]   In light of the fact that Telxon and Symbol have **admitted** that Crumpler was not an Executive Officer (*see* Defendants' Amended Resp. to Plaintiff's Second Req. for Admissions No. 7), their suggestion that Crumpler may be transformed into one just because Paxton and Crumpler herself generically referred to Crumpler as an "executive" during their depositions is simply yet another example of their willingness to play fast and loose with the facts.  (*See* Memo in Op. at 27, 29) (misrepresenting that whether Crumpler was an Executive Officer is still an issue of fact).  In any event, Paxton, Crumpler and others repeatedly noted that Crumpler was not an Executive Officer of Telxon.  (Paxton Dep. at 27-28, 33-34, 186-87; Garwood Dep. at 38-39; Hone Dep. at 35; Crumpler Dep. at 75, 138; Pais Dep. at 62-63)  Furthermore, it is the definition stated in the By-Laws, not a generic label of "executive," that determines who is an "Executive Officer" of the corporation.  (Staples Dep. at 38-39)

First, former Board member Rose's statement is nothing more than speculation, and must be disregarded for that reason alone. Rose left Telxon's Board in August of 1999. (Rose Dec., ¶ 1) Crumpler was hired in June of 2000. Thus, Rose had been gone from Telxon for over nine months at the time Crumpler was hired. In the interim, the composition of Telxon's Board changed such that, by May of 2000, there was a new majority of directors.[7] Rose has no personal knowledge of Telxon's "practices and policies" *at the relevant time*.

The Rose and Reddy Declarations also must be disregarded because the courts have recognized, in rejecting an analogous argument that the specific provisions of a corporation's by-laws did not apply, that the "Court will not allow the Defendant's conclusory allegations to overcome corporate records;" as a matter of law, a corporation's by-laws are determinative. *See* Telxon Corp. v. Paxton, Case No. 5:01CV2356 (Oct. 6, 2003) at 8 (Attachment A hereto) (granting judgment for Paxton on Telxon's breach of fiduciary duty and conversion claims relating to stock options in Telxon subsidiary Aironet); *see also,* id. at 9 (rejecting, due to lack of corporate documentation, Telxon's claim that employees' past receipt of Aironet stock options had been Board-approved: "There is nothing in the [SEC] proxy [statement] that suggests Telxon Board approval was required for the Telxon employees . . . to personally receive and exercise the stock options."). Likewise here, the Court should soundly reject Telxon's and Symbol's attempt to manufacture a "genuine issue of fact" through conclusory statements contained in a (non-notarized) "Declaration" that are not only not reflected in any Board resolution or other official policy statement, but also directly rebutted by the plain terms of Telxon's By-Laws.

---

[7]  Paxton joined Telxon's Board in March of 1999. (Paxton Dep. at 6-7; Pltf. Ex. II at 000696-697) Hone and Garwood both joined the Board in approximately September of 2000, at about the same time that Rose left. (Hone Dep. at 7-8; Garwood Dep. at 8; Pltf. Ex. II at 000729-732) Gallagher and Lehr joined the Board in May of 2000. (Pltf. Ex. II at 000775) Therefore, by May of 2000, there were five new Directors, with only Reddy and Cribb (and Goodman) remaining from before Paxton's appointment as CEO and Chairman of the Board.

In response to Paxton pointing out that a "practice and policy" restricting the CEO's authority to hire employees who are not Executive Officers would conflict with Telxon's By-Laws and thus be void under 8 Del. Code § 142(a), Third-Party Plaintiffs argue that a corporate by-law may be amended without formal Board action *if* there is "clear proof of a definite and uniform custom or usage." (Memo. in Op. at 27-28) Even if true, this proposition accomplishes nothing for Telxon and Symbol here, however, because there is no "clear proof" that "the course of conduct relied on to affect the change must have continued for such a period of time as would justify the inference that the stockholders had knowledge thereof and impliedly consented thereto." Osteopathic Hosp. Ass'n of Delaware, 195 A.2d 759, 762 (Del. 1963). Telxon and Symbol have failed as a matter of law to produce any evidence meeting the high legal threshold of establishing a binding past practice.

Unlike the case at bar, the Osteopathic Hospital case cited by Telxon and Symbol involved a question of whether written by-laws, purportedly enacted in 1955, were ever duly adopted by the members of the association. Id. at 762. The facts reflected that the members of the association acted in accordance with such *written* by-laws for six years. Id. The court found that in view of the time "during which the membership accepted and acted pursuant to the 1955 by-laws, the facts amply justify the conclusion that they are valid." Id. Likewise, in the earlier case cited, In re Ivey & Ellington, Inc., 42 A.2d 508 (Del. Ch. 1945), the court found that "unanimous consent by the stockholders to a regular course of action" was necessary to justify the conclusion that an amendment to the by-laws was intended. Id. at 510.

Here, by sharp contrast, the record evidence reflects that not even the other Board members (Garwood and Hone), the CEO (Paxton), Telxon's in-house counsel (Hansen), or Telxon's VP of HR (Pais) -- let alone any "stockholders" -- were aware of or acquiesced in this

alleged "practice and policy" regarding "senior management." To the contrary, the statements of the other Board members, as well as Hansen and Pais[8] -- show that Telxon, per the By-Laws, required Board approval only for Executive Officers. Telxon's and Symbol's "evidence" plainly fails as a matter of law to meet the high threshold of "clear proof" required by the cited cases.

The Court should also note that despite the Reddy and Rose Declarations being solicited and drafted by Telxon's counsel, the most Telxon was able to elicit was that the "Compensation Committee" -- not the Board -- had a "practice and policy" of "reviewing and approving" the hiring of members of Telxon's "senior management." (Rose Dec., ¶¶ 4, 6; Reddy Dec., ¶ 4) Obviously, a *committee* of the Board having a "*practice*" of reviewing something is entirely different from a binding corporate *requirement* that the CEO not hire certain individuals without prior Board approval. And under Telxon's Certificate of Incorporation, committees lacked power to amend Telxon's By-Laws: "Any such committee, to the extent provided in the resolution of the board . . . may exercise all of the powers and authority of board . . . **but no such committee shall have the power or authority in reference to . . . amending the By-laws of the Corporation.**" (Pltf. Ex. LL at 00259) (emphasis added).[9] Since Telxon's By-Laws expressly state that the *requirement* of advance approval applies *only* to "Executive Officers," a conflicting "practice and policy" of the Compensation Committee would be void.[10]

---

[8]    Consistent with the By-Laws, the Declaration from former in-house counsel Glenn Hansen states that only the hiring and compensation of corporate "officers" required Board approval. (Hansen Dec., ¶¶ 3, 9) Pais likewise. (Pais Dec., ¶ 2)

[9]    There is also no evidence that Telxon's Board passed the necessary resolution so empowering the Compensation Committee, but even if it had, the Certificate of Incorporation clearly bars giving a committee such power.

[10]    The illegitimacy of Third-Party Plaintiffs' argument that Paxton, the CEO, did not have authority to hire or compensate employees who, like Crumpler, were not Executive Officers is further highlighted by the fact that the Vice President of HR, Pais, testified that she had the authority to (and did) approve consulting contracts, employment agreements and change in control agreements with Telxon employees. (Pais Dep. at 8-10, 13, 73-74; Pltf. Exs. Z, AA) Crumpler likewise testified that she, as well as Cecile Hickman, another, even lower-level HR manager, had authority to hire Telxon employees. (Crumpler Dep. at 73-75)

Finally, with respect to Crumpler's Change in Control ("CIC") Agreement and Amendment thereto (Def. Exs. 5 and 6), Third-Party Plaintiffs have likewise asserted that Paxton "lacked authority" to execute these contracts under the alleged "practices and policies" of the Compensation Committee. (Memo. in Op. at 12-13, citing, *inter alia*, Reddy Dec. at ¶ 18; Rose Dec. at ¶ 7; Pais Dec., ¶ 2) While this claim and its "supporting evidence" suffers from all the same infirmities noted above, **each and every one of these Declarations states that Telxon's alleged "practice and policy" regarding CIC agreements applied to such arrangements "with *officers* of the company."** (Id.; *see also*, Hansen Dec., ¶ 3) [11] Because, as discussed above, there is no dispute that Crumpler was *not* a Telxon officer, such a policy pertaining to officers, even had it been shown to exist (which it has not), would be immaterial.

### B.    There Is No Record Evidence That Paxton "Backdated" Anything.

Third-Party Plaintiffs' other basis for alleged wrongdoing by Paxton is their premise that he "backdated" the Amendment to Crumpler's CIC Agreement (Def. Ex. 6). Undisputedly, the purpose of the Amendment was to correct a clerical error in the CIC Agreement so that it would properly reflect the original agreement that Crumpler would receive the same employment benefits Pais had (including a two-year CIC agreement). (Paxton Dep. at 139-41; Crumpler Dep. at 120-21) As it has all along, Telxon's and Symbol's allegation of backdating remains nothing

---

[11]    Interestingly, Hansen also states that he "does not recall" ever telling Paxton that Board approval was *not* required for "change in control agreements" with corporate officers. (Hansen Dec., ¶ 9) Hansen's statement, of course, proves nothing; in fact, it means that Paxton's testimony that someone in Telxon's legal department told him that Board approval was not required for CIC agreements remains uncontroverted. What is most revealing, however, is that Third-Party Plaintiffs were unable to solicit from Hansen an *affirmative* statement that he told Paxton that Board approval was required for CIC agreements. This silence dovetails neatly with the lack of evidence that *anyone's* CIC agreement was ever submitted to or approved by the Board. Indeed, Symbol paid numerous other employees their benefits under substantively identical CIC agreements after the merger closed -- agreements that, just like Crumpler's, were signed by Paxton, reflected the same June 8, 2000 date, and -- even though some of the individuals were, unlike Crumpler, Executive Officers (*see* Defendants' Amended Responses to Plaintiff's Second Request for Admissions No. 17) -- were never "authorized" by Telxon's Board. (*See* Bradshaw Dep. at 92, 97, 100-04, 107-08, 110, 114-21; Paxton Dep. at 186, 200; Pltf. Exs. M, P, Q, R, S)

more than self-serving conjecture.  Despite extensive discovery, Telxon and Symbol have produced no *facts* that would allow a jury to conclude the Amendment was backdated.[12]

Telxon and Symbol have gone to great lengths to foster the misconception that there is record evidence showing that the Amendment to Crumpler's CIC Agreement (Def. Ex. 6) was "backdated," *i.e.*, that despite its June 29, 2000 date, it was really signed *after* the July 25, 2000, Merger Agreement between Telxon and Symbol (and, the argument goes, therefore would have required Symbol's approval).  Telxon and Symbol time and again make false statements such as "At some point after the Merger Agreement was signed, Crumpler drafted an amendment to the Change in Control Agreement" and "Beth Staples testified that Crumpler's Amendment to the Change in Control Agreement was entered into after the Merger Agreement."  (*See, e.g.*, Memo. in Op. at 15, 16, 17, 26 n. 27, 31, 32, 37, 40, 44, 47)

Despite repetition *ad naseum*, however, Telxon's and Symbol's accusation of "backdating" all boils down to a single point of reference: the testimony of Staples at pages 60-72 and 84 of her deposition.  (*See* id.)  What is particularly deceitful about the reliance upon Staples's purported testimony is that although Staples did spend several pages of her deposition *speculating*, based upon her limited knowledge, about when the Amendment might have been signed, she ultimately admitted, after several attempts (both by herself and by Telxon counsel James Wertheim) to avoid and evade the question, that **she does not have any personal knowledge as to when the Amendment was signed**.  (Staples Dep. at 75)

Specifically, Staples was asked, and finally responded, as follows:

---

[12]  Despite Third-Party Plaintiffs' repeated diversionary tactics focusing on the dates that the agreement between Crumpler and Paxton was subsequently actually documented and signed, the bottom line remains that Telxon and Symbol have not produced a shred of record evidence to contradict what is truly the *material* fact in this case: that these terms and conditions of Crumpler's employment with Telxon were definitely agreed upon as of June 8, 2000.  (*See* Bradshaw Dep. at 62-63; Pais Dep. at 56, 63, 81-82, 121; Staples Dep. at 51, 75)

Q:    [by Mr. Manzler]  Do you have any personal knowledge as to when Exhibit 6 [the Amendment to Crumpler's Change in Control Agreement] was prepared?

A:    No.

Q:    Do you have any personal knowledge as to when Exhibit 6 was signed by Mr. Paxton?

Mr. Wertheim:  Objection to the form.  Asked and answered.

A:    No.

Q:    Do you have any personal knowledge as to when Exhibit 6, Defendant's Exhibit 6,  was signed by Ms. Crumpler?

Mr. Wertheim:  Objection to the form.  Asked and answered.

A:    Not specifically, no.

(Id.)  Thus, Telxon's and Symbol's entire foundation for their fraud counterclaim against Paxton is premised upon the sheer speculation of a witness who admitted point blank that she had no personal knowledge that any such backdating actually occurred.  Given the true record facts, it is extremely difficult to view these misrepresentations, reiterated *ad naseum* as if they would become true by sheer weight of repetition, as anything other than a deliberate attempt to mislead the Court.[13]  In truth, there is no record evidence that Paxton backdated anything.

**C.    Third-Party Plaintiffs' Have Failed To Produce Record Facts Sufficient To Support The Requisite Elements Of A "Fraud" Claim.**

Having clarified the true record facts, it follows that Third-Party Plaintiffs have not produced evidence which would allow a reasonable jury to rule in their favor on their claim of

---

[13]   Likewise, Telxon's and Symbol's hypothesis that the Amendment itself reflects backdating by virtue of the fact that it refers to Pais as Crumpler's "predecessor" when Paid did not actually leave until August of 2000 ignores the uncontroverted testimony from Paxton and Pais that there was an agreement in place in April of 2000 that Pais would be leaving Telxon, which is exactly why Paxton moved to hire Crumpler: to ensure that the Human Resources function would be seamlessly covered. (Pais Dep. at 33-34, 39-43; Paxton Dep. at 38-41; Pltf. Ex. BB) Therefore, it was known as of the time Crumpler was hired in June that she would be Pais's "successor," even though Pais was not physically "out the door" until mid-August.

"Fraud" against Paxton.  Specifically, there are no record facts that Paxton "fabricated" a consulting agreement with Crumpler, "backdated" her Offer Letter, CIC Agreement, or the Amendment thereto, or violated Telxon's Relocation Policy.

Furthermore, to the extent that Third-Party Plaintiffs take issue with any other alleged actions (or omissions) by Paxton regarding which they claim to have raised a genuine issue of fact, they still failed to come forward with any evidence that *Paxton* committed such alleged actions or omissions or that he did so with the *intent* of misleading another into relying upon it, both requisite elements of a fraud claim.  To cite but one example, Telxon and Symbol have pointed to some evidence that Crumpler's two-year CIC Agreement may not have been provided to Symbol before July 25, 2000. Such a fact, even if true, however, in no way demonstrates that *Paxton* (or Crumpler) acted with a fraudulent motive.  There is *no* record evidence that it was Paxton's responsibility to compile or produce the lists that Telxon sent to Symbol.[14]  There is no evidence that Paxton intended to, or did, "conceal" Crumpler's employment documents.  Given this failure of proof, Third-Party Plaintiffs cannot establish their fraud claim.[15]

Finally, Telxon and Symbol have failed to show any resulting injury from their purported reliance on Paxton's (non-existent) misrepresentations/omissions.  While Telxon claims that the

---

[14]   Pais, who was part of Telxon's due diligence team, was responsible for compiling such employment-related agreements, including CIC agreements, so they could be provided to Symbol.  (Pais Dep. at 27-28, 49-53, 79-80, 166-67)  When Crumpler reviewed Pais's compilation in August of 2000 (*i.e.*, after the initial Merger Agreement was signed but before the deal was closed), however, she discovered that a *number* of employees' agreements, including her own, had not been included in the materials provided to Symbol (possibly because Pais was no longer involved in preparing CIC agreements by June of 2000, and thus had been unaware of many of the agreements executed at that time).  (Crumpler Dep. at 124-25, 165-68; Paxton Dep. at 160-61; Pais Dep. at 50-54, 79-84, 86, 143-44, 166-67)

[15]  The "issue" of whether Crumpler's correct two-year change in control provision was transmitted to Symbol prior to July 25, 2000, is not *material* to the resolution of this matter anyway, as there is no dispute that the correct agreement was in fact provided to Symbol before the merger actually closed on November 30, 2000.  (*See* Bradshaw Dep. at 41-44, 55-57; Crumpler Dep. at 126-28, 165-68; Pais Dep. at 143-46; Pltf. Exs. D, G, H)  This undisputed disclosure eliminates Symbol's claim of "fraud by omission" since Symbol was aware of Crumpler's contractual benefits prior to closing the deal with Telxon.

compensation and benefits it paid to Crumpler constituted the "injury," the record facts remain uncontroverted that **Crumpler merely received the *identical* compensation and benefit*s* that the employee she replaced, Meg Pais, would have received anyway**.  In return for its compensation to Crumpler, moreover, Telxon received the benefit of Crumpler's services.  And there is no allegation or evidence that Crumpler did not perform those services competently; to the contrary, Crumpler's services were valuable and she was well qualified to perform them.  (*See* Pais Dep. at 9-10, 13, 35, 90, 101, 104: Paxton Dep. at 13-14, 16-18)  Revealingly, Telxon and Symbol are unable to come up with *any* substantive argument to the contrary, merely labeling Paxton's demonstration of their lack of injury "bizarre."  (Memo. in Op. at 32-33)

> **D.     Third-Party Plaintiffs' Theory That Paxton Breached His Fiduciary "Duty Of Loyalty" Fails As A Matter Of Law Because Telxon And Symbol Have Not Carried The Heavy Burden Of Showing That Paxton Acted In Bad Faith.**

Third-Party Plaintiffs now identify their claim against Paxton as allegedly being one for breach of the fiduciary duty of loyalty.  (Memo. in Op. at 33)  Applying the governing principles of Delaware law to the record facts, it is clear that Telxon's and Symbol's duty of loyalty claim against Paxton is without support and must be dismissed.

As detailed in Paxton's MSJ (at pp. 19-20, 23), the duty of loyalty requires that directors and officers place the interests of the corporation before their own financial interests and not abuse their position for self-gain or advantage.  Normally, a "breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain."  In re Reliance Securities Litigation, 91 F.Supp.2d 706, 732 (D. Del. 2000).  In the case at bar, Telxon and Symbol do not even attempt to argue that Paxton engaged in any "self-dealing" or otherwise misused the corporate office of CEO for personal gain.

Instead, Telxon and Symbol posit two alternative theories: (1) that "breaches of the duty of loyalty include acts of bad faith made against the interests of the corporation, including acts of intentional misconduct," and (2), that "preferring the interest of another over those to whom a fiduciary duty is owed also constitutes a breach of the duty of loyalty." (Memo. in Op. at 33-34) Assuming for the sake of discussion that Third-Party Plaintiffs' interpretations of Delaware law are accurate -- which is far from clear -- neither of these purported principles would suffice to prevent summary judgment in the case at bar because Telxon and Symbol simply have not presented facts capable of satisfying either of these requirements.

First, the record evidence provides no basis for concluding that Paxton committed any act in "bad faith." As Telxon and Symbol acknowledged, to make a showing of bad faith on the part of Paxton, they would have had to produce facts showing that Paxton committed acts "so lacking in business rationality that the only conclusion one can reach is that the defendants were acting in bad faith." (Memo. in Op. at 33-34, *citing* Emerald Partners v. Berlin, 2001 Del. Ch. LEXIS 20 at*89 (Del. Ch. 2001)). Obviously, this is an extremely heavy burden for a plaintiff to carry, and one which Telxon and Symbol have not shouldered here. To the contrary, Paxton has provided detailed explanations of all of the actions that Telxon and Symbol now -- in hindsight -- challenge, including retaining Crumpler as a consultant, hiring Crumpler as an employee, and agreeing upon the various aspects of her employment compensation package. (*See* Paxton MSJ at 25-27)[16] It was upon this same failure of proof that the Emerald Partners court granted summary judgment to the defendant directors, in fact, holding that "no credible evidence supports the argument that the challenged decisions lacked a rational business purpose . . . . That

---

[16] Indeed, it is inherently nonsensical for Telxon and Symbol to assail Paxton for giving Crumpler *exactly the same* employment terms and benefits that Telxon itself had been providing to Crumpler's predecessor, Pais.

plaintiff may disagree with the business rationale for those decisions does not establish that they lacked such a rationale" Id., 2001 Del. Ch. LEXIS 20 at *90. [17]

Second, with respect to Third-Party Plaintiffs' argument that it is possible to prove a breach of the duty of loyalty by showing that Paxton "preferred the interest of another over those to whom a fiduciary duty is owed," the sole, unpublished case to which Telxon and Symbol cited, In re ML/EQ Real Estate Partnership Litig., 1999 Del. Ch. LEXIS 238 (Del. Ch. 1999), does not bear out their claim that this is Delaware's governing legal standard. In ML/EQ Real Estate, the plaintiffs' theory was that the defendants, managers for one of the corporate entities in the real estate partnership, engaged in certain real estate deals which preferred the interests of their own entity (i.e., essentially their own interests) over those of another entity in the partnership. Id. at *15. The case does not even remotely suggest that by hiring an employee (and providing her with the same compensation package her predecessor received), a CEO could be deemed to have "preferred the interests" of another over the corporation's interests to the extent that he breached his duty of loyalty.

Finally, Delaware's "business judgment rule" (see Paxton's MSJ at 24-27) fully protects Paxton from Third-Party Plaintiffs' claims. While Telxon and Symbol are certainly free to disagree with Paxton's judgment calls regarding hiring Crumpler and providing her with certain benefits -- always easy to do, of course, in hindsight -- such second-guessing does not, as a matter of law, prove fraud or breach of fiduciary duty absent specific evidence that Paxton actions cannot be "attributed to any rational business purpose." Unocal Corp. v. Mesa Petroleum

---

[17]  Plus, even if Telxon and Symbol had demonstrated that Crumpler was an Executive Officer whose hiring and compensation required prior Board approval, they certainly have not produced any facts showing that *Paxton's* conclusion that she was *not* an Executive Officer, and his reliance on the terms of Telxon's By-Laws to conclude that he thus was *not* required to obtain Board approval, was reached in bad faith or lacked a rational basis.

Co., 493 A.2d 946, 954 (Del. 1985).  Paxton has explained his reasons for the actions that Third-Party Plaintiffs now challenge in hindsight, and regardless of whether Telxon, Symbol or, with all due respect, the Court, agrees with those reasons, there is no way a jury could reasonably find that Paxton had no rational business purpose.  The breach of fiduciary duty claim therefore must be denied.[18]

### E.    Once Again, Third-Party Plaintiffs Have Not Offered A Single Substantive Argument To Dispute Paxton's Demonstration That He Is Entitled To Summary Judgment On His Counterclaims For Indemnification And Advancement Of Legal Fees And Costs.

In response to what Paxton believed -- and the record now has shown -- to be baseless legal claims asserted against him as a Third-Party Defendant in this litigation between Plaintiff Crumpler and Defendants Telxon and Symbol, Paxton filed two distinct counterclaims against Telxon and Symbol for: (1) Indemnification under 8 Del. Code §§ 145 (b) and (c); and (2) Advancement of legal costs and attorneys' fees under 8 Del. Code § 145 (e).  On August 1, 2003, Paxton moved for summary judgment on both claims.

Telxon and Symbol have presented no substantive argument at all, factual or legal, to dispute Paxton's demonstration that he is entitled to indemnification and advancement of attorneys' fees as a matter of law.  This failure alone warrants judgment for Paxton.  *See, e.g.*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (to avoid summary judgment, non-moving party must produce "specific facts" sufficient to permit court to find in its favor on each

---

[18]  Third-Party Plaintiffs' opposition to Paxton's Motion for Summary Judgment on Counts III and IV of their Complaint, for Indemnity and Contribution, respectively, argued only that *if* a corporation proves that it has suffered a loss due to an officer's breach of fiduciary duty, the corporation may be entitled to indemnification from the officer.  (Memo. in Op. at 34-35)  Third-Party Plaintiffs thus (a) abandoned their "Contribution" claim and (b) conceded that their "Indemnity" claim is essentially derivative of and dependent on their breach of fiduciary duty claim.  Because, for all the reasons set forth above and in Paxton's MSJ, Third-Party Plaintiffs have failed to produce facts sufficient to establish a breach of fiduciary duty by Paxton, their remaining claims must be dismissed as well.

essential element of case); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th Cir. 1989) (Rule 56 motion requires party opposing summary judgment to "put up or shut up.").

Instead, Third-Party Plaintiffs have merely asserted that Paxton "has not properly moved for summary judgment," falsely claiming that "Paxton asks the Court to excuse his obligation to move properly for judgment on these claims according to the Federal Rules of Civil Procedure and to accept instead, as a substitute for a proper motion, his moot Memorandum in Opposition to a moot motion of Symbol's that is no longer pending." (Memo. in Op. at 35-36)

Paxton, of course, did no such thing. Rather, Paxton clearly identified his August 1, 2003 motion as seeking judgment both on Third-Party Plaintiffs' claims against him *and* on his Counterclaims against Telxon and Symbol. In the body of his memorandum, moreover, Paxton referenced the undisputed facts and explained that he was entitled to judgment as a matter of law on both claims because (a) Third-Party Plaintiffs' claims against him clearly arose out of his duties as a director and officer of Telxon, (b) contrary to Telxon's and Symbol's previous misstatements, Delaware law clearly states that there is no requirement to prove "good faith" in order to receive advancement of attorneys' fees, and (c) even if Delaware law allowed indemnification of an officer or director only in the absence of bad faith (which it does not), there was no such showing of wrongdoing in this matter. (Paxton's MSJ at 29-30)[19]

Third-Party Plaintiffs' strange assertion is apparently based solely on the fact that, rather than go through the pointless exercise of reiterating precisely the same governing principles of Delaware law that Paxton had previously set forth at length in his September 30, 2002

---

[19]   It was unnecessary for Paxton to set forth a separate statement of facts with respect to the Motion for Summary Judgment on his Counterclaims against Telxon and Symbol because all of the requisite facts demonstrating Paxton's entitlement to judgment had either been set forth in the preceding Statement of Undisputed Facts and/or were admitted by Telxon and Symbol in their Answer. *See* Defendants/Third-Party Plaintiffs' Answer to Third-Party Defendant's Counterclaim (filed October 21, 2002) at ¶¶ 12-20, 35.

Memorandum in Opposition (Attachment D hereto), Paxton simply incorporated that discussion of the relevant Delaware law by reference. Paxton did *not* ask the Court to "accept . . . as a substitute for a proper motion, his moot Memorandum in Opposition," but simply referenced the *legal principles* already explained in his previous filing, for purposes of efficiency and because those same principles are relevant and controlling here. Not surprisingly, Telxon and Symbol cited no support of any kind for their assertion that Paxton motion was not "proper."

Paxton therefore again respectfully requests that the Court order Telxon and Symbol to advance promptly to Paxton reimbursement for his substantial legal costs and attorneys' fees incurred in this litigation, which Telxon and Symbol should have provided long ago.[20]

## IV.    CONCLUSION

For each and all of the reasons set forth above, Paxton respectfully requests that the Court enter judgment in his favor on (1) all of Third-Party Plaintiffs' claims against Paxton and (2) Paxton's Counterclaims against Third-Party Plaintiffs.

Respectfully submitted,

 /s/ Michael A. Manzler
Michael A. Manzler  (0059968)
Dinsmore & Shohl LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio  45202
(513) 977-8693
michael.manzler@dinslaw.com

Trial Attorney for Third-Party Defendant
   John W. Paxton, Sr.

---

[20]    The real reason that Telxon and Symbol did not respond substantively to Paxton's Motion for Summary Judgment on his Counterclaims is likely because, under Delaware's statutory law of Advancement, they simply have no basis whatsoever from which to put together even a colorable argument that Paxton is not entitled to advancement of his attorneys' fees and costs. It really is that clear.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Reply Brief in Support of Third-Party Defendant John W. Paxton, Sr.'s Motion for Summary Judgment was filed with the Court electronically on October 10, 2003.  Notice of this filing will be sent to Steven J. Miller, James S. Wertheim and John J. Pinney, Attorneys for Defendants/Third-Party Plaintiffs, Goodman Weiss Miller LLP, 100 Erieview Plaza, 27th Floor, Cleveland, Ohio 44114-1882, miller@goodmanweissmiller.com, wertheim@goodmanweissmiller.com and pinney@goodmanweissmiller.com, and to Robert A. McMahon, Attorney for Plaintiff, Eberly McMahon Hochscheid LLC, 3700 Eastern Avenue, Cincinnati, Ohio 45226, bmcmahon@emh-law.com, by operation of the Court's electronic filing system, and parties may access this filing through the Court's system.


  /s/ Michael A. Manzler_____
Michael A. Manzler (0059968)


#946148